IN THE UNITED STATES COURT OF FEDERAL CLAIMS

THE SALT RIVER PIMA-MARICOPA INDIAN COMMUNITY,

Plaintiff,

v.

THE UNITED STATES OF AMERICA,

Defendant.

Case No. 06-943
Judge Lawrence M. Baskir
**(Electronically Filed November 8, 2007)**

**EXHIBIT 1, PART A TO**

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION TO SUPPLEMENT THE RECORD AND FOR SUPPLEMENTAL BRIEFING**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE AK-CHIN INDIAN COMMUNITY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No.: 06-932L |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

Courtroom 8, Room 512
National Courts Building
717 Madison Place NW
Washington, D.C.

Wednesday
October 24, 2007

The parties met, pursuant to notice of the Court, at 10:58 a.m.

BEFORE: HONORABLE EMILY C. HEWITT
Judge

APPEARANCES:

<u>For the Plaintiff</u>:

G. WILLIAM AUSTIN, III, Esquire
MARK I. LEVY, Esquire
CATHERINE F. MUNSON, Esquire
JENNIFER M. ROMERO, Esquire
Kilpatrick Stockton, LLP
607 - 14th Street, N.W., Suite 900
Washington, D.C. 20005-2018
(202) 508-5842
(202) 824-1437
(202) 824-1435
(202) 639-4723

APPEARANCES (continued):

For the Defendant:

LAURA M.L. MAROLDY, Esquire
KEVIN J. LARSEN, Esquire
U.S. Department of Justice
Environment and Natural
Resources Division
P.O. Box 663
Washington, D.C. 20004
(202) 514-4565
(202) 305-0258

C O N T E N T S


| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| For the Plaintiff: | | | | | |
| Alexis Applegate | 11 | 59 | 70 | -- | -- |

## E X H I B I T S

| PLAINTIFF'S EXHIBITS: | IDENTIFIED | RECEIVED | DESCRIPTION |
|---|---|---|---|
| 1 | 9 | 10 | "Action, Plaintiff's Exhibits GWA," folder containing Plaintiff's Exhibits A through N. |

# E X H I B I T S

| DEFENDANT'S EXHIBITS: | IDENTIFIED | RECEIVED | DESCRIPTION |
|---|---|---|---|

(None)

P R O C E E D I N G S

(10:58 a.m.)

THE CLERK: All rise. The United States Court of Federal Claims is now in session, the Honorable Emily C. Hewitt presiding.

THE COURT: Good morning. Please be seated.

We are on the record in Ak-Chin Indian Community, Case No. 06-932L for an evidentiary hearing, to be followed by oral argument on the United States' motion to dismiss.

Just before the proceeding began, I had an indication that the Plaintiff, in connection with the evidentiary hearing, had put together a package of documents and let me learn more about that.

MR. AUSTIN: Yes, Your Honor. Good morning. My mame is Bill Austin, appearing on behalf of Ak-Chin.

THE COURT: Please feel free to sit. If you are standing up, I think, walking toward the center of the room where the mike is, is probably your best bet.

MR. AUSTIN: Let me try again. I'm Bill Austin, appearing on behalf of the Plaintiff in this matter.

Let me begin by briefly identifying others at counsel table with me, and then we can address the

matter of the notebook.

To my left is Mark Levy. Mr. Levy will be representing Plaintiff in this morning's oral argument regarding the government's motion to dismiss. Also with me are Catherine Munson and Jennifer Romero of our law firm. Seated in the audience behind us is Alexis Applegate, who, as the Court is aware, has been requested to appear this morning to give testimony regarding the sequence of filing issue presented in this matter.

THE COURT: I got Ms. Munson's name, and then right after that?

MR. AUSTIN: Jennifer Romero.

THE COURT: Thank you. Since we're doing introductions, let me let the United States introduce their team as well.

MS. MAROLDY: Good morning, Your Honor. Laura Maroldy for the United States, and with me at counsel table is Kevin Larsen and Paul Smythe from the Department of the Interior.

THE COURT: Good morning, all.

MR. AUSTIN: Your Honor, if I could address the matter --

THE COURT: Mr. Austin, you have the floor.

MR. AUSTIN: Okay. Thank you. I had a

chance to speak with government's counsel about what I'm proposing a few minutes before I provided your clerk with a notebook.

THE COURT: And notwithstanding that you're not counsel of record, I will recognize you to represent the Plaintiffs this morning.

MR. AUSTIN: Thank you very much. As the Court, I believe, is aware, Mr. Harper, our lead counsel --

THE COURT: Otherwise occupied.

MR. AUSTIN: Yes, otherwise occupied, and it's, in fact, the same matter that gives rise to my proposal that we use the notebook in lieu of my taking the time to individually submit to the witness the exhibits that we intend to cover with her.

THE COURT: That's fine. Let me just ask if you would give a copy to the United States, if you haven't done so already.

MR. AUSTIN: We have done so.

THE COURT: Has the United States had an opportunity to look through? The main concern that the Court would have was that if there was a document that is in the binder that would be unfamiliar to the other party as a result of the exchange of documents during discovery.

MS. MAROLDY: No, Your Honor. I got this a few minutes ago, and, from that review, it appears that everything is something that was produced in discovery.

THE COURT: Thank you.

MR. AUSTIN: Thank you very much, Your Honor. So do we have the Court's permission, then?

THE COURT: Yes. You can provide a copy of the book to the Court and put a copy on the witness stand, which will be to my right. Tell me when you're ready to have the witness sworn and when you're calling the witness. Thanks.

To complete the record, I'm going to let you move this into evidence right now, Mr. Austin.

MR. AUSTIN: Thank you, Your Honor. Plaintiff moves into evidence, for purposes of this morning's evidentiary hearing, documents identified as Plaintiff's Exhibits A through N, as listed in the index to the notebook of materials that having provided to the Court and to government counsel.

(The document referred to was previously marked for identification as Plaintiff's Exhibit No. 1.)

THE COURT: Thank you. The exhibit that's

styled on its cover, "Action, Plaintiff's Exhibits GWA," is admitted for purposes of the evidentiary hearing.

(The document, previously identified as Plaintiff's Exhibit No. 1, was received in evidence.)

THE COURT: The Plaintiff to call its witness.

MR. AUSTIN: Yes, Your Honor. Alexis Applegate.

THE COURT: Ms. Applegate, if you would come -- the witness stand is here this morning. When you arrive at the chair, and before you are seated, if you would indicate that you are ready to take the oath by raising your right hand.

Whereupon,

ALEXIS ELIZABETH APPLEGATE

having been duly sworn, was called as a witness and was examined and testified as follows:

THE COURT: Thank you. Please state your full name for the record.

THE WITNESS: Alexis Elizabeth Applegate.

THE COURT: Thank you so much. Please be seated. Please pour a glass of water for yourself, if

you would like.

You may examine, Counsel.

THE WITNESS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. AUSTIN:

Q Good morning, Alexis.

A Good morning.

Q By whom are you employed?

A Kilpatrick Stockton, LLP.

Q How long have you worked for Kilpatrick Stockton?

A Since the fall of 2000.

Q And has that been at our law firm's Washington, D.C., office?

A Yes, it has.

Q Where is that office located in relation to this Court?

A It's at 607 - 14th Street, a couple of blocks away.

Q Within walking distance?

A Yes.

Q What is your position at Kilpatrick Stockton?

A Currently, litigation paralegal.

Q Describe your educational background since

high school for the Court.

A After high school, I went to a small Quaker school in Greensboro, North Carolina, Gilford College, where I obtained my B.S. in political science; B.A. in German studies, with a concentration in environmental studies in the Honors program.

I then moved here to Washington, did an internship at the Environmental Law Institute, and started my employment with Kilpatrick Stockton, which, while I was a full-time employee, I finished my master's in public policy at George Washington University in December of 2005.

Q Are you a member of our firm's litigation section?

A I am.

Q Are you part of Plaintiff's team in the <u>Cobell</u> litigation?

A I am.

Q Is there currently an evidentiary hearing taking place in that case?

A There is.

Q Do we need to complete your testimony as promptly as possible so that you can rejoin the <u>Cobell</u> team in district court?

A I would appreciate it.

Q I want to direct your attention to our firm's involvement in tribal trust litigation. Were you responsible for filing the complaints on behalf of the Ak-Chin Indian Community in the Court of Federal Claims and in the Federal District Court?
A Yes.
Q Did you file both of these complaints?
A I did.
Q Did you file them on December 29 of last year?
A I did.
Q Was December 29th a Friday?
A It was.
Q So that New Year's Day was the following Monday.
A Yes.
Q Do you recall which of the Ak-Chin complaints you filed first on December 29th?
A Yes. I filed the Ak-Chin complaint in this Court first.
Q Are you sure of that?
A I'm certain.
Q How so?
A The last complaint I filed of the day was with the district court. It was the Ak-Chin district

court complaint, and, therefore, hence, I would have had to file the CFC complaint prior to that.

Q Are there other things about this final filing that cause you to remember it as being the last one that day?

A Absolutely. We did some due diligence, myself and other members of my team, to find out that the district court does sequentially number their cases. The highest number in the series of cases that we filed that day was the Ak-Chin case. Knowing that the district court is the last place that I went, I know that the Ak-Chin case was the last case that I filed of the day.

Q Did it take two separate trips to the district court on December 29th to accomplish the filing in Ak-Chin?

A It did.

Q Tell me about that.

A The first trip I took to the district court, I went in at the clerk's office. I tried to give it to the intake clerk, who stated that she was too busy to complete the filing, and I would have to come back at a later time. She would call me to pick up and file the complaint.

Q So you then returned on a second occasion to

complete the filing in Ak-Chin.
A I did.
MS. MAROLDY: Objection.
THE COURT: And what's the nature of the objection before you answer? I'll ignore the answer that you gave. Ms. Maroldy?
MS. MAROLDY: Leading and it contains a conclusion.
THE COURT: Sustained.
BY MR. AUSTIN:
Q You returned to the district court clerk's office on a second occasion in regard to the filing you made of the Ak-Chin complaint. Is that right?
A I did.
Q And what happened on this occasion?
A The second trip of the day to the district court is when I dropped off the complaint, and the intake clerk asked me to return.
The third trip of the day was my second trip in regards to Ak-Chin, and that was where I actually paid for the complaint with the cashier, returned the receipt to the intake clerk, at which point she gave me the summons with the adjoining complaints, as well as my file-stamped copy.
Q And when you completed this process, did you

have an exchange with the security guard at the district court?

A Somewhat embarrassingly, yes. It was the last filing of the day for me. I had filed seven complaints. It was somewhat of a stressful day. I was leaving for my New Year's vacation, and the security clerk had seen me a few times that day, so we exchanged a high-five as I exited the courthouse.

Q Now, had you previously filed two other complaints in the district court on December 29th?

A I had.

Q For which tribal clients?

A Passamaquaddy and Salt River.

Q And this was prior to your making the second and third trips to the district court that day to file Ak-Chin?

A Yes. It was my first trip to the district court.

Q How can you be certain it was the Ak-Chin complaint that you filed last in time in the district court that day?

A There are a few reasons. The first, as I mentioned previously, was due to the sequential case numbering in the district court. Knowing that it was the last-highest number in the cases that I filed that

day, I know that it was the last case that I filed in the district court that day.

In addition, the Passamaquaddy and Salt River complaints were -- I guess the word would be somewhat uneventful. We had them prepared, and we took care of them rather easily. There were some issues with filing the Ak-Chin complaints.

Q What is the basis for your understanding that the highest civil action number in the district court meant that Ak-Chin was the last of the three complaints filed?

A I called the clerk's office and asked, and that was the answer I received. In addition, there were members of my team who did the same and got the same answer.

Q Let's take a few moments to cover the other complaints you filed on December 29th. Okay?

A Uh-huh.

Q You mentioned you filed seven complaints, all told, on December 29th?

A I did.

Q How many trips did you make that day to the clerk's offices for the two courts in question to accomplish those filings?

A If you'll allow me, I would like to go

through it to make sure I get it right.

Q Please.

A The first trip of the day, I walked here to the CFC to file three complaints -- Passamaquaddy, Salt River, and Tohono O'odham -- then returned back to the office, at which point I discovered that the district court complaints in Passamaquaddy and Salt River were now ready. I then took my first taxi to the district court and filed those two.

I returned to the office, to find that the Ak-Chin CFC complaint was ready. I walked that over to here, came back to the office, to discover that the district court in Ak-Chin was ready. That is the one that I actually did two trips to the district court, seeing as the clerk was busy and didn't have time to complete what needed to be done for me in one trip.

THE COURT: Could you go through that again?

THE WITNESS: Sure.

THE COURT: Thanks.

THE WITNESS: The first trip, I came here to the CFC clerk's office to file Passamaquaddy, Salt River, and Tohono O'odham.

I then returned to the office, upon which I was told, and figured out, that both the Passamaquaddy and Salt River district court complaints were ready.

So I took those to the district court. Those were prepared for me while I waited. I did not have to return for those.

I then returned back to the office, to discover the <u>Ak-Chin</u> CFC complaint was ready. I walked that over here.

I returned to the office and found out that the <u>Ak-Chin</u> district court was ready. I took that over to the district court by taking the cab, to find out that the clerk didn't have time to do it while I waited.

So I returned back to the office and then, later, returned back to the district court to obtain and completely file the <u>Ak-Chin</u> district court complaint.

BY MR. AUSTIN:

Q Let me ask you a few questions about your first trip to the clerk's office that day, the one that you have indicated was to the Court of Federal Claims to file three other tribal complaints in the Court of Federal Claims. I trust I'm able to keep the order as well as you have presented it in your testimony.

Why were CFC complaints for three other tribal clients filed that morning, but <u>Ak-Chin</u> wasn't

at the same time?
A They were ready to be filed.
Q Why didn't you wait until all four of them were ready?
A Well, we represent separate clients in these various tribal trust cases, so I didn't want the waiting for one client to adversely impact the other three clients, when they were ready.
Q What time did you file the three other tribal complaints in the Court of Federal Claims on the morning of the 29th?
A I'm not really certain, seeing as neither court has time-stamped copies. I know that it was, I believe, after or around nine-thirty.
Q Let me ask you to look at Exhibit A in the notebook that has been prepared for this morning's proceeding. Can you identify that for me?
A Sure. It's an e-mail from Catherine Bosken to myself, cc'ing a number of other individuals on our team. It was sent at nine-twenty-six on the date in question, and it is forwarding links to our document management service, the final versions of Tohono O'odham, Salt River, and Ak-Chin CFC complaints.
Q Who is Katie Bosken?
A Katie Bosken is an associate in our Winston

Salem office.

Q Was she assisting with the preparation of the Court of Federal Claims complaints?

A She was.

Q What did her 9:26 a.m. e-mail provide?

A She lets me know that the Tohono O'odham, Salt River, and Ak-Chin links are attached and final, and she states that Justin Guilder, who is another associate in our Washington office, is preparing the Passamaquaddy.

Q Now, the e-mail that Katie Bosken sent you did not indicate whether the Passamaquaddy complaint in the CFC had been finalized as of that time. Do you have an understanding as to whether that complaint also had been completed by 9:26 in the morning?

A Yes. It was my understanding that Justin Guilder took over the handling of the Passamaquaddy and got it prepared at approximately the same time.

Q Now, Ms. Bosken's e-mail also referred to the Court of Federal Claims complaint for Ak-Chin as being in final as of that time, doesn't it?

A Right.

Q Was that correct?

A No, it was not. There was some information that we needed from the tribe.

Q Do you recall why, as of 9:26 on the morning in question, the Ak-Chin complaint, for filing in the Court of Federal Claims, was not yet done?

A Yes. As I just stated, there was some missing information that we needed to obtain from the tribe.

Q Were we having difficulty in getting all of the information needed to complete those --

A Yes, we were. Our contact, Mr. Roybal, due partially, I think, to the holiday and partially due to the difference in time, we were having problems contacting him.

Q Let me show you what's been marked as Exhibit B. Is that an e-mail you sent to Keith Harper and Justin Guilder on the morning of the 29th?

A It is.

Q At 7:47 a.m.?

A Yes.

Q What time did you start work on December 29th?

A I believe it was approximately seven-thirty.

Q Why the early start?

A Simply put, I had seven complaints to file that day. I also had a vacation planned, so I was determined to get them finished before the close of

business.

Q Now, your 7:47 a.m. e-mail asked whether there were, and I'm quoting from it, "any changes from Eddie on the Ak-Chin complaints last night, or can I go ahead and get them ready for filing?"

Now, was the "Eddie" you referred to Ed Roybal, Ak-Chin's outside counsel?

A Yes.

Q Did you get a response to your 7:47 a.m. e-mail?

A I believe I got an oral response. To explain logistics, I'm not on the same floor as the people that I was working with, so when I was preparing the complaints, I was not near my computer. After the e-mail, I went upstairs to see what was going on. I asked the question to them orally.

Q What were you told?

A That they were not ready as of yet.

Q Now, does the fact that you sent this e-mail at 7:47 in the morning on December 29th suggest you were anxious to get the Ak-Chin complaints completed?

MS. MAROLDY: Objection.

THE COURT: Rephrase, Counsel. An objection, which I'll make up for myself, is it's leading.

BY MR. AUSTIN:

Q What does your sending of this e-mail at 7:47 on the morning in question suggest about your state of mind at the time you sent it?

A I wanted to make certain that we were still on top of getting the Ak-Chin complaints filed. I was somewhat anxious or nervous to make sure that that happened.

Q Was Friday, December 29th, the --

THE COURT: Next time you get into the state of mind, ask her if she recalls. Then if she doesn't recall, ask her if this refreshes her recollection. Thank you.

MR. AUSTIN: Thank you, Your Honor.

BY MR. AUSTIN:

Q Was Friday, the 29th of December, the date we committed to our clients to get these complaints on file with the courts?

MS. MAROLDY: Objection.

THE COURT: Basis for the objection?

MS. MAROLDY: It's leading, Your Honor.

THE COURT: Try something that's more who, what, how.

BY MR. AUSTIN:

Q Did we have a deadline of Friday, the 29th

of December, for filing these complaints?

MS. MAROLDY: Same objection, Your Honor.

MR. AUSTIN: Your Honor, let me interpose this comment.

THE COURT: Let me interpose.

MR. AUSTIN: Yes, ma'am.

THE COURT: "What was your concern?" something of that sort, or "What generally were your concerns that morning?" something of that sort, and then if she doesn't recollect, but you believe could be refreshed, you may turn to something.

MR. AUSTIN: Thank you.

BY MR. AUSTIN:

Q What was your concern about getting these complaints filed?

A We had promised all of our tribal clients that we would file the complaints before year end, and December 29th being the Friday before the end of the year, we had to get them on file that day.

Q Was there a further concern about a possible early closing that day?

MS. MAROLDY: Objection, Your Honor. Leading.

THE COURT: Sustained.

BY MR. AUSTIN:

Q Were there additional grounds for your concern?

A Yes. Mr. Harper had some concern as to both the holiday and President Ford's death as to whether the courts would be closing early that day. He had me call both clerks' offices, at which point, there was this Court of Federal Claims clerk who said, We have no plans to close early, but I do not have control over what the chief judge decides to do.

Q Let me show you Exhibit C. Is this an e-mail that Mr. Harper sent you on the evening of December 28th at 9:44 p.m.?

A It is.

Q Do you recall receiving it?

A I do, yes. I received it the next morning. I had already left for the day and, at the time, did not have a BlackBerry.

Q And that is why you then made calls to the clerk's offices, as you've testified.

A Yes.

Q And you reported the outcome of these conversations to Mr. Harper.

MS. MAROLDY: Objection. Leading.

THE COURT: I think the damage is done. Go ahead. You may answer.

THE WITNESS: Yes. I did report these findings to Mr. Harper, who then --

THE COURT: And whoever has a BlackBerry on in this place, would they please turn it off? I'm allowing whoever it is, it's time to turn it off now. Thank you.

You may answer. If you need the question rephrased, he'll redo it.

THE WITNESS: Could you rephrase the question, repeat the question, please?

BY MR. AUSTIN:

Q You reported the outcome of your conversations with the district court clerks to Mr. Harper.

A Yes.

MS. MAROLDY: Objection.

THE WITNESS: Yes. I did report what I had found, by calling the clerk's office, to Mr. Harper. He then instructed me to file the Court of Federal Claims cases first due to the fact that neither of us had too much experience filing complaints in this Court, but we did have experience in the district court.

BY MR. AUSTIN:

Q Had you ever filed a complaint in the Court

of Federal Claims prior to December 29th?

A Not to my recollection.

Q To your knowledge, had Mr. Harper ever filed a complaint in the Court of Federal Claims prior to December 29?

A No.

Q Let me show you Exhibit D. Is this an e-mail that Keith Harper sent you at 8:59 a.m. on the 29th referring to the CFC complaints?

A Yes. That e-mail is part of the string.

Q Does the e-mail say: "We will have to run those copies again while you --"

MS. MAROLDY: Objection, Your Honor.

THE COURT: Restate the objection, please.

MS. MAROLDY: Your Honor, the document has been moved into evidence. It speaks for itself. We can all look at this redacted copy and see what it says.

MR. AUSTIN: Your Honor, I may not understand the basis for the objection, but I'm simply attempting to facilitate this examination by referring to something that has, in fact, been admitted for purposes of today's proceeding.

THE COURT: You may continue.

MR. AUSTIN: Thank you.

BY MR. AUSTIN:

Q Does the e-mail say: "We will have to run those copies again while you file the DDC"?

A It does.

Q To your knowledge, was there a need, at that time, for additional changes to be made in the Court of Federal Claims pleadings?

A I don't know the answer to that question.

Q In any event, were all such changes accomplished by approximately 9:30 a.m. on the morning --

MS. MAROLDY: Objection, Your Honor.

THE COURT: Sustained. The question was asked and answered.

BY MR. AUSTIN:

Q Were the three tribal complaints for <u>Passamaquaddy</u>, <u>Salt River</u>, and <u>Tohono O'odham</u> ready to go at 9:30 a.m.?

MS. MAROLDY: Objection, Your Honor. Leading, and we've already covered it in an e-mail regarding this subject.

THE COURT: I'm going to allow the answer. Go ahead.

THE WITNESS: Yes, they were.

THE COURT: And how do you know that?

THE WITNESS: I had, partially from my recollection, partially from the e-mail that I received from Katie Bosken at 9:26, which tells me that the complaints were finalized.

BY MR. AUSTIN:

Q Now, Mr. Harper's 8:59 a.m. e-mail referred to you proceeding to "file the DDC" while additional revisions to the CFC complaints were being completed. Correct?

A Yes.

Q Did you do that?

A I did not. I don't recall, until we started going through the discovery process, ever seeing this e-mail. I think it was at a time, as I mentioned earlier, that I was away from my computer. At this time, at 9 o'clock, was approximately the time I was calling the clerk's offices of both courts to figure out if they were closing early or not, and then got oral instruction from Mr. Harper to go ahead and file the Court of Federal Claims actions.

Q Now, when did you make your first trip to the district court on the 29th to file complaints there?

A Again, I don't have time stamps, so I can't be precise.

Q Was it after you had made the filing of the Court of Federal Claims complaints in the CFC on behalf of Passamaquaddy, Salt River, and Tohono O'odham?

A It was.

MS. MAROLDY: Objection, Your Honor.

MR. AUSTIN: Your Honor, she has testified, as Your Honor will recall, as to the order of trips to the courts. So the question that I presented to her is simply summarizing testimony previously solicited.

THE COURT: Well, one of the things that's of interest to the Court is exactly how much of this is you and how much of this is the witness, and, in a direct examination, the burden is on the witness.

MR. AUSTIN: I understand, Your Honor.

THE COURT: You have your documents, and you have testimony, and you could come here and be a witness and put the testimony together, but your witness needs to tell you what she remembers, and if you need to refresh recollection, that's fine.

MR. AUSTIN: Yes. This presents a unique situation, certainly in my experience, because I was a member of this team as well and involved.

THE COURT: I understand that, and you could have decided to become witnesses and have someone else

be the lawyer.

MR. AUSTIN: Yes.

THE COURT: The problem is we want to know what the witness has a present memory of.

MR. AUSTIN: Yes, Your Honor, and that is certainly our objective in presenting Ms. Applegate to the Court this morning, as the Court has directed.

THE COURT: Thank you.

BY MR. AUSTIN:

Q I think, before the discussion of a moment ago, we were talking about the timing of the first filing in the district court on the 29th. What complaints did you file at that time?

A Salt River and Passamaquaddy.

Q Were these complaints filed after you had made your first trip to the Court of Federal Claims to file the three other complaints?

MS. MAROLDY: Objection, Your Honor.

THE COURT: It really is the same question. You can ask her again to tell you the order of things, but what you're doing basically is setting an order for her, and if she needs assistance from a document to do that, that's fine, but you are providing her the answer to the question. You're not a hostile questioner.

BY MR. AUSTIN:

Q You made five trips that day to file complaints, which --

THE COURT: The same problem. Just you can ask her what she did. This is an able person that you've wanted to keep at your firms, and just ask her what she did.

BY MR. AUSTIN:

Q Was the filing in district court --

THE COURT: No. Ask her what she did that morning.

BY MR. AUSTIN:

Q All right. What did you do that morning with respect to filing of complaints?

MS. MAROLDY: Your Honor, I think this has been asked and answered.

THE COURT: It has been. I'm willing to have the memory of this witness again.

THE WITNESS: As previously stated, the morning I filed three complaints in the Court of Federal Claims. Those were the Passamaquaddy, Salt River, and Tohono O'odham cases. I then went back to the office, obtained the district court actions for the Passamaquaddy and Salt River. I went to the the district court and filed those in one trip.

I then returned to the office, to find that the Ak-Chin CFC complaint was now ready. I took that to this Court and filed it. I returned to the office, to find that the Ak-Chin district court complaint was now ready. I took that to the district court, at which point the clerk's office was busy at this point during the day, and there was a line, and the intake clerk seemed somewhat frantic and asked for me to drop off the materials and come back.

BY MR. AUSTIN:

Q Thank you. Let me show you Exhibit E and ask you to identify it.

A Yes. It's one piece of paper, but there are three documents. The top is a petty cash slip that we use in my offices for reimbursement purposes. The next is my first taxicab trip to the Court and then the return. I know this because I made the notation of "a.m." on the receipts.

Q When did you make those notations, "a.m.," on the receipts?

A The same day. Again, it was year end, and I had to get all reimbursements and the administrative fees done so as to get reimbursed.

Q How many taxicab rides did you take to the district court on December 29th?

A Well, that would be six. I had three trips, six rides, in a taxi.

Q I'm interested in your trips to the district court by taxi. How, then, can you tell, from looking at Exhibit E, that this set of receipts marked your first trip to the district court that day?

A The "a.m." notation.

Q While we're on this subject, let's identify the other two sets of taxicab receipts from that date. Let me ask you to look with me at Exhibit F. Do you have that?

A I do.

Q Great. Does that set of cab receipts relate to your second trip to the district court that day?

A They do. It's similar. It has the petty cash slip and the two receipts. Although it is somewhat difficult to read in this copy, there is a notation of the second trip on the receipts.

Q Where does that notation "second trip" appear on this exhibit?

A In the time portion of the second receipt.

Q And you made that notation.

A I did.

Q When did you make it?

A Again, the same day.

Q What was the purpose of the second taxi trip to the district court on December 29th?

A Initially, I thought it was to file the Ak-Chin complaint, but, as we now know, it was to drop it off at the intake clerk.

Q Did you take this trip to the district court before or after you had filed all four of the complaints in the Court of Federal Claims, including Ak-Chin?

A After.

Q Let me show you Exhibit G. Do these taxicab receipts reflect --

THE COURT: Just ask her what these reflect.

BY MR. AUSTIN:

Q What do these taxicab receipts reflect?

A Again, it's the same basic setup. We've got the petty cash slip with the two receipts, and the notation is "Ak-Chin" that I have put on the taxicab receipts.

Q What was the purpose of this third trip to the district court?

MS. MAROLDY: Objection.

THE COURT: I'll allow it, the answer, with -- something that happened a year ago, plus, is if you know.

THE WITNESS: I do know. It was to complete the filing of the Ak-Chin complaint.

THE COURT: How could you tell the difference, just for curiosity, between the documents that are under Tab F and Tab G?

THE WITNESS: F and G? The second trip indicates to me that my thought process of the day was second trip was my actual second trip of the day, and then the third was the Ak-Chin, which was the third of the day.

THE COURT: Thank you.

BY MR. AUSTIN:

Q Let's go back to the first trip you made by cab to the district Court, the a.m. trip. Are you with me?

A Okay.

Q On this trip to the district court, which complaints did you file?

A Passamaquaddy and Salt River.

Q How do you know that?

A They were the first filed complaints in the district court that day due, again, to the sequentially numbered case numbers in the district court.

Q Were they filed together?

A They were. You can tell that, again, by their sequential numbers.

Q Why wasn't the Ak-Chin complaint in the district court filed at the same time as these other two complaints?

A It was not ready.

Q Would you describe the filing process in the district court for the Passamaquaddy and Salt River complaints you filed that morning?

A Certainly. As I stated, I brought the two complaints and all of the necessary materials, including civil cover sheets -- we had a notice of related cases, the CDs that contain the PDF versions of the documents, all of this, the package, the summons, everything -- to the district court for both.

I went to the intake clerk and gave them to her. Her process is somewhat detailed. She goes through to make sure that you have everything that is needed: the check, everything I just mentioned. She, if she is not busy, asks you to sit down, and you wait for her to go through her process to make sure everything is kosher.

She then gives you a sheet of paper with the check that you take over to the cashier, which shows the cashier that the complaint is good to go. You pay

the cashier. You get a receipt, which you then bring back to the district court intake clerk. She sees the receipt, knows that you have paid, and that's the time you get the summons and the adjoining complaints, as well as any file-stamped copies that you want.

MS. MAROLDY: Your Honor, I would move to strike that, to the extent it's supposed to be testimony about the clerk's practice on every occasion. I think we're interested in what happened on the particular date we're talking about.

THE COURT: The matter is on the record, but I take the point, which is a point of argument, by the United States. You may go on to your next question.

MR. AUSTIN: Let me ask this. It might help clarify.

BY MR. AUSTIN:

Q Is the description of what took place at the district court clerk's office, in fact, a description of what occurred when you made the filings on behalf of Passamaquaddy and Salt River on the morning of December 29th?

A Yes. It is a description of what I witnessed and did that day.

Q Where did you go after you finished filing the first two district court complaints?

A Back to the office.

Q Did you check on the status of the Ak-Chin complaints at that time?

A I did.

Q What did you find?

A I found that the Court of Federal Claims action was ready to be filed, at which point I prepared it with the necessary copies and whatnot and brought it here to be filed and then returned to the office.

Q Now, by that point in time, on December 29th, had all of the other complaints you filed that date been filed?

MS. MAROLDY: Objection.

THE COURT: Sustained.

BY MR. AUSTIN:

Q Was Ak-Chin the only tribal client left, as of that time, for filing complaints in the Court of Federal Claims and the district court?

MS. MAROLDY: Same objection, Your Honor.

THE COURT: The documents are going to speak for themselves. If you want her to go through the order again, I think we've actually done that.

MR. AUSTIN: We will not do that again, Your Honor.

THE COURT: Okay.

BY MR. AUSTIN:

Q Let me show you Exhibit H. Do you recognize that e-mail?

A Yes. It has been shown to me since the filing day.

Q What is it?

A It's an e-mail from Justin Guilder, who, as I mentioned before, is an associate in our Washington office, to Edward Roybal, who is counsel for Ak-Chin.

Q What time was this e-mail sent by Justin Guilder to Ed Roybal?

A Eleven-forty-one.

Q Let me show you Exhibit I and ask that you identify two e-mails on consecutive pages in that exhibit.

A Okay. The first is a response to what we just were looking at, from Mr. Guilder to Ed Roybal, Mr. Roybal responding at 1:28, "Okay. Let me check." And then the next is a redacted sent from BlackBerry response at 1:45 from Mr. Roybal to Mr. Guilder.

Q. And looking at these e-mails, do they appear to have been Mr. Roybal's responses to Justin Guilder's requests for additional information?

A Yes. As I said, they seem to be in

response.

Q Did we wait to get Ed Roybal's responses before completing and filing the CFC complaint for Ak-Chin?

MS. MAROLDY: Objection, Your Honor. Leading.

THE COURT: You actually probably could do this in a more non-leading form.

BY MR. AUSTIN:

Q Was the CFC complaint for Ak-Chin filed prior to Mr. Roybal's responses?

A Yes.

MS. MAROLDY: It's still leading, Your Honor.

THE COURT: I agree, but I'll allow it. Go ahead.

THE WITNESS: Yes, it was.

BY MR. AUSTIN:

Q Now, how was the filing accomplished without obtaining these responses beforehand?

THE COURT: If you know.

THE WITNESS: I do know. It's my understanding that Mr. Guilder was able to find the information without receiving information from Mr. Roybal.

BY MR. AUSTIN:

Q When was the CFC complaint for Ak-Chin ready to go?

A It was sometime between 11:41 and 12:41.

Q How do you know that?

A There are consecutive e-mails. There is the 11:41 we just looked at, and there is another one that I sent to you, Mr. Austin, on the same day, I believe, at 12:41, saying that I had taken care of all of the complaints, and I was waiting to get the summons from the Ak-Chin.

Q Let's look at Exhibit J. Is this the e-mail that you sent me at 12:41 p.m. on the 29th?

A It is. It is an e-mail from me to you at 12:41, stating, "Sorry." I was apologizing for just getting back to him. "We have filed them, but I'm waiting for the summons. We filed most of them today." So, at that point, I was waiting for the summons and adjoining complaints and the file-stamped copy from the district court in Ak-Chin.

Q Is that why there was reason to return to the district court a second time that day?

A Yes.

MS. MAROLDY: Objection.

THE COURT: I completely agree. Go on to

your next question. While your witness is looking at this piece of paper, if you recall, you have a clause in here, "We found most of them today." Why did you use the word "most" there, if you remember?

THE WITNESS: I'm sure we had filed the Tohono O'odham action in the district court on the 28th.

THE COURT: Thank you.

BY MR. AUSTIN:

Q Your e-mail to me of 12:41 p.m. stated you were waiting for the summons. Correct?

A Yes.

Q Did you return to the district court clerk's office to obtain the summonses in Ak-Chin?

A I did.

MS. MAROLDY: Again, we're leading.

BY MR. AUSTIN:

Q Tell me about the second trip to the district court clerk's office.

A I returned --

THE COURT: That is unreasonably confusing. Ask her about a time. You've got testimony out here that this would have been her third trip to the district court.

BY MR. AUSTIN:

Q Was this the fifth trip to the district court that you have testified about?

THE COURT: Now you're really -- we're really in a wreck now.

MR. AUSTIN: Let me try again because I have managed to confuse things.

BY MR. AUSTIN:

Q Was this the third trip by cab, that you had testified about, to the district court?

A It was the third and last, yes.

Q And what was the purpose for this third and last trip to the district court?

A It was to complete the filing of the Ak-Chin district court complaint. As I mentioned the process before, it was to go to the intake clerk. I paid at the cashier. I returned to the intake clerk and got the summons with the adjoining complaints and my file-stamped copies back.

Q Did you observe the file-stamped copy being prepared while you were present on this further trip?

MS. MAROLDY: Objection.

THE COURT: Sustained. You can ask what she saw the clerk doing when she was there, if anything, if she recalls. Hint.

BY MR. AUSTIN: