IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE SALT RIVER PIMA-MARICOPA INDIAN COMMUNITY,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | ) | Case No. 06-943<br>Judge Lawrence M. Baskir<br>**(Electronically Filed November 8, 2007)** |

**EXHIBIT 1, PART B TO**

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION TO SUPPLEMENT THE RECORD AND FOR SUPPLEMENTAL BRIEFING**

Q What did you observe the district court intake clerk doing, upon your return?

A I don't know the specifics. I just know what she gave me, which was my check, to go to the cashier, come back, and she gave me -- I didn't witness when she did stamping and all of the logistics that she does to get things filed in the district court.

Q Was there a line of people waiting at the intake clerk's station when you arrived?

MS. MAROLDY: Objection.

THE COURT: Sustained, sustained, sustained. You can ask her what the conditions were in the courthouse. You can ask her what conditions were in the clerk's office.

BY MR. AUSTIN:

Q What were the conditions in the clerk's office, upon your return that day?

A It had gotten significantly busier as they day progressed. There were a number of tribes filing complaints in the district court, so much so that the clerk had, at one point during the day, slyly remarked, "Oh, another tribal case."

Q What time did you return to the district court?

A In which instance?

Q This final occasion.

A Again, I don't know the specifics, but it was between 11:41 and 12:41 and after I filed the CFC complaint in the Ak-Chin matter.

Q Let me refer you to Exhibit K. Is this an e-mail you sent me at 2:23 p.m. on the 29th?

A It is. It's an e-mail from myself to you, responding to our earlier 12:41 e-mail. It says, "I just got back from the court. Leaving soon. Have to get my time in before I leave." If I didn't mention it, it's said 2:23. At this point in the day, I am finished with the filings of the complaints, thank God.

I had contacted the process server and said, to my recollection, I had dropped off all of the complaints and their adjoining summonses in our mail room, to be picked up by the process server before I sent this e-mail.

Q When did you contact the process server about making arrangements for serving the complaints?

A I contacted them that day. I had contacted them earlier in the day to make sure that they had time and availability to do it, knowing that it was a number of complaints, and when you're dealing with

these sorts of situations, they had to go to Interior, Justice, Treasury, the U.S. Attorney's Office, a number of places.

So I had called them earlier to check to make sure they could do it. They said they could. I had mentioned to them, actually, that I had to return to the district court to get the last complaint before I could give them that.

Once I made that last and final trip, and I had obtained the filed Ak-Chin district court complaint, I called them again, prepared the documents, put them in the mail room, and they came and picked them up again before I sent this e-mail at 2:23.

Q Let me show you Exhibit L and ask you to identify it.

A This is an e-mail from myself to you, Mr. Austin, Justin Guilder, and Keith Harper, who are the attorneys I was mainly working with that day. It's a synopsis of a conversation I had with the process server. It states that they had successfully served at Interior with Kempthorne and Ross Swimmer.

They had also made it to Justice, for the attorney generals, at 3:42. They had also made it over to Third Street to the U.S. Attorney's Office at

3:57. They told me that no one at the Department of Treasury was there to accept service. They promised they would return.

I believe, if I remember correctly, Monday was a holiday, as was Tuesday, due to President Ford's death, so they returned on the third.

Q Did you find it surprising that the complaints and summonses that you had arranged to be picked up sometime after 2 o'clock that day had been served on Interior Defendants within an hour's time?

THE COURT: Leading, leading, leading.

BY MR. AUSTIN:

Q The service on the Interior Defendants was made at 3:14 p.m. Is that correct?

A Yes, it is.

Q Was that approximately an hour after you had placed the materials to be picked up by the process server?

A It was.

Q The Interior Department is located what distance from our offices?

A A few blocks. It's over on C and Constitution, so it's minutes away.

Q Less than a mile in distance?

A I would guess, yes.

Q Based on the foregoing, did it surprise you that service of process could be effected within an hour's time?

MS. MAROLDY: Objection. Leading.

THE COURT: Really. Her mental impressions about this are relevant to what?

MR. AUSTIN: The government argues, in its reply, that it is remarkable that service could have been accomplished, given the timeframe outlined in our discovery responses, and, for that reason, I thought it appropriate to cover with the Court this morning --

THE COURT: Well, unless I know that this person is an expert on process serving, which I don't -- I have no foundation for knowing. I can imagine her job description includes some of these interactions, but --

BY MR. AUSTIN:

Q You worked before with --

THE COURT: Don't even try to qualify her. The process server. If you want to put a process server on, go for it.

MR. AUSTIN: Your Honor, let me move on.

BY MR. AUSTIN:

Q In summing up, then, Alexis, are you certain the <u>Ak-Chin</u> complaint --

MS. MAROLDY: Objection.

THE COURT: I completely agree. She has testified under oath.

BY MR. AUSTIN:

Q Okay. Let me ask you to look with me at Exhibit M. Is this a true and correct copy of your affidavit, dated May 1, 2007?

A Yes. It looks like my signature.

Q Did you prepare this affidavit addressing the sequence-of-filing issue in this case?

MS. MAROLDY: Objection.

THE COURT: What's the basis of the objection?

MS. MAROLDY: Leading again, Your Honor, and I think the document speaks for itself.

THE COURT: What was the question again? Did you prepare?

MR. AUSTIN: Did you prepare?

THE COURT: That's fair enough. You may answer.

THE WITNESS: Yes.

BY MR. AUSTIN:

Q Is that your signature on page 2?

A It is.

Q And did you swear, in the affidavit, that

the complaint for Ak-Chin in the Court of Federal Claims was filed prior to the complaint filed in the district court?

MS. MAROLDY: Objection, Your Honor.

THE COURT: The basis for the objection?

MS. MAROLDY: It's leading, Your Honor. Counsel is simply asking the witness to restate what's in a document.

THE COURT: The document speaks for itself. We have the document in front of us.

MR. AUSTIN: Your Honor, let me --

THE COURT: She stated that she prepared it. It is stated that it was sworn.

BY MR. AUSTIN:

Q Let me turn, then, to Exhibit N. Alexis, would you look with me at the document marked as Exhibit N? Is this a copy of Plaintiff's interrogatory answers served on the government in this case in July of this year?

A Yes. It seems to be.

Q Did you carefully review the contents of these answers before they were signed and attested to by Keith Harper as being true and correct?

A I did.

Q And do Plaintiff's interrogatory answers

also state you were certain the Ak-Chin complaint in the district court was the last of the complaints you filed on the 29th of December?

MS. MAROLDY: Objection, Your Honor.

THE COURT: I agree. The document speaks for itself here.

MR. AUSTIN: Your Honor, for purposes of the record, the response alluded to, and the question was an answer to, Interrogatory No. 11 at page 12.

BY MR. AUSTIN:

Q Alexis, are you absolutely positive, as you testify here today before the Court, that you filed the CFC complaint --

THE COURT: It's been asked and answered, sir. This is bolstering. This is not testimony. This is bolstering. It's not testimony. She has answered this question. It doesn't matter whether she is certain. She stated it under oath, sir.

MR. AUSTIN: Yes, and, Your Honor --

THE COURT: Sir, she has stated this under oath. You need to stop this line of questioning. It's all bolstering.

MR. AUSTIN: And the reason for the bolstering, Your Honor, is that the government, in its materials, attempts to raise a question about whether

or not --

THE COURT: That is argument, sir, and Mr. Levy, I'm sure, will deal with that in argument. You have your testimony. It doesn't get any better because somebody repeats it five times. It's just the same testimony.

MR. AUSTIN: Thank you, Your Honor. I have no further questions at this time.

THE COURT: Thank you. Any questions by the United States?

MS. MAROLDY: Yes, Your Honor, but if I may have a few minutes, I may be able to eliminate some exhibits, et cetera.

THE COURT: Sure. Certainly. We're going to be on recess until a few minutes before noon. Try to get back at that time.

MS. MAROLDY: Thank you, Your Honor.

THE CLERK: All rise.

(Whereupon, at 11:51 a.m., a short recess was taken.)

//

//

//

//

//

A F T E R N O O N S E S S I O N

(12:00 p.m.)

THE CLERK: All rise.

THE COURT: Good morning for the last time. Please be seated.

The United States to cross-examine. The witness continues under oath.

MS. MAROLDY: Yes, Your Honor. First, it might be helpful, as a housekeeping matter, if we handed up some exhibits I may use.

THE COURT: Make sure that the copies of those exhibits -- are they things that have been put forward before the Court in prior -- we have a number of documents, as you know, that were attached to the various filings in connection with the briefing on the motion.

MS. MAROLDY: Yes, Your Honor. I think some of them fall into that category, and perhaps one or two were documents produced in discovery that were not necessarily --

THE COURT: Okay. But they are in the category of documents that have been exchanged between the parties.

MS. MAROLDY: Yes, Your Honor.

THE COURT: Okay. Make sure a set of those

is in the hands of Plaintiff's counsel.

Now, let me just ask Plaintiff's counsel, do we have another copy of this for the court reporter?

MR. AUSTIN: Yes, Your Honor.

THE COURT: Great. Thank you.

And do you have a clean copy for the court reporter, Ms. Maroldy?

MS. MAROLDY: Yes, Your Honor.

THE COURT: Let me just mention to the witness, the examining counsel will tell you what to open when she wants you to open them.

THE WITNESS: Thank you, Your Honor.

(Pause.)

THE COURT: Let me just ask, have you ever been a witness on cross-examination before?

THE WITNESS: I have not been one myself.

THE COURT: You've seen it before. Let me just give you my little explainer on it.

The questions, instead of being open ended, will be intended to be yes or no questions. Most of them will be of that nature, and if the question can be answered in good conscience, or any kind of conscience, yes or no, answer yes or no and then, very quickly, to signal to your attorney that you don't like that answer, even though it's true, say, "May I

explain?" and your counsel and Ms. Maroldy will say -- maybe she will say yes, and sometimes that happens, and it sometimes is helpful, whatever, and sometimes it's not. She may say no, but then your unease with your answer, in case you feel you've been boxed into a corner, will be apparent to Plaintiff's counsel. Thank you. That is intended to stop me from having to say, "Just answer yes or no."

THE WITNESS: Okay. I'll do my best, Your Honor. Thank you.

MS. MAROLDY: Thank you, Your Honor. I just noticed that the exhibit in the folder I marked two is one that has already been moved into evidence, so I will not move that one in. Does the Court prefer that I move the others in at this time?

THE COURT: Yes. Why don't you do that generally, if they are all part of discovery?

MS. MAROLDY: Thank you, Your Honor. At this time, the United States moves in the documents provided to the Court and to the court reporter and to Plaintiff's counsel. They are in folders marked "Exhibit 1," "Exhibit 2," "Exhibit 6," "Exhibit 8," Exhibit 12," "Exhibit 14," and "Exhibit 15."

THE COURT: The Court has one to eight, not six, then 12, 14, and 15. Why don't you take a look

at your stack? You don't have a stack yet?

MS. MAROLDY: I apologize, Your Honor. I wasn't sure exactly what documents would be used on direct and what would already be moved in.

THE COURT: Sure.

MR. AUSTIN: We also don't have six.

MS. MAROLDY: Exhibit 6 is a document that was produced in discovery. I will hand this to Plaintiff's counsel now and maybe, so as not to delay matters, proceed --

THE COURT: Sure.

MS. MAROLDY: -- and we'll get the rest of six when we --

(Pause.)

THE COURT: Have you clarified that the witness has this document now because the witness's format is a little different; it's in a book?

MS. MAROLDY: Ms. Applegate, do you have Exhibit 6 in front of you?

THE COURT: The way you do it is you open the book, and Exhibit 6, the one that she has just given you.

MS. MAROLDY: This is Exhibit 6 of Defendant's exhibits.

THE WITNESS: I don't have any Defendant's

exhibits.

THE COURT: She doesn't have any Defendant's exhibits in front of her, Ms. Maroldy.

MS. MAROLDY: Okay. I thought Mr. Larsen --

THE COURT: Give him a second. Have we run through the sets?

MS. MAROLDY: Maybe I took too many, Your Honor. I apologize.

THE COURT: That's okay. We're going to get a set for you, and the way we're going to get a set is you're going to take it away from the court reporter, and then we'll give your set to the court reporter, exactly. Go for it.

(Pause.)

MS. MAROLDY: I appreciate the Court's and everyone else's patience.

Ms. Applegate, you now have a set of Defendant's exhibits in front of you. By all means, if I refer to an exhibit number, and you don't have it, please give a shout.

THE WITNESS: Will do.

CROSS-EXAMINATION

BY MS. MAROLDY:

Q There came a time, in April of this year, Ms. Applegate, when your colleague, Ms. Munson, asked

you about the timing of the filing of the complaints in this case. Isn't that correct? This is the filing of the DDC complaint you referred to in your direct and the ones that you filed in this Court.

A I believe that's correct.

Q And, Ms. Munson sent you an e-mail asking about that matter. Is that correct?

A Yes.

Q And you replied to Ms. Munson by e-mail. Is that correct?

A Yes.

Q Now, if you turn to Exhibit 12 --

THE COURT: Let me just ask Ms. Applegate, if you would pull the microphone towards you or move up toward it.

BY MS. MAROLDY:

Q If you turn to Exhibit 12, Defendant's Exhibit 12, in front of you, Ms. Applegate, you'll see that there is a page bearing the number "PAS00482" on the bottom right-hand corner. Do you see that?

A Yes, 00112?

Q 482.

A That's not my 12.

THE COURT: If you go further back in the stack, you may yet find this. There is a series of

pages. Hang on, Counsel.

THE WITNESS: Yes. I have it.

BY MS. MAROLDY:

Q And this is the response that you sent to Ms. Munson. Isn't that correct?

A It is.

Q And you stated that, at that time, you were not certain about the order of the filing of complaints. Isn't that correct?

A I stated that there was no precise way for me to know due to the lack of time stamping, yes.

Q And you were, at the time that you sent this e-mail to Ms. Munson, endeavoring to provide her with accurate information. Isn't that correct?

A Yes.

Q Would you turn to the document marked "PAS00483" in that collection?

A Uh-huh.

Q That also reproduces an e-mail that you sent to Ms. Munson. Isn't that correct?

A Yes.

Q And that was also in April of 2007.

A Yes. I believe it's on the same day.

Q And in that e-mail, you were endeavoring to give Ms. Munson accurate information. Isn't that

correct?

A Yes.

Q Now, earlier today, you testified about what happened when you returned to the DDC and what you testified was your last trip to the DDC on December 29th. Do you remember that testimony?

A I do.

Q And you testified that when you returned to the district court, you paid a filing fee and then took a receipt, and it was at that time that you got a file-stamped copy of the complaint. Is that correct?

A Yes.

Q You testified that you gave information to your colleagues for the responses to interrogatories. Correct?

A I did assist, yes.

Q Do you recall that in the responses to interrogatories, you stated that you had first received the file-stamped copy of the complaint and summons and then paid the cashier?

A I don't recall that.

Q At the time you provided information for the responses to interrogatories, you were endeavoring to give accurate information. Isn't that correct?

A Yes.

Q And you reviewed those responses to interrogatories before they were filed. Correct?

A Yes.

(Pause.)

BY MS. MAROLDY:

Q Now, after preparing an affidavit in this case, which I believe was Plaintiff's Exhibit N that was discussed in your direct testimony, you gave affidavits regarding the filing of the complaints for the Salt River case and for the Passamaquaddy case. Isn't that correct?

A Yes. I recall that.

Q If you would turn to Exhibits 14 and 15 of Defendant's exhibits that I've given you, there is information in there that was not in the affidavit that you provided for the Ak-Chin case. Is that correct?

MR. AUSTIN: Objection. Vague.

MS. MAROLDY: Take your time, Ms. Applegate. You can review the exhibits and --

THE COURT: I think it's a clear question. She may not be able to answer it.

THE WITNESS: I'm not certain, at this point. I haven't reviewed these.

MS. MAROLDY: Please take your time.

THE COURT: Does she have a side-by-side that she can use?

MS. MAROLDY: I believe so, Your Honor. She has Plaintiff's Exhibit N, which is the affidavit that was introduced earlier, the Ak-Chin affidavit.

THE WITNESS: Actually "M."

MS. MAROLDY: "M?" Thank you.

THE COURT: Clear the deck so you can see it.

(Pause.)

THE WITNESS: Yes. It does seem like there is more information here.

BY MS. MAROLDY:

Q And you prepared all of those affidavits, Plaintiff's M, as in "Mary," and Defendant's Exhibits 14 and 15?

A Yes.

Q And those exhibits, 14 and 15, were prepared after you prepared the Ak-Chin affidavit. Isn't that correct?

A Let me check the dates to make sure. Yes. It seems so. Again, I haven't reviewed these in some time.

(Pause.)

BY MS. MAROLDY:

Q When you returned for your last trip of the day to the district court, Ms. Applegate, you received a file-stamped copy of the Ak-Chin complaint from the clerk. Isn't that correct?

A Yes.

Q And that file-stamped copy bore a case number that was a matter of five numbers higher than the second complaint you filed that day. Isn't that correct?

A I know it was higher. I don't know by how much.

Q Well, if my math is off, the exhibits will show that.

If you would look at --

THE WITNESS: Am I finished with the affidavits?

MS. MAROLDY: Yes, ma'am. Thank you.

BY MS. MAROLDY:

Q If you would look at, when you've gotten those out of your way, Exhibit 1, Ms. Applegate, Defendant's Exhibit 1.

A Okay.

Q Are you familiar with this type of document?

A I would speculate it has the ECF on the bottom, so I would assume that it comes from the

district court's electronic case-filing system.

Q If you would like at the first entry on Defendant's Exhibit 1, Ms. Applegate, that refers to the Passamaquaddy case that you filed in the district court on December 29th. Correct?

A It does.

Q And the second entry on Defendant's Exhibit 1 refers to the Salt River case that you filed in the district court on December 29th. Correct?

A It does.

Q And the fifth entry on Defendant's Exhibit 1 refers to the Ak-Chin complaint you filed on December 29th. Correct?

A Yes.

Q If you would take a look at Defendant's Exhibit 8, Ms. Applegate, there should be three sheets of paper in that folder.

A Uh-huh.

Q And if you would look at the one that bears the stamp "Ak-Chin 00029" in the bottom right-hand corner.

A Okay.

Q First, do you recognize these documents?

A They are sort of grainy, but I believe they are the receipts obtained once filing the district

court complaints.

Q So these are receipts you obtained -- isn't that correct? -- on December 29th.

A Yes.

THE COURT: Counsel, just a second here. This is Exhibit --

MS. MAROLDY: -- 8, Your Honor.

THE COURT: -- 8. What's the Bates?

MS. MAROLDY: The Bates ends with the digits 00029, Judge.

THE COURT: I have 2-7 only, just the one page. Mr. Larsen perhaps will be able to assist.

So I'm looking for 2-8 and 2-9 and any other --

MS. MAROLDY: It should just be three, Your Honor.

THE COURT: Okay.

(Pause.)

BY MS. MAROLDY:

Q And 0029 bears handwriting on the top. Is that yours?

A I'm not certain.

Q If you look at about two-thirds of the way down on 0029, you'll see a number, 062245. Do you see where I am?

A No.

Q It's above the legend at the very bottom.

A Yes, 062245, yes.

Q That is the same as the number assigned by the Court to the Ak-Chin case, if you compare it to Exhibit 1?

A Yes. It seems so.

Q And this document, 0029, has an entry for "receipt number" three lines down from the top. Do you see where that is?

A Yes.

Q And if you look, Ms. Applegate, at the document marked 00027 --

A Uh-huh.

THE COURT: Let me just excuse myself to get a member of my staff to get me a magnifying glass.

(Discussion held off the record.)

THE COURT: You may continue. I'll pick up with you when I get my extra eyes here.

BY MS. MAROLDY:

Q If you would look at the page bearing 00027, Ms. Applegate, you'll see the number that is just above the legend at the bottom of this receipt, the number 062241. Is that correct?

A Uh-huh.

Q And that is the same as the case number for the Salt River complaint filed in the district court. Correct?

A It is.

Q And turning to the page, 00028, that is also a copy of a receipt that you received on December 29th.

A Yes. It has 062240, which is Passamaquaddy.

Q And the receipt number near the top of 0028 for Passamaquaddy has the numbers, 4616001251.

A It does.

Q And the receipt number for the receipt for Salt River has the receipt number, 461001252. Correct?

A I believe it's 461601252.

Q Thank you. And the receipt for Ak-Chin bears the receipt number, 4616001258. Correct?

A That is correct.

(Pause.)

MS. MAROLDY: That is all I have, Your Honor.

THE COURT: Thank you.

Further questions on redirect?

MR. AUSTIN: Yes, Your Honor, just a couple.

THE COURT: Redirect is within the scope of

cross.

MR. AUSTIN: Yes.

REDIRECT EXAMINATION

BY MR. AUSTIN:

Q Alexis, do you have Defendant's Exhibit 8 in front of you?

A Okay. Yes, the receipts.

THE COURT: That's what the Court has as the receipts.

BY MR. AUSTIN:

Q I misspoke. Let's try Exhibit 12. It should be the folder containing the April 23 e-mails that Ms. Maroldy asked you about.

A Yes.

Q Directing your attention to the first page of the pages that she questioned you about, do you see the "re" clause that appears on the April 23, 2007, e-mail?

A Yes. It says: "Re: Complaints in Salt River and Passamaquaddy."

Q Is the e-mail exchange with Ms. Munson, then, an exchange that took place in regard to other cases than Ak-Chin?

THE COURT: You're still on direct, in terms of your questions. If you can point to a particular

piece of testimony and clarify it, that's fine, but --

BY MR. AUSTIN:

Q Did this e-mail that Ms. Maroldy asked you --

THE COURT: First, start way back. Do you know what this e-mail referred to?

MR. AUSTIN: I will try again. Thank you.

THE COURT: Okay.

BY MR. AUSTIN:

Q Do you know what this e-mail referred to?

A Yes, I believe so.

Q What was that?

A It was a request by Ms. Munson to see if there was a way for me to definitively figure out what time the Salt River and Passamaquaddy cases were filed.

Q Did the e-mail say anything about the Ak-Chin sequence filing?

MS. MAROLDY: Objection.

THE COURT: You may answer.

THE WITNESS: It does not. It does not say anything about the --

THE COURT: Asked and answered. Go ahead. Your next question.

BY MR. AUSTIN:

Q Have you since had an opportunity to review the relevant materials pertaining to these other two cases?

THE COURT: You may answer.

THE WITNESS: I have spent some time compiling the e-mails such as those that we reviewed today.

BY MR. AUSTIN:

Q And have you been able to determine, based on your further review, the sequence of filing in Passamaquaddy and Salt River?

MS. MAROLDY: Objection, Your Honor.

THE COURT: You may answer.

THE WITNESS: I have.

BY MR. AUSTIN:

Q And what have you determined?

A As testified earlier this morning, all of the cases I filed in Salt River and Passamaquaddy, I filed the CFCs prior to the district court cases.

Q And on April 23rd, when this e-mail exchange took place, did you have any doubt in your mind about Ak-Chin being the last complaint --

MS. MAROLDY: Objection, Your Honor.

THE COURT: Wait. I completely agree. The objection is, "Did you have any doubt in your mind?"

We've been through this bolstering. This is not a question that was asked on cross. You're way out of scope. If you have a question that elucidates a question that was asked on cross, you may have it.

MR. AUSTIN: Your Honor, the bolstering seemed appropriate in light of the questions --

THE COURT: The bolstering is appropriate. It is your argument. You have the only thing you ever have in a court of law here, which is documents that are stated to be sworn to, and the testimony of a witness who has given her word to tell the truth. That's all we get. We don't get someone to tell the truth four times. That's all we get.

We don't have the rack, and we don't have bolstering, both sides, neither side.

MS. MAROLDY: Thank goodness.

MR. AUSTIN: Fair enough, Your Honor.

BY MR. AUSTIN:

Q Ms. Maroldy also asked you about the two affidavits that you had filed in other Court of Federal Claims actions. Correct?

A She did.

Q And you testified, in response to her questions, did you not, that you had included different information in these other affidavit?

A I had.
Q These other affidavits pertained to --
THE COURT: Why? Why? Why?
BY MR. AUSTIN:
Q Why were the contents of these other affidavits different?
A. They pertain not only to different cases but to different recollections as to how I came about my final conclusions.
MR. AUSTIN: Thank you. I have no further questions.
THE COURT: Question on recross, within the scope of redirect -- not necessary -- it's an opportunity -- and then we will release the witness.
MS. MAROLDY: I have no recross, Your Honor.
THE COURT: Thank you. The witness may step down. The testimony is concluded. Thank you for your testimony, Ms. Applegate.
(Witness excused.)
THE COURT: If you're collecting the documents that you were examined on by the United States, as you walk by, would you take them over to the court reporter?
(Pause.)
THE COURT: We turn now to argument. At the

conclusion of argument, we'll have a brief status conference, at which we will provide an opportunity for briefing that will take advantage of the testimony, in addition to the documentary evidence that was admitted today.

(Discussion held off the record.)

THE COURT: We will go ahead and schedule briefing that will fit in with your schedules.

This is Defendant's motion. On the other hand, the party with the laboring oar here, because of the burden of proof and the burden of persuasion in a case that's about jurisdiction is the plaintiff, and I think it's appropriate for the Plaintiff to go first, in that case.

(Pause.)

MR. LEVY: Thank you, Your Honor. Mark Levy for the Plaintiff. Good afternoon. Judge Bruggink did the same thing.

There are three issues before the Court today on the Section 1500 motion.

The first is whether the district court case was pending at the time the CFC complaint was filed.

The second is whether the two cases involved the same claim, which, in turn, has two issues. One is whether they are the same operative facts. The

other is whether they asked for the same relief.

For the government to prevail under Section 1500, it has to win on all three of those issues. If we win on any one of them, the Section 1500 motion should be denied. We submit that we win on all three of them, but that's not necessary for us to prevail today.

I would also say, by way of introduction, that the Federal Circuit said, in the Loveladies case, that Section 1500 is not to be broadly construed beyond what its literal terms require.

Now, let me start with the issue of timing. In doing that, I don't mean to suggest that timing is the principal question before the Court or the only question that the Court should decide. Any of the three issues that I mentioned are independently sufficient for us to win, and we would urge the Court to decide all three of the questions presented.

They are essentially alternative grounds for denying the government's motion. None of the three issues -- time timing, the same operative facts, or the same relief -- is superior to, or logically antecedent to, the others. They are really co-equal issues.

At some point, there is likely to be

appellate review of the Section 1500 issue. I think it would assist the Court of Appeals and facilitate comprehensive appellate review if all three issues were decided. That certainly would be the most efficient way to proceed, to have all of these questions decided at the same time, and there are, of course, other pending cases in which these same issues are presented.

Your Honor's decision in Breneman is controlling on the question of the same day filing, which is really the principal argument that the government makes, and it has given no ground for distinguishing Breneman. I think the Breneman opinion rejects the government's argument that there are simultaneous filings, in which the government relies on the cases under the transfer statute, Section 1631. It rejects the government's policy arguments.

I also think, if you just look at the plain statutory text, which uses the term "pending," lawyers will understand "pending." If you said to somebody, if you filed the complaint at nine and filed another complaint at 11, was the one at 11 pending when you filed the claim at nine, they would say no. So there is nothing to support the same-day argument that the government makes.

So the only real question on the timing issue is when, in fact, the complaints were filed. We can prevail on this issue of timing on either or both of two prongs.

First, as Your Honor has just heard, I will say, at considerable length, the factual record demonstrates that the CFC complaint in this case was filed before the district court complaint in the Ak-Chin case. That's a matter of fact.

If the Court so finds, by preponderance of the evidence -- we think the record, indeed, is compelling, and I'll be interested to hear what the government has to say, even though we're going first, this is really the issue that they are raising. But we think the record certainly supports, we would say, compels, the conclusion that the CFC complaint was filed first.

I'm really not sure what more to say about the facts, unless the Court has any particular questions about them. We think Ms. Applegate testified clearly, convincingly, that she filed the one before the other, and she had good reasons to remember it that way and to do it that way.

So, without repeating all of the testimony, we think there really is not an open question on that

any longer.

THE COURT: You'll have another opportunity also to pull together today's testimony --

MR. LEVY: Thank you, Your Honor.

THE COURT: -- which is good because the materials that came in with the briefing are less exhaustive than the materials that were presented to the Court today.

MR. LEVY: I see. That's fine.

THE COURT: So the argument that the parties have submitted on this issue, in the three briefs that we've received, is based on a somewhat different factual record than the factual record which is now in front of the Court.

MR. LEVY: All right, Your Honor. Let me also say, though, apart from the factual record, as you've just termed it, there is another ground on which we can win, and I don't want to get the terminology too confused, but we think that the legal rule is, and this has been briefed to the Court, that a complaint has not been filed for purposes of the clerk's office -- "filing" can mean lots of different things, but filing for purposes of the clerk's office -- until the process is completed, including the payment of the filing fees.

Under that legal rule, then a lot of the factual issues -- as I say, we think we've already won on those, but even if we didn't, we could still prevail under this legal rule, and I admit that there are conflicting cases. Both sides have cited cases, and the law is not of one mind on this issue.

THE COURT: It's not decided in the circuit either.

MR. LEVY: It's not decided in the circuit, but I did want to bring to Your Honor's attention a case in this course. It's the Anno case. It is not cited in the briefs, but it is cited in the cases cited in the briefs. The cite is 113 F.supp. 673, Court of Claim (1953). So it is a venerable case, shall we say? The holding of that case is that the payment of the filing fee is a prerequisite to the filing of the complaint.

So that's the rule that's followed in this Court, and there are two subsequent decisions of this Court that basically state the same rule -- Cofield at 25 Claims Court 465 (1992) and Lee, 33 Federal Claims 374 (1995) -- and, again, both of those say that the payment of filing fees is required before the complaint can be filed.

That's really all I have to say about the

timing issue, and, as you said, we will have an opportunity to be heard further on that.

Let me turn to the issue of the same claim. Under Loveladies, the legal standard is that two claims are the same if they have both the same operative facts and the same relief. Once again, the government has to prevail on both of those in order for Section 1500 to deprive this Court of jurisdiction. If they win on one but not the other, then the Section 1500 motion should be denied.

Now, there was a lot of discussion about operative facts, and I will get into the complaints in just a minute, but I want to be clear, if I can, about what I mean by that term. The operative facts, as the footnote in Loveladies says, are the facts necessary to establish the claims.

That can be juxtaposed to what some of the cases call the "general factual circumstances," and I think I've seen the term "background facts." Those are the things that are in the complaint. As you know, under the notice pleading rules of the federal rules, complaints tell a story. They often include lots of things that are not necessary but are useful for other reasons, and the plaintiff decides to put them in.

So it's important to understand the difference between the operative facts, which are the necessary facts to establish a claim, and the general factual circumstances, the background facts, whatever one chooses.

THE COURT: And you're going to tell me now what they are in the district court case and what they are here.

MR. LEVY: I am.

THE COURT: And I'm going to believe, at the end of this, that they are different.

MR. LEVY: I hope so, Your Honor. I'm also going to talk about the relief.

THE COURT: As you said, that's the third issue.

MR. LEVY: Right. What I would plan to do is talk about the complaints, if that's all right. I would like to talk about the complaint in this Court, the facts, and then the relief.

THE COURT: You may be very specific.

MR. LEVY: Okay. I have the complaints, just in case Your Honor has any questions.

But I do think that by explaining the allegations and the theory and putting the legal issues in context, that will help Your Honor to

understand our submission, and we think that, at the end of that, as you were just saying, that the legal issues really will become relatively clear.

Let me start with the CFC complaint. As Your Honor well knows, we are seeking money damages based on a money-mandating trust duty of prudent management and investment. So it's got to be a money-mandating duty, and the duty in the complaint in this Court is the duty of a trustee of prudent management and investment.

This Court's jurisdiction is framed by, and limited to, money damages, and that is what Plaintiff seeks in this case, money damages. Money damages are compensatory. As in any case, they compensate or substitute for the injury suffered, and let me give you a homely example, my watch.

If somebody takes my watch or breaks my watch, I get money damages. That doesn't return my watch, it doesn't repair the watch; it is compensation for, or substitution for, the injury to my watch, either its loss or its breakage.

The same is true of the money damages in this case. We seek compensation for the government's breach of its trust duty of prudent management and investment of the assets held in trust for the

Plaintiff, both the real assets and the financial assets.

That's what we seek. That's all we seek. And the key point here, for purposes of distinguishing the relief sought in the district court complaint, is that these money damages reflect what is not in the trust system but should have been if the government, as trustee, had not mismanaged or imprudently invested our accounts.

Let me give you an example. Suppose there is an asset, a piece of land -- it doesn't really matter -- an asset in the trust that could have been rented but wasn't. It was simply allowed to lay fallow. It wasn't used, it wasn't rented; it just sat there. It was neglected.

Now, if it had been rented, there would have been some kind of income -- a lease payment, an easement payment, whatever it was -- and that income would have been our money and gone into the trust, but because, in my hypothetical, the government did nothing -- it just let it sit there -- it lay fallow -- that money was never materialized.

It was never realized. So that is money that should be in the trust system, should be in our trust account, but isn't and never was because of the

government's breach of its fiduciary duty to the Plaintiff.

That's what makes this damages. It's money that's not there. So if we prevail at the end of the day, as I expect we will, the government will have to come up with money. There will have to be an infusion, as some of the cases use the term, an infusion of money to compensate us for the loss that we suffered. That's the relief, based on the trust duty of prudent management and investment.

THE COURT: Wait a minute. Isn't there also, just to be clear about what I thought was in the addendum in the case in this Court, it's within your category of money that's not there, but it's earnings on money that is there.

MR. LEVY: Yes.

THE COURT: Investment earnings.

MR. LEVY: Right. In other words, if there was money there, and instead of investing it at whatever would have been a prudent way at a prudent rate, the secretary of interior put the money under his mattress. We don't think that's prudent investment.

The money that should have been there is not there, so it is in the same category, as I've just

described it, and that is true of our prayer for relief in this Court, in general. There may be variations on the theme, but that is the theme, and that's what makes the damages, and that's why we are in this Court.

Now, what are the operative facts that we need to establish in order to make out our claim for that money damage relief? I will say at the beginning, there will be some facts, even some operative facts, in common between this case and the district court case, for example, that a trust exists. That's an operative fact. We have to prove that to win in this Court or in the district court. It's the same trust in both courts. So that's an operative fact that is common.

Now, that does not mean, as a matter of law, it does not mean that they are the same operative facts, but I want the Court to be clear -- I don't want to be misunderstood -- as suggesting that there is no common fact. There is, but all of the rest of the operative facts that we will need to establish in this Court are not involved in, not even relevant to, I would say, the district court proceeding.

What are the differences? Well, first of all, in this Court we have to show that there is a

money-mandating duty. We don't have to show that in the district court, so that's one difference.

Another thing we're going to have to show here is whether the asset was utilized. Did it lay fallow, or was it rented or however else it was used? So that's an operative fact in this Court. If it was utilized, what was the return? That's an operative fact.

Were there lease payments? What was the bank account rate? That's an operative fact on the issue of, was the asset prudently managed? Was it used? What was the return on it? And another operative fact that would follow that is, what would be the rate of return on a reasonably and prudently managed asset?

Those are all operative facts. If we're going to win in this Court, we're going to have to establish all four of those facts and probably others as well, but I use those as, at least, the ones that are clearest to me to illustrate the point. We're going to have to prove all of those facts in order to prevail, and none of those, as we'll see in a minute, are at issue in the district court. We don't have to show any of those things in the accounting claim.

So let me summarize the proceeding in this

Court. The trust duty is the duty of prudent management and investment. The relief is money damages to compensate us for the loss of what should have been realized but was not, that should have been in the account but was not, and the operative facts are those necessary to establish that claim, including the use, if any, of the asset, the rate of return, and the rate of return for that asset if that asset had been prudently invested.

So that's the relief and the operative facts in this Court.

THE COURT: So, in this Court, for example, investment, if you could determine in the evidence that Interior and Treasury had failed to invest the money correctly, and there is a legal standard -- either it's general prudence or there is percentage that's been set out by Congress -- your measure of damages would be the difference between what happened and what should have happened.

MR. LEVY: That's right. I will be quite candid. I don't know what our proof is going to look like. I assume that it would be expert testimony. There would be different ways of proving it, but our damages are measured by what we should have gotten and didn't, what should have been in the trust system in

our trust account and wasn't, never has been, isn't today and won't be in the future. That's what makes this damages.

Now, let me turn to the district court complaint, and if you compare the complaint in this Court, as I've just described it, and the complaint in the district court, I think you will see that they are not the same operative facts, they are not the same relief. In fact, the two complaints are quite complementary, and they were drafted in light of the different jurisdictional restrictions and relief that can be awarded in the two courts.

In the district court, the trust duty at issue is the duty to account. It is not the duty of prudent management and investment. The operative facts, as I said under the legal standard at the beginning, are those necessary to show that claim -- that is that the trustee delegates have not, never have met their duty to account.

Now, what are those operative facts for the accounting duty? I would say there really is one operative fact. That doesn't mean there isn't going to be lots of evidence on it. It will be a long proceeding, I'm sure, if we get to the trial phase in this. But the central operative fact in the district

court is whether the Defendants have ever provided a complete and adequate accounting. That's the operative fact in the district court.

THE COURT: Failure to furnish an accounting.

MR. LEVY: Yes. Exactly. That will be a complicated issue to try, but there is that central operative fact. That's not an operative fact in this Court at all.

The previous list of operative facts that I gave Your Honor -- money-mandating duty, was the asset used, what was the return, and how does that compare to a prudent rate of return? -- none of that is going to be relevant in the district court, complete separation, in that sense.

Let me put it this way. We could win -- I think we're going to win both cases -- let me say on the record -- we could, in theory, win the mismanagement case in this Court and lose the accounting case in the district court or vice versa.

If the Defendants in this case were the hedge fund manager of the year -- they did a brilliant job of investing the assets -- we will lose in this Court, but if they didn't provide an accounting, we will win in the district court. And, conversely, if

the Defendants here, and they didn't, but if they had provided the gold-plated standard of an accounting, we could lose in the district court, but that doesn't mean they properly managed our assets, and, therefore, we could get damages in this Court. They are two different cases, two different sets of operative facts.

Now, let me also turn, then, to the relief that we're seeking.

THE COURT: No. We have not been given examples to you.

MR. LEVY: Pardon me?

THE COURT: We have not been given examples to you about -- I've been reading from the complaint -- you say you're not talking about, just so you know.

MR. LEVY: I'm saying those are not operative facts. The complaint contains a lot of language, I admit.

THE COURT: Just so you know. Relief?

MR. LEVY: Pardon?

THE COURT: Relief. You were going to talk about relief.

MR. LEVY: The relief sought in the district court for the accounting breach, the equitable relief

sought there, is not the same as the money damages relief sought in this Court for the mismanagement. Equitable relief and money damages are not the same relief.

Now, the main point, in terms of understanding the district court complaint, is that the equitable relief sought there is to correct what is in the trust system but not in the right trust account.

So, in this Court, as I said before, the money is nowhere in the trust system because the asset, for example, was never invested, so there was no return realized. The money has never been realized. There is no money anywhere.

In the district court, the money is in the trust system, but it's in the wrong account. Put another way, in this Court, if we prevail, the government is going to have to have an infusion, to use that term again, of money to pay the damages.

THE COURT: Let's just say that the land lay fallow.

MR. LEVY: Okay.

THE COURT: How is the money in the trust system?

MR. LEVY: It's not, and that's why we're

seeking damages, for its imprudent usage and investment.

THE COURT: So let me just understand that, in the district court, you would not be able to obtain a restatement of an account to change an amount of the trust balance to reflect the fact that, in a particular year, an asset that might have been expected to have been rented by a trustee was not rented.

MR. LEVY: The answer to that is that would not support the relief of restatement. It would support the relief of damages, and that's what we're seeking in this Court. We are seeking restatement in the district court.

Let me give a parallel example, just so we've got both examples on the table. In the district court case, let's assume, and this is very simple, that the money was collected and put in the wrong account. It should have been put in our Account A.

THE COURT: I'm fine on that one. I want you to deal with a failure to realize the value of an asset, which I've just given you as an example, land that's not rented that would have thought to have been rented by a prudent trustee.

MR. LEVY: My answer is that that would be

damages in this Court.

THE COURT: Is there any way in the district court that you would obtain any relief with respect to the land that it would have been thought, with respect to prudent trust activities, would have been rented but was not? Will there be any relief in district court that relates to that failure?

MR. LEVY: The answer is no.

THE COURT: Okay. That's it. No, but?

MR. LEVY: Well, it's no, and I want to emphasize that. You might call it "bolstering," but this is argument, not testimony.

We can get complete relief that we've requested in both cases, and there won't be duplication. The government is not going to have to pay twice for the same wrong.

Now, the "but" is this: I want to be clear that we might get some kind of relief in the accounting action in the district court for that land, but it wouldn't be for the failure to rent it, to invest it.

For example, suppose the government simply doesn't know that this land is a trust asset. You would be astonished at what the government doesn't know about this trust. If the government doesn't know

that this is a trust asset, then the accounting will show us that lack of knowledge, and the account records will be corrected to include it as an asset.

So we could get that kind of relief, accounting, equitable relief, in the district court related to the piece of land we're talking about, but the wrong would not be the failure to rent it. The wrong would be the failure to know that it's a trust asset.

THE COURT: Let me ask about a somewhat different activity in which the asset is now put to a productive use by contract, and the contract calls for the government to collect, as a trustee, a certain amount, and the government has been collecting one-half of a certain amount for many years. What relief do you get in the Court of Federal Claims, and what relief do you get in the district court? There is a contract.

MR. LEVY: The answer is that we get damages in the Court of Federal Claims for the money that's not there but should have been. Those are damages. Subject to my explanation about accounting, we don't get relief in the district court for the failure to collect the requisite rents.

THE COURT: What do the words mean in

paragraph 6 of your prayer for relief in the district court complaint? "Any additional equitable relief that may be appropriate," and then there is an e.g. clause, and the last in that e.g. clause is "or an injunction directing the trustee to take actions against third parties." Does that have any relation to my hypothetical, for example, the relationship that you're asking the trustee to go back and try to enforce the contract?

MR. LEVY: Perhaps I misunderstood the hypothetical. As I understand trust law, the beneficiary has a choice. It can either sue the third party, or it can sue the trustee to require it to proceed against the third party.

THE COURT: It seems like the second could possibly be contemplated here.

MR. LEVY: I misunderstood. I thought the hypothetical was that it was the government that simply didn't bother to collect the money.

THE COURT: It's hard to know what happened. I'm sure the government and the tenant are pointing at each other. That's not a problem. We'll assume everybody says, I didn't do it.

My question is addressed to what you're looking for here in your complaint in the federal

district court. What activity do you want to have go on there?

MR. LEVY: Well, the first thing I would say, Your Honor, I think this is the explanation of how the paragraph was drafted. The first thing we ask for is the restatement.

THE COURT: I understand that.

MR. LEVY: You understand that.

THE COURT: I understand that.

MR. LEVY: And when we go on to say, "as well as anything that may be available." I think all we had in mind was that we're entitled to get whatever relief we can get in a court of equity that we need for a complete remedy.

THE COURT: And one of those kinds of relief is an injunction directing the trustee to take action against third parties.

MR. LEVY: I believe, under trust law, that's correct.

THE COURT: I'm just reading the complaint. I'm not trying to get to the bottom of trust law here.

MR. LEVY: To the extent that is trust law, then we could seek that injunctive relief in the district court. We are not seeking to recover the same money twice.

THE COURT: Really? I would have thought, actually, that, with respect to the investment aspect of this, there is a standard set by statute or general trust law about monies that are actually in trust and how they should have been handled.

There is a dollar in either case. It's supposed to have been handled a certain way. What's going to happen in the Federal Claims Court, and what's going to happen in the district court? It's, unfortunately, 10 years later. It's still the same dollar. Nothing has happened to the investment. What do you get out of the Federal District Court, and what do you get from the Federal Claims Court?

MR. LEVY: I think that's my example about the money under the mattress. I want to make sure I'm understanding. That's the answer I'm about to give, is I understand your hypothetical. That would be the damages in the Claims Court, and I'm not sure. We might be able to get a declaration in the district court. I don't know that we could get an injunction simply on the theory that you don't get injunctions to obey the law.

THE COURT: "We ask for a degree providing for the restatement of the community's trust fund account balances in conformity with this accounting."

MR. LEVY: The word "restatement" is critical. What that remedy means is that it's money that's in the system, and a quarter of equity can move it from one place, one account, to another place, another account. That's really the touchstone of the difference between the two complaints.

So, in Your Honor's hypothetical, as I understand it, the money is not there that should have been. That's damages, and the government will have to make an infusion of cash to pay us those damages at the end of the case.

If the money is in the trust system -- that is, the interest was earned -- but, for whatever reason, it was put in somebody else's trust account or the general treasury -- it went someplace where it shouldn't have gone instead of our trust account where it should have gone -- then a restatement -- it's a term of art -- the equitable relief of restatement will move the money where it should be and where it should have been all along.

But, again, I want to make it clear, we're talking about different funds. The funds in the district court case are in the system, and they can be restated. The accounts can be restated.

In this, the complaint in this Court, the

money is not there. It's not a restatement; it's damages to compensate us for the fact that the money was never realized. It's a lost opportunity. It was never there.

So, on that understanding, we can get the complete relief we've asked for in both cases without duplication.

I want to make it clear -- I think this is important to understanding the equitable nature of the remedy we seek, the accounting and restatement that we seek, in the district court -- that relief relates to the beneficiary's own property. It's a little hard to conceptualize because it's all money, but it was money that's in the trust system, it's the beneficiary's property, and it was put in the wrong place.

The district court complaint is seeking the return of the very thing that the beneficiary is entitled to. That makes it equitable relief, and this Court can't give, cannot give, equitable relief, and, in particular, this Court cannot give an equitable accounting.

Your Honor recognized that in the Osage case. We've cited the Klamath case and the Cherokee Nation case. There is another case I would cite to Your Honor that's not in the brief. It's an earlier