IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE SALT RIVER PIMA-MARICOPA INDIAN COMMUNITY,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 06-943<br>Judge Lawrence M. Baskir<br>**(Electronically Filed November 8, 2007)** |

**EXHIBIT 1, PART C TO**

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION TO SUPPLEMENT THE RECORD AND FOR SUPPLEMENTAL BRIEFING**

Ak-Chin case that stands for the same proposition, and that cite is 657 F.2d at 983, 1004-1005.

Indeed, in a case that we do cite, but not for this proposition, is Judge Posner's opinion for the Seventh Circuit in a case called Rice v. Continental Casualty. Judge Posner makes, in his opinion for the Court, makes the same point, and the Supreme Court relied on Judge Posner's opinion in the Great West case.

Indeed, the government concedes, at page 18, of its reply brief that this Court does not have jurisdiction to grant an equitable accounting. So I think that is well settled.

Now, the Court does have authority, and the terminology gets a little confusing perhaps, to grant an accounting in aid of judgment, but that's a horse of a different color. It is not the same thing. An equitable accounting is a broad, expansive accounting.

An accounting in aid of a judgment has at least two significant limitations.

One, it's not a pre-liability accounting, the way an equitable accounting is. It comes into play only after liability has been established, so that's the first difference.

The second is that it's very narrow. It's

in aid of the judgment to obtain information. It's really like discovery, in a sense, as I understand it. It's kind of a tool to make the judgment meaningful and effective, but it's not relief in its own right.

So the Court can give that kind of an accounting in aid of judgment, but that's not the accounting we're seeking in the district court. That is a general, equitable, pre-liability accounting.

If the CFC complaint is dismissed, as the government requests, under Section 1500, that means that we, the Plaintiff, will not be able to get full and complete and equivalent relief in the district court. So this Court should not be under a misunderstanding that it doesn't really matter which court when we can get full relief in either case.

In other words, the dismissal on the jurisdictional grounds has important substantive consequences, and if we can't seek damages in this Court, the Plaintiff will be deprived of a complete and effective remedy for the egregious and longstanding breach of duty that the government has engaged in.

THE COURT: Couldn't this whole thing have been avoided?

MR. LEVY: Excuse me, Your Honor?

THE COURT: Couldn't this whole thing have been avoided?

MR. LEVY: If the government had complied with its trust duties.

THE COURT: That's one way. There is another way.

MR. LEVY: What would Your Honor suggest?

THE COURT: Well, if you come over here the day before and file here.

MR. LEVY: Well, we think we actually did file here first. That's a different issue.

THE COURT: I know, but one of the things that's lacking in the discovery that I've seen so far is any consciousness of the possible fun time we're having here together.

MR. LEVY: Live and learn. All I can say, Your Honor, is this is not the only case, as Breneman and others show, and the Court has sent the message. The recent case of D'abrara -- I think it's pronounced -- made the same point, that that is a safety valve, a safe harbor, if you will. That response to the government's argument that we're seeking kind of an arbitrary result here, in terms of same-day filing; Section 1500 is always going to have some arbitrary element because you can control the timing if you know

about this problem.

Now, let me say a little bit about Christopher Village and Suburban Mortgage that the Court asked us to address this morning.

THE COURT: Thank you.

MR. LEVY: I think those cases are completely different. They involve the jurisdiction of the district court, not this Court. They weren't Section 1500 cases. But let me go on and distinguish them, in any event, and then respond to the questions that Your Honor may have.

There are some distinctions that apply to each of the individual cases. There are some that apply to both of the cases together, and let me start with those. These are distinctions in both cases.

In both Christopher Village and Suburban Mortgage, the case that was brought in the district court could have been brought in the Court of Federal Claims. If that had happened, the Court of Federal Claims would have decided every one of the legal issues presented in the district court, and the Court of Federal Claims could have awarded full, effective, adequate relief.

That's not true here. We could not have filed the district court case, the accounting case, in

this Court. If we had filed it here, even assuming the Court had jurisdiction, this Court wouldn't decide every legal issue we've presented in the district court, and it wouldn't decide the accounting issue.

We talked about the fact that this Court can't grant a general, equitable, pre-liability accounting, and this Court could not award the full and complete relief we seek in the district court. You can't award accounting or restatement of the money that's in the system but in the wrong place.

So, for those reasons, I think Christopher Village and Suburban Mortgage, both of them are distinguishable. Let me go on and talk about each of the cases briefly individually.

Christopher Village; to say it was an odd case, I think, understates it. There, the district court case was solely a predicate for a later damages suit in this Court against the United States. You could think of it as a parasitic case as got out of the Fifth Circuit and had kind of a tortured procedural history with mootness and everything.

It really was parasitic. The district court proceeding was really designed solely, exclusively, only to obtain money damages against the United States in this Court.

That's not true here. The district court case is a free-standing case. For all we know, the proceedings in this Court will terminate first. We could get a judgment affirmed by the Court of Appeals, affirmed by the Supreme Court before the accounting case is over. So we're not proceeding in the accounting case to set up the damages case here.

The equitable relief in the district court will have substantial independent value of its own. That's one of the standards that comes from the Kidwell and Tootle cases from the D.C. Circuit, but it shows that this is not a stalking horse for damages, as it was in Christopher Village, and the accounting could provide information to the Plaintiff that has nothing to do, as I understand it, with any prospective damages suit against the United States in this Court.

For example, and I'll give you a few illustrations, under the 1994 Indian Trust Reform Act, a tribe is permitted to withdraw its assets from the trust. So if the Plaintiff in this case gets information in the accounting, it can withdraw its assets. That has nothing to do with a damages case in this Court against the United States.

THE COURT: So you're saying, based on

Christopher Village, that one of the things that your clients learned and its counsel do not anticipate, and, in fact, are making a representation here that they are not using material from over to the district court to come back and sue here. So we won't be hearing from you again on that.

MR. LEVY: That's not what I'm saying.

THE COURT: Okay.

MR. LEVY: I am saying, to be honest, I don't know. If the information in the accounting turns up other breaches that involve money-mandating duty and damages, we may well be here in front of Your Honor or some colleague on the Court. What I am saying is that this case in this Court and this case in the district court don't have that relationship. They are independent. Each of them serves a purpose that the other could not.

We could get information in the accounting where we would sue third parties. That's not a damages action against the United States, as it was in Christopher Village. We might negotiate with third parties.

The Plaintiff's land is in Arizona. It's a booming place. We may want to rent that land. We don't know whether there are incumberances. We know

that there are some power lines going overhead. We don't have any information to know whether that's pursuant to an easement or a lease, what the money is. We would be entitled to negotiate with third parties for the effective commercial use of this land, if we knew what the current situation is, and we don't, and we may learn that in the accounting. I would expect we would learn that.

So we may take action. The purpose of the accounting is to provide us with information to protect our rights, as beneficiary, in the trust assets. We might get that information and decide we want to negotiate with the power company in Arizona for an easement for its power lines, nothing to do as in Christopher Village.

Let me say also a word about Suburban Mortgage, and then I will conclude, unless the Court has further questions.

That was essentially a case on a contract to require the government to comply with its contractual obligations to perform under the contract. A suit like that belongs in the CFC, not in the district court. That is the heart of this Court's jurisdiction. So, in that sense as well, I think it's easily distinguishable.

I would actually say Suburban Mortgage helps us in the following two respects.

First, the Federal Circuit distinguished Bowen on the ground that Suburban Mortgage did not involve either sovereign entities or the ongoing and complex relationship between sovereign entities. That's not true here.

Here, we have two sovereign entities, as in Bowen. Here, it's the United States and a sovereign tribe, as, in Bowen, it was the United States and the Commonwealth of Massachusetts, and we do have an ongoing and complex trust relationship, again, parallel to Bowen but completely absent in Suburban Mortgage. In fact, I could editorialize and say I don't think there is anything more complex than the trust relationship between Native Americans and their federal government.

The other distinction with Suburban Mortgage is that Suburban Mortgage did not involve any request for prospective injunctive relief to get the government to change its conduct. Again, that's not true in the district court here. We are seeking equitable and injunctive relief, as may be appropriate -- we'll see at the end of the day -- to get the government to conform, going forward with its trust

duty to account. Again, that was not at all present in Suburban Mortgage.

If I could cite Your Honor to one other case that I think is in this same line but not in Your Honor's order. It's a case called Doe v. United States, 372 F.3d 1308, the Federal Circuit, 2004. I think Doe makes clear that money damages in a CFC are not an adequate or equivalent remedy where equitable relief is sought in the district court, and to the extent that that's the question that Your Honor was raising in the order, I think the discussion that we've had of the two cited cases, as well as the Doe case, answers that question in our favor.

THE COURT: Thank you.

MR. LEVY: If the Court has no further questions?

THE COURT: Possibly later. Thank you.

And for the United States?

(Pause.)

MS. MAROLDY: Just a point of clarification. Did I understand Your Honor correctly that the Court does not want to hear argument today on the timing issue?

THE COURT: Well, I'm happy to hear argument on it. I already have. I am going to call for,

because the testimony and the documentary evidence that was adduced in the evidentiary hearing is somewhat different than the documentary evidence that was attached to the motion practice, I'm going to allow additional briefing.

You have the floor, and it is one of the three issues. I think we're in agreement.

MS. MAROLDY: Thank you, Your Honor.

THE COURT: You certainly should feel free to address it.

MS. MAROLDY: First, I know Your Honor has read the briefing and, obviously, understands the parties' respective positions, and, in sum, we think this case should be dismissed under 28 U.S.C. § 1500.

To start with the actual text of the statute, this Court shall not have jurisdiction of any claim for, or in respect to which, the Plaintiff or his assignee has pending in any other court any suit or process against the United States or any person who, at the time that the cause of action arose, was in respect thereto acting, or professing to act, directly or indirectly, under the authority of the United States.

Section 1500 was enacted for the benefit of the government and was intended to force an election

where both forums could grant the same relief arising from the same operative facts, and we know that from, among other authority, Loveladies and the John Manville case.

So part of the requirement of the distinctive relief was to prevent the government from having to pay twice for the same wrongdoing.

I think that helps us step back and look at why Section 1500, and why are we all going through this process? The Plaintiff, of course, has the burden to show the existence of facts supporting jurisdiction in this case. It hasn't discharged that burden here.

It filed both suits the same day, Friday, December 29. Published cases -- at least I'm not aware of any -- don't explicitly address whether, in an instance of same-date filing, prior to this Court's decision in Breneman, whether one actually had to look at the time of day or whether same-day filing should simply be deemed to be simultaneous filing.

Of course, we acknowledge the Court's Breneman decision, but we respectfully disagree and maintain our position that filing on the same day is sufficient to trigger the operation of 1500.

I have a few cites for the Court. One is an

unpublished order from 1978. It's Frundsie v. U.S., 216 Court of Claims 439, and that concerned cases filed the same day in the Eastern District of New York and the U.S. Court of Claims, and the case filed in this Court was dismissed under Section 1500, and it certainly appeared that the Court accepted, without discussing, accepted that same-day filing triggered 1500.

Likewise, Allstate Financial Corp. v. United States, 29 Fed. Claims 366 (1993), claims were filed in the district court and this Court on the same day in 1993, and all parties, as well as the Court, in that case appeared to deem those complaints simultaneously filed.

Likewise, Hill v. United States, 8 Claims Court 382 (1985), again, concerned cases filed in the Eastern District of New York and in the United States Claims Court on the same day, and the Court's decision refers to them as "simultaneously filed," and, therefore, 1500 was triggered.

We think it's consistent with the purpose of the statute to construe the statute that way, and it also conforms to the way many federal courts keep records, not necessarily routinely time stamping complaints that are filed during the day. It avoids

having to have an evidentiary proceeding on the timing issue.

We would submit, nevertheless, even if the time of day on December 29th of the filings is material to the 1500 issue, that the Plaintiff has not shown by a preponderance of the evidence that it filed its suit in this Court before it filed its lawsuit in the district court, and a preponderance of the evidence was the standard of the Reynolds case, which we cited in our papers, and I believe it's all the standard that this Court applied in Breneman.

Both cases were filed on the same day. We know, from the district court's docket that Ms. Applegate filed the Passamaquaddy case and the Salt River case, as well as the Ak-Chin cases, and that those two cases, Passamaquaddy and Salt River, were the first two cases filed in the district court on December 29th.

We know that there was a written directive from Mr. Harper to file the district court complaints before the Court of Federal Claims complaints, and Plaintiffs so admitted in their interrogatories. Plaintiffs have also admitted, through their interrogatories, and we have the e-mail sent at 11:41, showing that the complaint to be filed in this Court

had not been completed by that time, 11:41 on December 29th.

Plaintiffs have explained in their interrogatories that the reason for Mr. Justin Guilder's e-mail was that he was still gathering information to be included in Plaintiff's complaint in this Court at 11:41 a.m.

Plaintiffs have also stated, and I believe Ms. Applegate testified this morning, as well as admitting in their interrogatories, Ms. Applegate walked to this Court and back to do that filing. So that all occurred some time after 11:41, when Mr. Guilder was still gathering information to include in that complaint.

Meanwhile, we know, from the district court's docket, if we turn back to that -- I believe it was our Exhibit 1, but the record will reflect that -- the Ak-Chin complaint was only the fifth or sixth complaint filed in the Court that day, out of a total of over 30 complaints. The Passamaquaddy and Salt River complaints were the first ones filed.

There has been much testimony and representations seriatim about how many trips Ms. Applegate made to the district court. In her affidavit in the Ak-Chin case, it was presented very

cleanly. She filed the Ak-Chin complaint in this Court first and then went to the DDC. The responses to interrogatories, which are in evidence, will show it seemed to indicate there were two trips to the Court.

We have now heard about three trips to the Court. But, in any event, we know, from Ms. Applegate's own e-mail to Mr. Austin on the day of filing, she reported to Mr. Austin that all of the complaints had been filed, and she was waiting for the summonses.

So we have the Ak-Chin complaint not yet finished by 11:41, but by 12:41, all of them, Ms. Applegate was reporting, had been filed, and she was waiting for the summonses.

We have Plaintiff's admission that when Ms. Applegate returned, later on in the day, to the district court on what has been represented as her third trip to the Court that day, the complaint had already been filed, and the summonses had been issued when she returned to pick them up. And there was no reason for the Complainant to file the complaint but to file them, and, sure enough, when Ms. Applegate returned, it had been filed, and she picked up the summonses.

Summonses summon, and summonses require the Defendant to answer that complaint. That had already taken place. So what time that the complaint was paid for, we would submit, is not necessarily that important. However, we've seen from the receipts produced by Plaintiff, and perhaps they have the originals which are more legible, we've seen from the receipts that the numbers for the payment for each of those complaints and each of those receipts bears the pertinent case number.

So we have the Ak-Chin receipt with the Ak-Chin case number. I believe it was a difference of a mere six or seven numbers from the Passamaquaddy and Salt River complaints, utterly consistent with what the Court's own docket showed, which was that the district court had filed that case shortly after the very first cases of the day.

It is undisputed that the district court complaints and summonses were served by 3:14 p.m., and we know that, between the time Ms. Applegate picked up the summonses and the time they were served, she had to travel back to the office. She left them in the mail room. She may or may not have had additional communications with the process server.

I don't recall that point precisely, but we

know those complaints and summonses were all served by 3:14 p.m., which is consistent with the fact that, as Ms. Applegate had represented in an e-mail to Mr. Austin, they had already been filed a few hours before, and it is consistent with the other evidence that seems to show that they were filed early in the day.

So, for all of those reasons, and I understand the parties will be having additional briefing, we would submit Plaintiffs have not met their burden to show by a preponderance of the evidence that the Court of Federal Claims case, although it was not filed after 11:41, was filed before the district court complaint was filed, and, obviously, we may have --

THE COURT: I'll ask the sidebar to stop. Thank you very much. You may continue, Counsel.

MS. MAROLDY: Thank you, Your Honor.

We also have the April '07 e-mails that were the subject of testimony today, and although one of them bore a heading that may or may not be meaningful, that says that it refers to the Salt River and Passamaquaddy complaints, the other one -- it was also part of Exhibit 12 -- simply refers to tribal trust cases generally, and I don't have the exhibit in front

of me, but I'm sure, when the Court looks at it, it will still say "I am not sure which ones I filed first."

Now, moving on to the substance of the complaints in this case, the cases teach that what matters is whether the two complaints are based on the same operative facts and seek the same relief. It's very clear from the various cases the parties recited in their briefing that it is looking at the complaints that is important and what appears on the face of the complaint that is material to this inquiry, not refinements that may occur in briefing or in oral argument. What we have here are cases that involve the same operative facts and seek the same relief.

The Plaintiff has tried to raise a distinction between the duties involved in the two complaints, but the fact is that different duties don't necessarily involve different operative facts for the purpose of 1400, and one of the ways we know that is from the case law, and one example is the British American Tobacco case.

In that case, tort and contract claims were brought involving the same transaction with gold bullion -- different theories. We all know tort and contract have different elements of proof, but the

same operative facts were involved, and the plaintiff was seeking the same relief, and, for that reason, it was held that this Court did not have jurisdiction because the claim fell within the scope of Section 1500.

Likewise, the Chavez case --

THE COURT: Let me ask about the same operative facts. You've put together the two issues, which we were talking about separately before, about the same operative facts and the same relief.

MS. MAROLDY: Yes.

THE COURT: Ever since Gilmore's The Death of Contract, we all know that the elements have gotten closer and closer together, but leaving that piece to one side, the relief is thought to be different. The contract, you get what the contract gives you, and then the tort, you're made whole. Those could come out to be the same, but they are not.

MS. MAROLDY: The nature of the relief would be the same, where, as in this case, monetary relief is sought, and I think that if we're looking for a more recent example than British American Tobacco, we can look at the Chavez case and the Nanilla case, where, again, there are different elements, but they were based on the same operative facts, and the same

relief was sought.

THE COURT: What I heard before was the only money you can get, if I understood Mr. Levy correctly, the only money you could get by, for example, a restatement of accounts, would be money that was "in the trust system somewhere." So my hypothetical, where money never came into the trust system because no one ever collected the money for rent, for example, it never made it into the trust system. That's something that he would not expect to be able to get in the district court.

MS. MAROLDY: What appears on the face of the complaint here is, among other things, an allegation that monies that should have been credited to the community, or amounts that should have been paid, are part of the duties that Plaintiff seeks to vindicate in that case, and I'm looking at paragraph 21 of the Plaintiff's district court complaint. And then, of course, when Plaintiffs sum up some of the relief they are seeking, they talk about restatement, equitable restitution, disgorgement.

These are very broad allegations, and I don't think a fair reading of this is that, from the complaints, from what is in the complaints, from how Plaintiffs have presented their respective lawsuits,

that monetary relief for an asset that lies fallow is not on the table.

THE COURT: Although if Mr. Levy is still advising, they don't think they can get it.

MS. MAROLDY: I take Your Honor's point about it may perhaps be cleaner to look at operative facts and then move on to the same relief.

Both of these complaints are as broad as they can be about what is, for lack of a better term, in play: the same assets, the same accounts, the same leases, easements, rights-of-way. Both courts, if both of these cases go forward, are going to need to examine the same challenged transactions, the management of investments, every challenged collection, every deposit, every disbursement, every lease negotiation, and concepts about whether the United States obtained fair market value, maximized productivity, and managed the assets in question so as to get the highest and best use.

They appear on the face of the complaint, and whether Plaintiff were to get what Mr. Levy has referred to as the "gold standard of accounting" in the district court or an accounting in aid of a judgment in this Court, both courts would have to be looking at the same transactions.

I think Mr. Levy, himself, alluded to one of the dangers of that, which is that there could be different results in the two courts, and going back to the purpose of Section 1500, to have two courts looking at the same transactions, period, is inconsistent with Section 1500 --

THE COURT: Actually, you'll agree with me that it's not, as long as you file in the right order.

MS. MAROLDY: Well, that seems to be the teaching of, I think, the T'econ case, but whatever the limits have been on only looking at focusing on whether this Court has jurisdiction if the case was already filed there before, that's certainly a concern in this case.

In other words, whether it works the other way, Your Honor --

THE COURT: Congress probably could draft a statute that worked the other way, but, at least as presently interpreted, they haven't.

MS. MAROLDY: That's my understanding, Your Honor, that the most recent, and I don't recall which case it was, but the most recent Federal Circuit decision that addressed that particular issue went that way.

So we would have two courts examining the

same transaction.

THE COURT: The argument is overinclusive, is what I'm saying. Because of the way Congress has got this drafted, we actually can have two courts examining the same --

MS. MAROLDY: I take your point, Your Honor, but for the purpose of 1500, where one of the purposes of it is to prevent the United States from having to defend in two fora at the same time, the same claims seeking the same relief, this case presents that situation.

Then, of course, the risk also is that the United States would have to pay twice. Plaintiff's complaint makes clear that they seek monetary relief in the district court. They are seeking restatement in paragraph 6, which is "Restatement of Account Balances," and paragraph 6 also speaks in terms of disgorgement, restitution, et cetera.

So regardless of any characterization of the claims as equitable relief or damages relief, the same relief, within the jurisprudence of 1500, is sought in both cases because they both seek monetary relief.

The complaints, obviously, speak for themselves, but they speak about the same alleged breaches. They both talk about failure to collect.

When we looked at paragraph 21 of the district court complaint a few minutes ago, if we look at paragraph 43 of the district court complaint, that speaks in terms of a restatement of trust fund account balances in conformity with the ultimate and complete accounting.

So it's very clear that the operative fact here is government conduct, and both courts would be examining the same government conduct, as I alluded to earlier: the management of the same assets; what negotiations may have taken place with respect to lease terms; collections, deposits, disbursements; whether monies were invested at a high enough interest rate, or, otherwise, value was maximized, et cetera.

Along the same lines, the fact that the Plaintiff seeks additional relief in district court does not change the analysis for the purpose of 1500, as the Supreme Court case, Keene, teaches, and as Harbuck, the Federal Circuit Court case teaches, 1500 applies if there is at least some overlap in the relief requested, and that is utterly consistent with the purpose of the statute, which is to prevent having to defend in two fora and possibly having to pay twice for the same alleged wrongdoing.

THE COURT: Just so I have a hard example in

my mind, what would be an example of an overlap of dollars that would be achievable in the district court and, similarly, achievable in the Federal Claims Court?

MS. MAROLDY: If it were found that some particular piece of real property, or an interest in real property, such as easements and rights-of-way, which are referred to in both complaints, if it were determined that the United States, as trustee, had not obtained fair market value for that benefit, for instance, from a third party -- I think Mr. Levy referred to power lines during his argument -- I have no idea how that works, but that would be an example.

If there is an easement for a power line, and Ak-Chin were the beneficial owner of that easement, and the United States were found to be a trustee of that asset and had not, in its role, obtained enough money, that would certainly come into play in assessing liability and damages in this Court.

If, in the district court, again, based on the very broad way that Plaintiffs have pled their complaint, the accounting showed that that easement, or what have you, is a part of the trust assets, and based on the way that the asset was managed, not enough monies were obtained, the so-called

"restatement of account balances" would take that into account in some way, shape, or form because based on the way the complaint is pled, the Plaintiff is seeking monetary relief.

THE COURT: His statement was, and this is way beyond my knowledge about how this would actually work, just what was represented in oral argument, is that they are not seeking anything that's not already in the trust system. So let's say that the people who are the beneficiaries of this stuff are the power company. That means it's not in the trust system, except that it could be obtained, and there is that little tag line, or taking an action that the district court might order against the third party.

MS. MAROLDY: Well, in both cases, it seems to me that the Plaintiffs are seeking money from the government. Whether the money is outside the trust system or in the trust system, based on the face of Plaintiff's complaint, they are seeking to go beyond the accounting and get some kind of monetary relief for that.

THE COURT: Thank you.

MS. MAROLDY: That's all I have, Your Honor.

THE COURT: Thank you very much. Let me just ask if there is any reply comments, and then I'll

give Ms. Maroldy an opportunity as well.

MR. LEVY: I have a series of points I would like to cover. First, I understand that we'll get a chance to file a brief on the factual record.

THE COURT: Absolutely.

MR. LEVY: I won't cover that today, but we do have a number of disagreements.

In terms of the sequence of filing, I just wanted to remind the Court that there is a controlling decision from the Federal Circuit called Hardwick that says, if you file first in the CFC and the next day in the district court, that's outside of 1500, so there is a controlling authority.

The British Tobacco case has nothing to do with our situation. As Your Honor was saying, that was a situation where they simply put different legal theories on the same thing. They called it "contract." They called it "tort." They sought the exact same relief for gold that was taken, and I quite agree that if the operative facts are the same, and the relief is the same, the fact that there are different legal theories does not save you from 1500, but that's not what we have going on here, as I've discussed at some length.

The government said that it's sufficient,

under 1500, if the nature of the relief is the same, if it's monetary relief. I think that's not so, and I would cite the Court to the Cook case and the OSI case. Both of those involve requests for money relief, and yet 1500 didn't come into play because the money relief was different.

It was measured differently, it compensated different things, and, at the least, that's what we have here because the money that's in the system is different money than the money that's not in the system. It's a different measure, a different species of relief.

THE COURT: Well, wait a minute. Isn't it a less or included category?

MR. LEVY: I'm sorry. I don't understand, Your Honor.

THE COURT: The less or included category; I'm referring to the fact that if, in the course of doing discovery and trial in the Court of Federal Claims, about the activities of the trustee in order to learn what happened to contracts and what happened to money that either wasn't collected or was collected and then mishandled, those two categories.

In the second category of mishandled, if it turns out that the Ak-Chin money all ended up in some

other trust fund, and that came to the surface, wouldn't that be a recovery that would be available in the Court of Federal Claims, breach of trust duty?

MR. LEVY: I don't think so. If Your Honor's question is that the money is in the trust system, but it was put in the wrong account, that's an equitable remedy of restatement.

THE COURT: Do you really think that we couldn't get that money for them in some fashion? If you found out, in the course of doing your Court of Federal Claims case, that the person who is supposed to be paying rent or the royalty or whatever it is, they say, "We absolutely paid it," and you go through, you find the money, you go through the various accounts -- this is really ugly -- you go through, and you finally get in there, and then, all of a sudden, it turns out that the person who was making the last key entry just, choog, like that with their paper, and now the Ak-Chin money is all of a sudden Cherokee money, and eventually you find out that that's what happened. Don't you think we might be able to get it back for them here?

MR. LEVY: I don't underestimate the ingenuity of the Court in doing the right thing.

THE COURT: It was a damage. It was a

damage for mishandling trust fund. The trust fund says it's supposed to go into the Ak-Chin account, and there was a mistake. I mean, Osage, you'll recall, has got a not dissimilar situation which has to do with the timing of payments.

MR. LEVY: Well, let me say this. I think what I said before is correct, but, at the least, I can say that that's not the relief we are seeking, and 1500 goes to the relief that we are seeking in the two complaints.

THE COURT: I would have thought that was relief. You're notice pleading here.

MR. LEVY: Yes.

THE COURT: If you found that, I'll just bet, whether you and I are both around when this is tried in the Court of Federal Claims, if it is, whoever is there in your shoes is going to be saying, "Absolutely, we're seeking that. We found it, and we're seeking it."

MR. LEVY: Time will tell. I guess, for now --

THE COURT: Just a guess, you know, that's the way it would go down.

MR. LEVY: It may prove to be a good guess. I don't know, Your Honor, but I guess, for now, I

would say it's not a ground to dismiss the complaint under 1500, which is all Your Honor has to decide.

But the point I was making about Cook was this: The government, as I understood the comment, was that as long as there is monetary relief sought in both courts, that's sufficient by itself under 1500. In Cook, as the Court will recall, there was a discrimination claim under -- I think it was Title VII of the Equal Pay Act, and there was a retaliation claim under the labor statutes. Both sought money, and yet 1500 did not require a dismissal, even though there was money at issue in both cases. That's the only point I was trying to make.

The government read from a number of the allegations in the complaints. I think we covered this before. There certainly is language in each complaint that could be read to refer to the other, and, with the benefit of hindsight, who knows how the complaints would be drafted today? I think they are proper under Rule 8.

But the main point is the operative facts. Not everything in a complaint is an operative fact, and, in Loveladies itself, the Court of Appeals ignored, if you will, language that it said wasn't an operative fact.

So I think that's what you need to look at, not is there some word in the complaint that might look across the divide to the other case, whether that's an operative fact? That's the issue.

The government referred several times to monetary relief, and that continues to confound me. I really don't know what monetary relief is. I know what money damages is, as a relief. I know what equitable relief is, and those are two different things. But I'm not really sure what monetary relief is.

The cases say that you can have equitable relief, even if it results in the ultimate transfer of funds, or even it has financial implications. Bowen is like that. Alaska Airlines is like that. The Doe case that I cited before is like that. The D.C. Circuit's decisions in Kidwell and Tootle are like that, and the old case in this Court of Casman are like that.

Those are instances where equitable relief might benefit the plaintiff down the road in some financial way. In Casman, for example, he was seeking back pay in one court and reinstatement in the other. If he was reinstated, I don't doubt that that would have financial implications for him, and yet the court

held, quite correctly, I believe, that 1500 did not bar the suit.

So I think the government's sort of use of this nebulous term "monetary relief" is not well founded. It's almost like a unicorn to me. I've never seen something that I can identify as monetary relief in any rigorous sense.

That pretty much covers their reliance on restitution and disgorgement. We talked before that that's just, if you will, a residual allegation. We should get everything we're entitled to, if it's appropriate, in the district court, but the real nub of the case is for accounting and restatement.

The government said several times that both cases will challenge ever transaction. I think counsel said that the United States maximized the investment. They also get into the negotiation over lease terms in both cases.

That's not my understanding. Certainly, that is true in this case, but, in the district court case, the question will not be, "Did the government negotiate hard?" or "Did it get a fair market return?" The question will be, "Did it account?" And those are two different things.

The government might have negotiated like

Donald Trump or Warren Buffet and still not accounted, or it might have accounted fully and simply had a sweetheart deal. Those are really two quite different things.

So, again, I come back to the point that different operative facts, different relief.

The government said the United States would have to pay twice. I can assure the Court that we are not going to get duplicate relief, but, again, the conceptual point is that we're not seeking the same thing in both courts. We do not think that the government is going to have to pay twice for the same wrong, if we win fully in each of the two cases.

THE COURT: What doctrines would you see preventing that from occurring, Counsel?

MR. LEVY: For 1,500 purposes, I think --

THE COURT: No, just generally.

MR. LEVY: Well, I'm not sure what the doctrine is that keeps a party from being compensated twice for the same wrong, but I'm sure it's something courts wouldn't do. I don't know whether it's a doctrine of equity or whether it's a doctrine of mitigation in damages.

But if it turns out, and I want to make clear, this is not the theory of our complaints, and

it's not the basis on which 1500 is being decided, but if it turns out that we get a dollar in the district court through restatement, and, again, I don't buy into the government's theory that that's monetary relief, but I'll use their formulation.

If we get a dollar in the district court for a wrong, we'll get a dollar in this Court for the same wrong. We're not going to get two dollars for one dollar's worth of harm.

THE COURT: So the legal doctrine is we're not going to get it.

MR. LEVY: You could cite "Levy on Law" or something like that, if you would like. I'm sure there is a doctrine that prevents that. Maybe even Grant Gilmore's book would say that.

The last thing I would like to say, Your Honor, is, on Harbuck, the government referred to "overlap in relief." I don't think we get anywhere near the overlapping-relief issue, but I just want to make it clear what Harbuck actually stands for.

In that case, in each court, the exact same relief was sought, "the same relief," in the language of Loveladies. In one of the courts, an additional form of relief was sought, and what the Court of Appeals held in Harbuck was that that's the same

relief. The fact that there is identical relief sought in both courts is not circumvented by the fact that some additional relief is also sought.

So the way I think of it, Your Honor, is that, in both courts, Relief X was sought. In one of the courts, Relief Y was sought as well, and what the Court of Appeals held was that Relief X and Relief X + Y are the same relief, and, in that sense, they were overlapping because the exact same thing was sought in both courts.

That's what Harbuck means by "overlap," and, as I say, we're nowhere near that here but certainly don't have that kind of overlapping in this case.

The last thing I would like to leave Your Honor with, and it goes back to this recurring issue about monetary relief and disgorgement and everything. I would refer Your Honor to the Tootle case in the D.C. Circuit.

That was one of these military correction-of-records cases, and the D.C. Circuit there held that jurisdiction was proper in the district court because the equitable relief sought there had value to the former service member, even though, as I said before, it might have some financial implications, in terms of his retirement benefits or medical coverage or

whatever, but I want to focus the Court's attention on the error that the district court made in that case that was reversed by the D.C. Circuit.

Now I'm quoting from the opinion, 446 F.3d at 176, and it's as follows: "The error of law reversed by the district court was that equitable relief was 'in essence a request for monetary relief because the plain effect of a judgment in Plaintiff's favor would be a significant financial gain for Plaintiff.'"

That's what the Court of Appeals said was wrong, as a matter of law, and I think that's the same thing, among many things, that is wrong with the government's position today.

If the Court has no further questions --

THE COURT: Thank you.

MR. LEVY: Thank you.

Any comments?

MS. MAROLDY: First, going to Your Honor's question about money not in the system, I would just remind the Court, and I think I may have done this, but, in paragraph 21 of the complaint, which we're all bound to look at to resolve this question, the actual text of the complaint itself speaks in terms of amounts not yet collected, amounts that should have

been paid, and I think that goes to Your Honor's question about whether money not in the system is at issue in Plaintiff's district court complaint, as pled.

I would just like to reiterate, in light of Mr. Levy's comments, that whether we're dealing with the same operative facts within the meaning of Loveladies and the pertinent case law does not turn on whether there may be a different legal duty involved in one case versus another or a different element. The operative facts that are very clearly the same in both of these cases are government conduct with respect to the transactions at issue.

Similarly, also going to the point that it is the face of the complaint, as Plaintiff presents its complaints, that the Court needs to focus on to resolve the 1500 issue.

The Court also has to examine those at the time the complaints were filed, and, therefore, counsel's assurances or beliefs or understandings about what they may or may not be able to obtain in the future aren't really pertinent here, nor the comment that time will tell.

The fact is that, right now, today, we have, on December 29, 2006, we have two complaints, one in

the D.C. Circuit for the District of Columbia and one in this Court, with very broad allegations alleging wrongful government conduct and that, by the terms of the district court complaint, speaking of restatement, disgorgement, equitable restitution, they are seeking monetary relief, and, therefore, 1500 should bar the complaint in this case, if the Court finds that Plaintiff has not met its burden to show that this complaint was filed first.

The Cook case and the OSI case that Plaintiffs have referred to involved later and different conduct, and here we have something very different. We have, as I mentioned earlier, both courts looking at the very same government conduct, and those are the key operative facts that are at issue in both cases, and, for all of those reasons, this case should be dismissed.

THE COURT: Thank you.

We now will turn to a status conference which will determine the filing schedule for the briefing. The Court expects, no later than October 29, to have its copies of the transcript from today, five days from now, and that is, I believe, a Monday. Let me make sure to Heritage that that would be what I would expect.

Friday is November 2nd, and the filing, Friday is the 9th, just to give us some dates within which, and then, the 16th, I think we would like to have an opening brief and then, very quickly, an opportunity to reply. Tell me when you can have opening briefs ready. The reply should be pretty short and sweet and quick after.

MR. AUSTIN: Your Honor, I have a question.

THE COURT: Yes.

MR. AUSTIN: Does the Court expect that there will be simultaneous filings by both sides?

THE COURT: Yes, yes.

MR. AUSTIN: We would propose, then, within seven days of the availability of the transcript, which I believe would be the first week of November, that the opening briefs be filed by that time.

THE COURT: That's Monday, the 5th. Is someone looking at a calendar? By the close of business on Monday, the 5th.

MS. MAROLDY: Your Honor, I would ask for a little more time.

THE COURT: Okay. We'll make it the same day for both parties. Tell me what your requirements are, Ms. Maroldy.

MS. MAROLDY: If we could make it that

Friday, the 9th.

THE COURT: That's agreeable to the Court. I know people have other responsibilities.

The following Tuesday, the 13th, for the reply, by the close of business on the 13th.

MS. MAROLDY: Just to be clear, Your Honor, is the briefing that the Court expects on the timing issue and the evidence we've heard today?

THE COURT: It is. I think the parties have done a very full job in argument, and I think I'm able to find your citations from the record and from the notes that we've made from the oral argument. I don't think that's a problem.

We just do have different evidence, and trying to address that in the same proceeding, this is really like post-trial briefing.

MS. MAROLDY: Your Honor, Mr. Larsen just pointed out to me that because of the Veterans Day holiday, we might have difficulty communicating with our client before our reply was due, between the 9th and the 13th --

THE COURT: The 14th, Wednesday, the 14th. Okay. Make that note.

I do have all of the documents, so I'll just ask that you not attach additional copies of anything.

We have everything. Just refer to it very specifically, if you will, by either something that was discussed here and in the form that it was discussed here -- we have that set -- or something that was attached in an exhibit to one of the briefs, but we don't need to see it again. Thank you.

Anything further? I thank the parties for their preparation, and we will look forward to receiving this last bit of assistance in making the decision. Good afternoon.

THE CLERK: All rise.

(Whereupon, at 2:01 p.m., the hearing in the above-entitled matter was concluded.)

//

//

//

//

//

//

//

//

//

//

//

//

REPORTER'S CERTIFICATE

DOCKET NO.: 06-932L

CASE TITLE: AK-Chin Indian Community, Plaintiff, v. United States, Defendant

HEARING DATE: Wed. Oct 24, 2007

LOCATION: Washington D.C

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the

Date: Wed., Oct. 24, 2007

John Del Pino

Official Reporter
Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4018