# UNITED STATES
# COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SALT RIVER PIMA-MARICOPA INDIAN COMMUNITY, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 06-943L |
| UNITED STATES | ) | |
| Defendant. | ) | |

Live Tape

(The following transcript was transcribed from a digital recording provided by the United States Court of Federal Claims to Heritage Reporting Corporation on 12/10/07.)

Pages: 1 through 90

Place: Washington, D.C.

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

# UNITED STATES
# COURT OF FEDERAL CLAIMS

Date: December 10, 2007

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SALT RIVER PIMA-MARICOPA INDIAN COMMUNITY, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 06-943L |
| UNITED STATES | ) | |
| Defendant. | ) | |

Monday,
December 10, 2007

Live Tape

(The following transcript was transcribed from a digital recording provided by the United States Court of Federal Claims to Heritage Reporting Corporation on 12/10/07.)

APPEARANCES:

On behalf of Plaintiff:

KEITH M. HARPER, Esquire
WILLIAM G. AUSTIN, III, Esquire
CATHERINE F. MUNSON, Esquire

On Behalf of Defendant:

KEVIN J. LARSEN, Esquire

JOHN MARTIN, Esquire
LAURA M. L. MAROLDY, Esquire

C O N T E N T S

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| For the Plaintiff: | | | | | |
| Alexis Applegate | 14 | 34 | 75 | -- | -- |

E X H I B I T S

| PLAINTIFF'S EXHIBITS: | IDENTIFIED | RECEIVED | DESCRIPTION |
|---|---|---|---|
| A | 15 | 33 | 9:26 a.m. email from Lawson to Applegate |
| B | 18 | 33 | Email from Applegate to Mr. Young |
| C | 19 | 33 | Email from Applegate to Mr. Young |
| D | 21 | 33 | 9:59 a.m. email string from Keith Harper to Applegate and others |
| E | 22 | 33 | Petty cash receipt with taxi cab receipts attached |
| F | 22 | 33 | Petty cash receipt with taxi cab receipt attached |
| G | 22 | 33 | Taxi cab receipts |
| H | 23 | 33 | 12:41 p.m. email from Applegate to Austin |
| I | 25 | 33 | 2:23 p.m. email |
| J | 27 | 33 | Cases filed with dates |
| K | 29 | 33 | Pleadings |
| L | 31 | 33 | 4-23-07 email string between Applegate and Munson |

## E X H I B I T S

| DEFENDANT'S EXHIBITS: | IDENTIFIED | RECEIVED | DESCRIPTION |
|---|---|---|---|
| 1 | 37 | 87 | 12-29-06 8:59 a.m. email from Harper to Applegate |
| 3 | 25 | 87 | PACER printout of the 12-29-06 filings |
| 4 | 39 | 87 | 9:26 a.m. email |
| 5 | 40 | 87 | Email from Guilder to Roybal |
| 6 | 41 | 87 | 12-29-06 email at 1:28 p.m. from Roybal to Guilder |
| 7 | 48 | 87 | Copy of Salt River filing receipt |
| 8 | 59 | 87 | 4-23-07 email at 10:36 a.m. from Munson to Applegate |
| 9 | 61 | 87 | Plaintiff's response to Defendant's first evidentiary hearing brief in support of government's motion to dismiss |
| 10 | 60 | 87 | 11-29-07 Court of Federal Claims receipt for an Ak-Chin filing |
| 11 | 68 | 87 | Court of Federal Claims Recipt No. 065957 |
| 12 | 70 | 87 | Court of Federal Claims Receipt No. 065959 |

| | | | |
|---|---|---|---|
| 19 | 66 | 87 | ECF PACER printout of Receipt No. 065958 |

E X H I B I T S

| DEFENDANT'S EXHIBITS: | IDENTIFIED | RECEIVED | DESCRIPTION |
|---|---|---|---|
| 20 | 68 | | ECF PACER printout of Receipt No. 065946 |
| 21 | 69 | 87 | Civil Docket Sheet Receipt No. 065957 |
| 22 | 70 | 87 | Civil Docket Sheet Receipt No. 065959 |
| 24 | 57 | 87 | Excerpts from Applegate's testimony in the District Court action |

P R O C E E D I N G S

THE CLERK: The United States Court of Federal Claims is now in session, the Honorable Lawrence M. Baskir presiding. Salt River Pima-Maricopa Indian Community v. United States, Case No. 06-943L comes before the Court today, Monday, December 10, 2007, for an evidentiary hearing regarding the Defendant's motion to dismiss pursuant to 28 U.S.C. ' 1500.

THE COURT: Good morning, everybody. Should we start by having you all identify yourselves, please?

MR. HARPER: Good morning, Your Honor. Keith Harper for the Salt River Pima-Maricopa Indian Community.

MR. AUSTIN: Bill Austin for Plaintiff.

MS. MUNSON: Good morning, Your Honor. Catherine Munson for the Plaintiff.

THE COURT: Good morning.

MR. LARSEN: Good morning, Your Honor. Kevin Larsen, Department of Justice for the United States. Here with me is co-counsel, Mr. John Martin and Laura Maroldy, also from the Department of Justice.

MS. MAROLDY: Good morning, Your Honor.

MR. MARTIN: Good morning, Your Honor.

THE COURT: Good morning.

MR. LARSEN: And Mr. Thomas Barton for the .Department of Interior.

THE COURT: Good morning, sir. There are a few preliminary matters. There's a motion by the Plaintiff to include in this record the record of the proceedings before Judge Hewitt. Mr. Larsen, do you have a problem with that?

MR. LARSEN: Your Honor, I think the Plaintiffs in this litigation between the parties and the briefing in that case doesn't necessarily oppose the admissions which last week that Your Honor had ruled on at the status conference. However, the United States would request to be able to cross-examine whatever witness, including Ms. Applegate, that may fully bear on any relevant issues related to the timing of the case.

THE COURT: Right. I think we are in understanding about that. Okay. The second matter had to do with meta data, which the government had requested of the Plaintiff. Mr. Larsen, you did request that with respect to the --

MR. LARSEN: Your Honor, I don't think we made a formal request. There were some issues about that that we raised in the brief.

THE COURT: So you have not made a formal request?

MR. LARSEN: No.

THE COURT: Okay. That settles that, and then I guess finally there was a request for reducing or supplemental briefing based upon the testimony that we're going to have today. Is that right, gentlemen?

MR. HARPER: Yes, Your Honor.

THE COURT: Seems to me that's a good idea since the briefing at the present time won't include what we hear today? That is sort of not what we're here for, so we'll do that. We'll set some schedules after we conclude with the evidentiary hearing, so I have no other preliminary matters, so let me ask, Mr. Austin, do you have any other matters?

MR. AUSTIN: No, Your Honor.

THE COURT: Who will be lead counsel over there by the way? Mr. Harper? Mr. Austin?

MR. HARPER: Your Honor, I'm counsel of record. Ms. Munson will be doing the principal examination this morning.

THE COURT: Okay. Mr. Harper, any preliminary matters?

MR. HARPER: We have no other preliminary matters.

THE COURT: Mr. Larsen, do you have any?

MR. LARSEN: Your Honor, just one housekeeping

matter. As Your Honor is aware, the parties filed respective notices with the Court on Friday afternoon with regard to at least in part some of the issues that came up at the November 9 status conference with regard to some of the inquiries that Your Honor had raised with regard to some of the filings practices in the District Court.

Certainly, I can say that I spoke with Ms. Munson and Mr. Austin about this by telephone on Friday afternoon, and there was a contemplation as to the parties potentially presenting some additional evidence before the client in the form of live witness testimony, at least that's the United States' request. I understand that Mr. Austin and Ms. Munson may have similar requests.

MR. HARPER: Your Honor, we do have an additional live witness to offer, Ms. Jennifer Romero, but I think it's a little bit different from what the government is offering. My understanding is that the government witness's testimony is solely about hearsay matters, so that would be an issue. Our witness is actually going to be giving testimony about direct observations that she made at the District Court, so I think there may be a little bit of a distinction there. I'm not sure if Ms. Munson has anything to add.

MS. MUNSON: I don't, Your Honor.

MR. LARSEN: Your Honor, if I may? The parties discussed actually on Friday the possibility of being able to present this Court with a joint statement to the Court, and after our conversation on Friday afternoon, the parties agreed that we could not provide the Court with a joint statement to the Court. However, the Plaintiffs went ahead and filed it with their notice.

They filed the statement, which the United States would say is hearsay with regard to a conversation Ms. Munson had with the District Court Clerk, and the United States did not tender or proffer its evidence and asks for the opportunity perhaps at the conclusion of the hearing if the Court feels it's necessary to at least allow the United State to proffer such evidence or present this evidence in the form of live witness testimony.

I realize Mr. Harper's objection, and certainly we could be prepared to address that at the conclusion here.

THE COURT: Let's wait. I had hoped of course that you all could make a common statement, which apparently is not so. I would be prepared to take representations by counsel rather than having counsel or

a witness come and testify as to conversations.

MR. LARSEN: Okay.

THE COURT: And I would be prepared to take that from both sides if you have no objection. You of course would lose the right to cross examine on this matter, but it doesn't seem to me that weighty.

MR. LARSEN: Certainly, Your Honor. I certainly can be prepared to make representations to what I know or what I personally witnessed, but, Your Honor, there is the additional issue as to the formal -- you indicated the government's position is there is potentially some additional relevant information out that there that may be relevant to this Court's jurisdiction that the United States did not purposely pursue because of administrative regulations in Federal Court, and I can address that.

THE COURT: We're talking in abstracts and generalities. I don't exactly know what you are specifically referring to.

MR. HARPER: Your Honor, we understand the Court has an interest in these factual matters, and we understand there may be things within knowledge of counsel on our side and counsel on Defendant's side both that are hearsay in actuality, and we don't mind trying to make either some kind of a joint stipulation or both

making representations. I think that that would be a fair way to proceed.

I think anything beyond that obviously if the Court thought it was necessary, we wouldn't have an objection, but at this juncture, we don't see the need for it in light of this live testimony taken here.

THE COURT: Okay. So my current preference is to hear representations from you all, and we'll see if we need something more formal than that, so are you prepared to call a witness?

MR. HARPER: Yes, Your Honor.

THE COURT: Okay.

MS. MUNSON: We would like to call Alexis Applegate. Your Honor, this is a notebook of Plaintiff's exhibits I've handed Defendant's counsel. May I approach?

THE COURT: Just give it to Ms. Weeman.

MS. MUNSON: We have a copy for Your Honor as well.

THE COURT: Thank you. Swear in the witness. Please raise your right hand. Ms. Weeman, are you prepared to swear in the witness?

THE CLERK: No.

Whereupon,

ALEXIS APPLEGATE.

having been duly sworn, was called as a witness and was examined and testified as follows:

THE COURT: Thank you very much. It's not that hard. Go ahead, Ms. Munson.

DIRECT EXAMINATION

BY MS. MUNSON:

Q Please state your name for the record.
A Alexis Applegate.
Q And where do you work?
A I work in the Washington, D.C. Office of Kilpatrick Stockton, LLP.
Q Were is that office located in relationship to this Court?
A 607 14th Street, which is just a couple of blocks from here.
Q And what's your position at Kilpatrick Stockton?
A I am a paralegal in the litigation group.
Q And describe your educational background for us after high school.
A After high school I went to a small Quaker school in Greensboro North Carolina by the name of Guilford College. I obtained a B.S. in political science and a B.A. in German studies graduating from the

honors program. I then did an internship at the Environmental Law Institute here in D.C. at which point I stayed in D.C. to take a position at Kilpatrick Stockton. During that tenure at Kilpatrick Stockton I completed my Masters in public policy at George Washington University in December of 2005.

Q Turning now to the filing of the complaints, who was responsible for filing the complaints on behalf of the Salt River Pima-Maricopa Indian Community in the Court of Federal Claims and District Court?

A I was.

Q And when did you file those complaints?

A On December 29, 2006. I can't be precise of the time due to the fact that there are no time stamps.

Q And do you remember what day of the week December 29, 2006 was?

A Yes. It was a Friday, the Friday before New Year's.

Q Which of the complaints was filed first?

A I filed the Complaint in this Court, the Court of Federal Claims, before District Court.

Q And what time on December 29th did you file the Court of Federal Claims complaint?

A Shortly after 9:30.

Q And how do you know that?
A I received an email from a colleague, Katherine Bosken, that forwarded the final versions of the Salt River complaint in conjunction with two of our other tribal clients. And at that point we prepared them and brought them over for filing.
(The document referred to was marked for identification as Plaintiff's Exhibit No. A.)
BY MS. MUNSON:
Q If you would, please take a look at Plaintiff's Exhibit A? Can you identify the document for us, please?
A It's the 9:26 email I just referenced from Katherine Bosken to myself and a number of other individuals forwarding the Tohono O’odham, Salt River and Ak-Chin CFC complaints.
Q And who is Katherine Bosken?
A Ms. Bosken is an attorney in our Winston-Salem office who is on our team.
Q And why didn’t her email include a link to the Passamaquoddy Court of Federal Claims Complaint?
A Another one of my colleagues, Justin Guilder, was handling the finalization of that complaint.

Q And when was the Court of Federal Claims complaint for Passamaquoddy finalized?
A Simultaneously.
Q What does Ms. Bosken's email say about the Court of Federal Claims complaint for Ak-Chin?
A It forwards a final version.
Q And was that actually the final version?
A It was not. It turned out we needed some further information.
Q And when was that complaint, the Ak-Chin Court of Federal Claims final?
A It was after 11:40.
Q And when did you file that complaint?
A Later in the afternoon.
Q Why didn't you wait until the Ak-Chin Court of Federal Claims complaint was ready and file all four of the Court of Federal Claims Complaints at the same time?
A Well, we represent obviously several tribal clients. I didn't want to adversely impact their interest in filing these complaints due to the fact that we had been delayed on another.
Q How many tribal trust complaints altogether did you file on December 29th?
A Seven. Four in this Court and three in the

District Court.

Q Please describe for us each of the steps you took to complete the filing of each of those complaints?

A Sure. We prepared, as I mentioned earlier, the Salt River, the Tohono O'odham, and the Passamaquoddy, CFC complaints first. I brought those over, I walked them over, filed them, obtained a receipt, and then walked back to the office. I arrived and the District Court complaints for Salt River and Passamaquoddy were ready. I took a cab over to the District Court, filed those with the intake clerk and took a cab back to the offices from the District Court at which point we prepared the Ak-Chin complaint for the CFC, walked that over and brought that back.

Then we prepared the Ak-Chin District Court complaint. I took a cab over to District Court to file the Ak-Chin complaint. The intake clerk stated that she was too busy to complete the filing while I waited, so I returned to the office to return later to complete the filing .

Q What time did you start work that morning?

A I think it was like 7:30.

Q Why the early start?

A We had a lot to do that day. I had in my career not filed seven complaints in one day, so I wanted to insure there was enough time to get everything done.

Q When was the District Court complaint for Salt River ready to be filed?

A Actually, the night before on the 28th.

Q Okay. How do you know that?

A There was an email from myself to our IT guy, Blaine Young, forwarding the final version of the Salt River complaint.

(The document referred to was marked for identification as Plaintiff's Exhibit No. B.)

BY MS. MUNSON:

Q I'm sorry for interrupting you.

A. Go ahead.

Q. If you would, take a look at Exhibit B? Can you identify it?

A Sure. It's an email from myself to Mr. Young, the one I just mentioned forwarding an attachment of the PDF version of the Salt River complaint, so that he could put it on a CD per the District Court requirements.

Q If the District Court complaint for Salt River was ready to be filed on the evening of December 28th why did you file the Court of Federal Claims complaints first?

A Mr. Harper instructed me to do it that way.

(The document referred to was marked for identification as Plaintiff's Exhibit No. C.)

Q If you would please turn to Exhibit C. Can you identify that document for us?

A Sure. It's a 9:44 p.m. email on the evening of the 28th from Keith Harper to our team, specifically it asks me to make sure the two Courts are not closing early.

Q And why was there concern about the Court closing early?

A It was the day before both the New Year's holiday and President Ford had passed away so there was another holiday. He wanted to make sure the Courts were not closing early for those holidays.

Q And what did you do in response to the e-mail?

A I called both clerks' offices. The District Court stated that there was no plan to do so. The clerk here in the CFC stated that he didn't know of a plan

but he was not in charge of what the Chief Judge decided.

Q What did you do with that information?

A I relayed it to Mr. Harper.

Q And how did he respond?

A He asked me to file the CFC complaints first both because of this comment by the clerk and because we had already filed the District Court complaint the day before and were familiar and comfortable with that process as we had done them before as well. The CFC complaints, I had filed pleadings, but I had not filed complaints in the CFC before, so we wanted to allow ourselves enough time to make any corrections if it was necessary.

Q To your knowledge had Mr. Harper ever filed a Complaint in the CFC?

A Not to my knowledge.

Q How did you respond to Mr. Harper's instructions?

A I carried them out.

Q And how did you do that?

A If for some reason I wasn't able to carry out his instructions, I would have notified him of that, and I don't recall any such conversation with him, so I

carried it out in the manner in which he instructed me.
Q What time on the 29th did you file the District Court complaint for Salt River?
A My estimation again, there's no time stamp, but it's probably estimated around 10:30. It took me that amount of time to get them ready and then to get over to the District Court to file them.
(The document referred to was marked for identification as Plaintiff's Exhibit No. D.)
BY MS. MUNSON:
Q If you would turn to Plaintiff's Exhibit D, please? Can you identify that?
A Sure. It's an email string actually specifically at 8:59 there's an email from Mr. Harper to myself and a number of other individuals saying that while we prepared the CFC complaints I should go file the DDC.
Q And did you in fact do that?
A I did not.?
Q And when did you receive this email or remember seeing this e-mail?
A I don't remember seeing it until we started preparing for discovery. I was not at my desk when this

email came through. I was upstairs on another floor working with Mr. Guilder and Mr. Harper and a number of other individuals on preparing the complaints. In addition, at about that exact time I was calling the clerk's offices as they were opening to make sure they weren't closing. In addition, at the time, at least, I didn’t have a Blackberry, so I wouldn’t have been checking my emails.

(The document referred to was marked for identification as Plaintiff's Exhibit No. E.)

BY MS. MUNSON:

Q If you would, please turn to Plaintiff’s Exhibit E and take a look at that. Can you identify that for us?

A Sure. It's a petty cash slip, which is what our firm uses for cash reimbursements with two taxi cab receipts attached. They represent an a.m. notation, meaning that it was in the morning and my first trip of the day from our offices to the District Court at 333 Constitution.

Q And who made the a.m. notation on the receipt?

A I did later that day. It was year end so I had to get all reimbursements and time in, in order to

make sure the bills closed at the end of the day.

Q How many additional trips did you make to District Court that day?

A Two additional, I made three total.

(The documents referred to were marked for identification as Plaintiff's Exhibit Nos. F and G.)

BY MS. MUNSON:

Q If you would please take a look at Exhibits F and G and identify those documents for us please?

A Sure. Exhibit F is again a petty cash receipt with taxicabs. There's an indication that it's the second trip of the day which would be my first trip with regards to Ak-Chin. Again, I made that notation that day and submitted them that day. Similarly, G is another petty cash receipt with more taxi cab receipts to and from the District Court with the Ak-Chin notation stating that it was another trip for the Ak-Chin complaint.

Q What time of day was the taxi trip notated with the second trip, which you testified was the first trip for Ak-Chin?

A The only time I have, it would have had to

have been before12:41.

Q How do you know that?

A I sent an email to Mr. Austin at 12:41 stating that I had completed dropping off all the filings, but was waiting for the clerk to finish the summons and prepare it all for filing.

(The document referred to was marked for identification as Plaintiff's Exhibit No. H.)

BY MS. MUNSON:

Q Could you please turn to Plaintiff's Exhibit H and identify that document?

A Sure. This is again a string of emails. My 12:41 email that I just referenced is there from myself to Mr. Austin apologizing for just getting back to him as I was preparing and filing complaints, that we had filed them all but I was waiting for a summons.

Q For which District Court complaint were you waiting for the summons?

A Ak-Chin.

Q And how do you know that?

A The Ak-Chin complaint was the last complaint I filed of the day. It was memorable in several senses – One, it was somewhat odd because I had to drop it off

and then go back and pick it up. In addition, I know that my last trip of the day was to the District Court, and the District Court sequentially numbers their case numbers, and the Ak-Chin was the last of the ones I filed that day.

Q How do you know that the District Court sequentially numbers the complaints?

A I myself called the clerk's office to inquire as did some of my colleagues.

Q What time of day was your last trip to the District Court?

A Well, I know it was between 12:41 and I think it's 2:23. There was another email that I sent to Mr. Austin stating that everything was done.

(The document referred to was marked for identification as Plaintiff's Exhibit No. I.)

BY MS. MUNSON:

Q Please turn to Exhibit I and identify that document for us?

A It is the 2:23 email. It states I just got back from the Court leaving soon, have to get my time in before I leave.So at that point in time I had completed everything and had given them to the process server to

be served. \.

(The document referred to was marked for identification as Defendant's Exhibit No. 3.)

BY MS. MUNSON:

Q Please turn to what the government has marked as Exhibit 3 in support of the Motion to Dismiss, it’s the last document in the notebook with tab 3?

Q Can you identify that for us, please?

A It looks to be from the website notice down here -- a PACER printout of the initial filings that were made on December 29, 2006.

Q And what does this listing reflect with regard to the District Court complaints for Salt River and Passamaquoddy?

A They are the first filed of the day.

Q And how do you reconcile the fact that Passamaquoddy and Salt River were first two filed in the District Court when you testified that you had filed complaints in the Court of Federal Claims prior to filing these?

MR. LARSEN: Objection, leading, Your Honor.

MS. MUNSON: I'm just asking her how she's

reconciling something. My question doesn't in any way suggest what the answer to that question should be. It is not a leading question.

MR. LARSEN: Your Honor?

THE COURT: I'm not sure how the witness is in a position to reconcile it at all.

MS. MUNSON: Okay.

THE COURT: Why don't you rephrase it.

MS. MUNSON: Okay.

BY MS. MUNSON:

Q What time of day did you file the Salt River and Passamaquoddy complaints?

A As I mentioned earlier it was around 10:30 in the day; 10:30 in the morning. It seems plausible to me that they would therefore be the first two of the day, due to the fact complaints aren't usually filed in my experience until later in the afternoon so you have a full day to prepare

MR. LARSEN: Your Honor?

THE COURT: It's based upon the witness's experience, and so I'll just take it like that.

MR. LARSEN: Okay.

BY MS. MUNSON:

Q Have you reviewed any of the filings listed on

the docket sheet showing the actions initiated on December 29th?

A I have, I reviewed everything filed after Ak-Chin through the PACER service provided by the Court system.

Q And what do these filings show?

A They show that after the Ak-Chin case, there were only nine cases that were filed in person during business hours.

Q And how do these listing show that?

A They have the same file stamp as those that were filed during business day for ours.

(The document referred to was marked for identification as Plaintiff's Exhibit No. J.)

BY MS. MUNSON:

Q If you would please take a look at Plaintiff's Exhibit J? Could you identify the documents included in Exhibit J ?

A Sure. After the 15 that were filed in person, there are five here - Coleman v. Lappin ) is the first here. They are all marked with the received stamp, at of earlier date than when they were filed, so Coleman v. Lappins was received on December 11 and was not filed

until December 29, Wills. v. D.C. Jail (ph) was received on December 12 and filed on December 29 -- Harris v Goins Jr. was received on November 29; filed on December 29.

Harley v. U.S. Parole Commission was received on October it looks like 13th, 2006; filed December 29th, and the last was received November 27th and received December 29th. That indicates that the documents when they were received didn't have everything that they needed, perhaps not the filing fee, and therefore had to be held until they were ready.

MR. LARSEN: Your Honor, just for the record, the witness has now just testifying as to random speculation as to why the Complaints weren't filed.

THE COURT: No, I understand. I understand.

BY MS. MUNSON:

Q Referring you back to Defendant's Exhibit 3, what do the pleadings listed on this docket sheet after Stamps versus Secretary show -- that's on second page of Defendant's Exhibit 3?

A The next five are a number of Notices of Removal that were filed in the after hours depository box that all have a time stamp that shows that they were

filed after the Court was closed.

(The document referred to was marked for identification as Plaintiff's Exhibit No. K.)

BY MS. MUNSON:

Q Okay. Now please take a look at Exhibit K.

A Sure.

Q Can you identify those documents for us, please?

A Sure. The first coincides with what is on Defendant's Exhibit 3. It's Beynum v. Clay. It was dropped in the depository box at 5:53; Ruffin. Department of Youth Rehabilitation Services ( was dropped in at 5:53; and Wilson-Green ( was 5:52; Cruz-Packer was 5:51 and Davis was 5:58, indicating that they were all filed in the after hours depository box.

Q And based on the pleadings that you just reviewed in Exhibit K, e when were the complaints listed in Defendant's Exhibit 3 that were listed after those Notices of Removal filed? ?

MR. LARSEN: Objection, Your Honor. This witness does not have first-hand knowledge of any of this evidence that she's testifying to. The documents can speak for themselves, in fact the documents can

speak for themselves as the only evidence really the Court has ordered. Ms. Applegate did not file these complaints. Ms. Applegate knows just as much as any of us in this courtroom about what happened to the filings.

MS. MUNSON: All she's doing Your Honor is she's not offering any sort of expert testimony here or specialized knowledge. She simply going through pleadings, and she's just telling us what the notations on the documents themselves say about what time they were filed.

MR. LARSEN: Your Honor?

MS. MUNSON: We're simply going through and authenticating the documents to get them into the record.

THE COURT: You don't have to authenticate the documents. They're self-authenticating.

MR. LARSEN: The documents speak for themselves.

THE COURT: They do.

MS. MUNSON: All right. Well, let's go on to something else.

THE COURT: I assume you agree with their admission and we'll grant that motion. Okay.

MS. MUNSON: Yes, thank you, Your Honor.

BY MS. MUNSON:

Q As a paralegal employed by Kilpatrick Stockton over the past six years, approximately how many in person filings have you done?

A Hundreds.

Q And at what time of day did you make these filings?

A They were almost always filed in the afternoon to give as much time as possible to work on the document.

Q And prior to December 29th, how many in person filings had you done by 10:30 in the morning?

A None that I recall.

(The document referred to was marked for identification as Plaintiff's Exhibit No. L.)

BY MS. MUNSON:

Q If you would please take a look at Exhibit L? Can you identify that document for us?

A It's an email string between yourself and myself, you had e-mailed me asking me: do you know of a way to find out what time the SR and Passamaquoddy cases were filed in the CFC and the District Court on December 29th.

Q And what was your response, the first sentence?

A Well, my first sentence, No there’s no o precise way. There's no time stamp on the documents filed during the clerk's office business hours, just the date.

Q Now, the second sentence in your April 23 response referred to your having "dropped them off at the intake clerk so she can process them." What was that about?

A That was the Ak-Chin complaint that I referenced earlier.

Q And let me direct your attention to the sentence in your the April 23 response that begins with "As for the CFC..." It says, "As for the CFC, I know I went over there and we were missing something, so I had to come back to the office and get it." Please explain for us how many trips you made to CFC and why?

A Again, I made two trips to CFC. The first was to file the Salt River, Passamaquoddy and Tohono O’odham. The second was the Ak-Chin. I referenced the missing something, -- I believe I got that confused with admissions packets that I had to bring over in January 2007 for Mr. Austin and another Kilpatrick Stockton

attorney in which I was missing an element of the packet and had to return.

Q And in your email response on April 23, what do you say regarding the emails in your sent box?

A I said I would forward you any emails from my sent box that I found.

Q And did you review those emails?

A I did and I forwarded them to you

Q What else have reviewed since then regarding the filings?

A I have reviewed Court rules, both local and federal, Rules of Civil Procedure, I have reviewed my e-mails in addition to the emails that were produced in discovery with regard to this issue. And I have reviewed pleadings filed in the case regarding this issue. Q

What have you concluded based on your review of those materials? (inaudible).

A That I filed the Salt River CFC complaint before I filed the District Court Complaint..

MS. MUNSON: I have no additional questions at this time. I would like at this point to move Exhibits A through L into evidence.

MR. LARSEN: No objections.

THE COURT: Okay. They'll be admitted.

(The documents referred to, previously identified as Plaintiff's Exhibit Nos. A through L, were received in evidence.)

THE COURT: Mr. Larsen?

MR. LARSEN: Your Honor, may I have a couple of minutes before I start my cross-examination? Would that be okay?

THE COURT: Sure. We'll take a five-minute break.

MR. LARSEN: Thank you.

(Whereupon, a short recess was taken.)

THE COURT: Mr. Larsen, are you ready?

MR. LARSEN: Yes, Your Honor. Thank you. Your Honor, just like the Plaintiff, the government also has a binder of exhibits I've shared with counsel. May I approach, Your Honor?

THE COURT: Yes, please.

MR. LARSEN: I've provided identical copies for the Court, for the clerk and for Ms. Applegate.

CROSS-EXAMINATION

BY MR. LARSEN:

Q Good morning, Ms. Applegate.

A Good morning.

Q During the break, Ms. Applegate, you saw me scribbling on the board here, and I did this just for demonstrative purposes.

MR. LARSEN: Your Honor, is the writing large enough for you to see?

THE COURT: It's large enough, but there's not enough contrast, so why don't you explain what it is.

MR. LARSEN: Okay.

THE COURT: The record can't see it either.

MR. LARSEN: Sure, Your Honor. Sure.

BY MR. LARSEN:

Q What I went ahead and did was try to create the series of events that you testified to on direct, and I used some abbreviations because some of the tribal names are rather long, but the letter PMQ I've abbreviated for the tribe Passamaquoddy Tribe of Maine v. United States. The abbreviations SRPM stands for Salt River Pima-Maricopa Indian Community, TO is Tohono O'odham.

Again, I repeated the same abbreviations down here, and you'll see down toward the bottom of the board

the Ak-Chin and Ak-Chin, and then off to the right-hand side you see the abbreviation CFC. That means the Court of Federal Claims, DDC the United States District Court for the District of Columbia.

BY MR. LARSON:

Q Ms. Applegate, you testified that on the morning of December 29, 2006, that you filed the complaints in this Court for tribal plaintiffs Passamaquoddy Tribe of Maine and Salt River Pima-Maricopa Indian Community and the Tohono O'odham Nation first, correct?

A I did.

Q You testified that that was somewhere in the ball park of about 9:30 a.m.

A Shortly after 9:30.

Q Okay. You then went to the District Court, and you testified that after you had gone back to the office and done what you needed to do over there, you took a taxi to District Court and filed complaints in the Passamaquoddy Tribe of Maine and the Salt River Indian Community, both of these versus Dirk Kempthorne and various other defendants?

A Yes. Dirk Kempthorne.

Q Right. Excuse me. In the District Court, and

that was approximately 10:30 in the morning, correct?
A Yes, but as I said, it's an estimation. I figure out how long it would have taken me to do the actions I needed to do and estimated it was 10:30, yes.

Q Right. Okay. And then you returned back to your office, and I think your testimony was that you said that you discovered that the Ak-Chin Court of Federal Claims complaint was then ready. You prepared that complaint, walked down to this Court and filed it, and then finally you took a cab back to the District Court and filed the District Court action for the Ak-Chin Tribe, correct?
A Well, finally I took it to the District Court and dropped it off. Returned later to file it once it was ready.
Q Right. Okay. But you'd agree that this is your best estimate of the sequencing?
A Yes.
(The document referred to was marked for identification as Defendant's Exhibit No. 1.)
BY MR. LARSEN:
Q Okay. Now, I'd like to go through some of the

evidence that some of these documents you may have seen before, and I'll go through them, and they may have a different government or Defense exhibit, but I certainly you have any questions feel free to go over it. Now, I'd like you to first turn to the exhibit that's behind Tab No. 1, the Government's Defense Exhibit No. 1 in the government's folder.

A Yes.

Q And I believe you did testify to this exhibit with Ms. Munson, so at 8:59 in the morning on December 29, you received this email, or least your email system received this email directing you from Keith Harper that you're to file the complaint in the District Court action while we presume changes were being made to the Court of Federal Claims complaint. Is that correct?

A That is what the e-mail states, yes. Q

Right. And you also testified that sometime after Mr. Harper's 8:59 email on December 29 that you were orally countermanded by Mr. Harper. He told you forget the instructions he gave you earlier that day and file the Court of Federal Claims action. Is that true?

A I'm not sure if he told me to forget. I don't remember ever hearing anything about the District Court being filed first, period. So but yes he did orally

instruct me to file the Court of Federal Claims first.

Q And that was the action in this case, the Salt River Pima-Maricopa Indian Community?

A Yes.

Q And so your understanding was that you were to file then the complaints in this Court first? That was your testimony?

A Yes.

Q Now, you agree that 8:59 in the morning on December 29 that the Court of Federal Claims complaints were not yet prepared to be filed?

A No. There will still changes being to the complaints themselves. I had prepared all the other necessary elements the day before and throughout the week before.

Q Okay. And you know this because you testified on direct that you received an email from an associate in one of your firm's other offices, Ms. Katie Bosken, and transmitting the final versions of these complaints at approximately 9:26 a.m. on December 29?

A That's true.

Q And then I believe you also testified that another associate at your firm was working on the Passamaquoddy complaint at 9:26 a.m?

A Yes.

(The document referred to was marked for identification as Defendant's Exhibit No. 4.)

BY MR. LARSEN:

Q If you would look at Defense Exhibit No. 4? Ms. Applegate, this document, Defense Exhibit No. 4, is this document the e-mail that you were just discussing, the transmitting the final copies of the complaints?

A Yes.

Q And these at 9:26 were not ready for filing. Is that true?

A At 9:26 they were ready for filing. They were to be printed out and copied to be filed.

Q Right. We'll go through that, but you weren't at the courthouse steps at 9:26 to present them for filing. Were you?

A No.

(The document referred to was marked for identification as Defendant's Exhibit No. 5.)

BY MR. LARSEN:

Q Now, I'd like you to look at Exhibit No. 5. Do you recognize this document, Ms. Applegate?

A I do.

Q It's an email from Justin Guilder to Edward Roybal. I think you testified to this document on direct. Isn't that true?

A I did.

Q And the document --

A Actually, no. No. I don't think I actually testified to this one, no. I'm familiar with it.

Q Okay. Do you recognize --

Q Okay. And the document is an email from Justin Guilder. Is Justin Guilder an associate at your firm?

A He is in the DC office.

Q Right. And Edward Roybal, he's an outside counsel for the Ak-Chin Indian Community?

A Yes.

Q And so at 11:41 Mr. Guilder was saying can you give me some information related to the Ak-Chin complaint, correct?

A That's correct.

(The document referred to was marked for identification as Defendant's Exhibit No. 6.)

Q Look at Exhibit No. 6 please, Ms. Applegate. It's also an email from Justin Guilder to Mr. Roybal, and that's Friday, December 29 at 1:28 p.m.

A It's actually, to correct you, it’s from Mr. Roybal to Justin Guilder.

Q Thank you. Thank you. My mistake. Again, if you look down further in the email chain it looks to be that Exhibit No. 5 is consumed in Exhibit 6?

A Right.

Q And this appears to be a response at 1:28 p.m. Do you know whether Mr. Guilder had gotten that information prior to 1:28 p.m.?

A Yes. It was a piece of information we were able to find elsewhere.

Q

Okay. But do you know when that information was received?

A It was pretty close to around the 11:41 time when we were were trying to find it at the same time we e-mailed Mr. Roybal.

Q Pretty close? Five minutes, 10 minutes, do you know?

A I don’t know.

Q Okay. But we do know at least that Mr.

Guilder did not have it as of 11:41, so now let's look back at Exhibit No. 4 just turning your attention back to Exhibit 4, let's just assume for purposes of your testimony here that aside from the Ak-Chin complaint that you testified that you filed the Ak-Chin complaint separately from the other three, and that would be Passamaquoddy, Salt River and the Tohono O'odham complaints that you just testified it was at least 11:41 in the morning that the last one was filed.

Let's go back to 9:26 a.m., and I would like to walk you through the steps you took that morning starting at 9:26 a.m. when this email had come in transmitting these three or four complaints that you say you were ready for filing. Do you recall where you were at 9:26 a.m. on the 29th?

A In and near Mr. Guilder's office and at his secretary's station right outside his office.

Q Do you know when you received this email or were notified that complaints were ready to be filed?

A Pretty simultaneously. Mr. Guilder was the one who notified me about and he received the e-mail at 9:26.

Q Okay. Within a few minutes?

A . If not at the same time, right, we were

right there.

Q Okay. Now, you testified on direct that you have to file -- I believe you testified on direct, but if I'm incorrect, please do correct me, but you testified that each complaint in the Court of Federal Claims required you to make seven copies of each complaint.

A. That’s correct.

Q. And you were going to file as of 9:26 in the morning, you knew you had to file the Passamaquoddy, Salt River Pima-Maricopa and the Tohono O'odham complaints, so you needed to make 21 copies of the complaints?

A I needed to make 21 copies of a less than 20-page document, yes.

Q Okay. So you made 21 copies of three complaints?

A I did.

Q Or seven copies --

A Let me rephrase. It wasn't necessarily me that did it. There was a team working on getting all this together, there were several of us getting these together simultaneously.

Q Were you one of the people though that were

making copies?

A I was in the copy room, yes.

Q Okay. So you made the three, the seven copies of each of the three complaints, and is the copy machine near your desk or on another floor?

A Again, I wasn't anywhere near my desk, but it's right next to Mr. Guilder’s office, yes.

Q Okay. Okay. And do you recall about how long it took to run the 21 copies of the three different complaints?

A I don't recall specifically. I know that we have multiple machines and that I can expect they also automatically staple and do everything you need them to do.

Q Okay.

A They are pretty state of the art, so it couldn’t have taken more than five to 10 minutes tops.

Q Five to 10 minutes? So we're at 9:36 at the very minimum if it's five to 10 minutes.

A Yes.

Q Now I'd like you to turn back to Exhibit 1 and look it briefly for a minute. Exhibit 1 again is an email chain. When we first discussed Exhibit 1, we were talking about the 8:59 email, which you received from

Mr. Harper. I'd like you to look actually at the top email. It's an email that's actually dated December 29, 2006, at 2:24, and you see the email chain directly below that from a Danya Stephens?

A Yes.

Q Is Danya Stephens employed at your office?

A She’s in another office, but she’s employed with Kilpatrick Stockton.

Q Okay. And you see the subject line it says, "need rush checks," and that email is time-stamped 10:09 a.m.?

A Yes.

Q At least we know that you have the copies of the other checks you needed. Are these rush checks referring to the filings fees--

A They're not.

Q Okay. What are they?

A They are another matter completely. They don’t have anything to do with Passamaquoddy, Salt River, Tohono O’odham or Ak-Chin.

Q Can you explain why they're part of this email chain?

A They are a part of the email chain because they are a related tribal client that we did not end up

filing a complaint for.

Q Okay. So your testimony is you already had the checks?

A I had prepared the checks prior to this, yes.

Q Okay. Now, in addition to getting checks, and you said you already had them and 21 copies of the complaints, had you previously prepared civil cover sheets?

A I had. For both courts.

Q Now, when you completed the copy process, and you provided these final copies for Mr. Harper, you needed to have one original signed copy. Is that true?

A That is true.

Q All right. So you got Mr. Harper to read through each complaint and sign that one original complaint before you made the copies, correct?

A Yes.

Q Is Mr. Harper's office near the copy room?

A It was at the time, yes.

Q Was it a couple of minutes away?

A Not even -- less than a minute away.

Q Okay. So it's probably 9:45. We know it's at least 9:36 before you were ready to walk down to the Court of Federal Claims. Do you agree with that?

What floor is your office located at 607 14th Street.
A We're at the nine through 11th floors.
Q And what floor - Do you recall what floor you were on?
A The floor that I was on that day was the 11th.
Q So approximately let's just say 9:40 in the morning you got on the elevator and walked down the street, and you walked to the Court of Federal Claims, which is approximately only a half a mile?
A No. Absolutely, not.
Q Four tenths of a mile?
A I don't know. I know it takes me less than five minutes to walk here today.
Q So it took you less than five minutes to walk roughly 0.4 miles?
A Yes, if you look it up on Google, sure.
Q So you traveled about four-tenths of a mile in five minutes?
MS. MUNSON: Objection, Your Honor. She's already testified she doesn't know how far it is, and that it took her less than five minutes.
BY MR. LARSEN:
Q Did it take you four minutes?

A It took me less than five minutes. I can't, I don't know.

Q Okay. You walked up to the court. You stood in line at the -- was there a line at security?

A No.

Q You walked straight to the clerk's office?

A I did.

Q Okay. And then you filed your three complaints in Passamaquoddy, Salt River and Tohono O'odham?

A I did.

Q And you took these 21 copies, and you filed them, correct?

A I did.

Q And you provided the intake clerk with copies of the complaints, the civil cover sheet, the filing fees, and I think you testified on direct that you then received a file-stamped copy of the complaint received it and walked back to the office?

A That's correct.

(The document referred to was marked for identification as Defendant's Exhibit No. 7.)

BY MR. LARSEN:

Q Okay. Please look at Exhibit No. 7. Do you recognize this document?

A Yes. I've seen it before.

Q Okay. Well, how do you recognize the document. You said you've seen this before?

A I've seen it in these proceedings for discovery purposes.

Q Okay. Could you just read into the record the Bates label number at the bottom right-hand corner?

A SR00014.

Q Okay. Would this be the copy of the receipt that you received when you filed the complaint in Salt River Pima-Maricopa Indians Community Case? --

A It looks to be, yes.

Q Could I get you to look now at -- strike that. Do you recall approximately, Ms. Applegate, how long it took you to stand in line, file the complaint, get copies of the complaints in order to be ready to walk out the door?

MS. MUNSON: Objection, Your Honor. She's already testified that she did not have to stand in line.

MR. LARSEN: I'm sorry, Your Honor. Strike the standing in line.

BY MR. LARSEN:

Q Do you recall approximately how long you were at the Court of Federal Claims?

A I recall that it did not take me very long at all, there no one was there. They processed my complaints very quickly, in fact, I have a specific recollection of thinking why Keith and I were so worried about this because it was a very easy process.

Q Okay. And so then your testimony is once you completed your filing, you got your Court-stamped copies and your receipts, you walked back to the office, and you discovered that at that point that the Passamaquoddy and the Salt River complaints were ready for filing?

A Yes.

Q Okay. So again, without going through all the details, you went up to the seventh or the eighth or ninth floor, in your office --

A Went to the 11th floor to find that everything had been prepared for me already, the copies and what not had been made and returned back down to catch a cab.

Q So popped in the office, grabbed the materials --

A Dropped off the CFC materials, picked up the DDC materials and then walked back and got on the

elevator.

Q Okay. And then you took a cab to the District Court, correct?

A Yes.

Q Do you recall about how long it took you to take a cab to District Court on December 29?

A I do it regularly. It usually takes five to 10 minutes.

Q And when you got to the District Court, you then went through security?

A Yes.

Q Walked to the clerk's office.

A Yes.

Q And then stood in line. Was there a line?

A Not that I recall no.

Q Okay. And then you filed the complaints in Passamaquoddy and Salt River, and you testified that was approximately 10:30 in the morning?

A Right. Yes, I got there and did that around 10:30 is my estimation.

Q How many copies did you provide for a filing in District Court. Do you recall?

A It's, I believe it's an original and one. You then have the notice of related cases, the civil cover

sheet, the payment and a number of other items.
Q Okay. And so you provided those materials to the intake clerk?
A Yes.
Q Okay. Did you at some point thereafter visit the cashier?
A Yes.
Q And made your payment for filing fees?
A That's correct.
Q And the cashier gave you a receipt per filing?
A She did.
Q And the file stamped copies of the complaint and (inaudible)?
A The cashier didn't but the intake clerk did. Yes.
Q Right. So you walked back to the intake clerk and got your filings. Was there a line there?
A It's all the same. It's all the same place, so no.
Q Okay. And then you took a cab back from the District Court, which is located at 333 Constitution Avenue, N.W. approximately 1.2 miles back to your office, and you said it took you about five minute.
A Five to 10 minutes.

Q Five to 10 minutes? Okay.
A That's what it usually takes.
Q And when you got back to the office, then your testimony is that you discovered that the Ak-Chin complaint for the Court of Federal Claims was ready at that point?
A We were working on it at that time.
Q Right. And as the evidence demonstrates so far and your testimony is at least 11:41 when a request for additional information was being made by the tribe's counsel to Ak-Chin?
A No. The additional information was requested by Mr. Guilder to the tribes.
Q Right. By your firm, right?
A Right.
Q So let's assume that Mr. Guilder got the information he needed in about four minutes so --
A It was public information, so it was quick.
Q Okay. So we know it would have been about 11:45 in the morning?
A Yes, I think along those lines.
Q And then you needed to make seven copies of the Ak-Chin complaint?
A Yes.

Q And you said you prepared the records and filing materials and you had a check, correct?

A Yep.

Q Again, you had Mr. Harper review the complaint one last time and sign it?

A I did.

Q Now, Ms. Applegate, you testified --

MS. MUNSON: Your Honor, we object to any questioning going beyond into the events well after the Salt River filings. It's not relevant to the time of the filings of the Salt River complaint in the Court of Federal Claims or the District Court (inaudible).

THE COURT: Mr. Larsen?

MR. LARSEN: Your Honor, the Plaintiff's went into this entire filing sequence on direct is clearly relevant, and since as we discussed the core and Ms. Applegate's credibility is essential to the determination of the Court's jurisdiction. She had set forth a timeline, which includes the filing of not only the Salt River and Passamaquoddy complaint in the District Court, but also the Ak-Chin complaint, and the United States should be able to examine Ms. Applegate's testimony with regard to everything she testified to on direct.

MS. MUNSON: It's not disputed that the Salt River complaint in the Court of Federal Claim or the district court was filed before any of the filings in Ak-Chin were done. This whole line of questioning is not relevant to the very narrow issue before this Court, which is which complaint was filed first? The Court of Federal Claims complaint for Salt River or the District Court.

THE COURT: No. I think you opened the door to this by talking about the sequence of events in filing the last Ak-Chin complaints, so I think it's open to Mr. Larsen to explore that, too.

BY MR. LARSEN:

Q Ms. Applegate, you just testified a moment ago that you had already preprepared the filing fees and cover sheets before the complaint was done, correct?

A Yes.

Q Okay. So then you walked back to the Court of Federal Claims with the Ak-Chin complaint, and again approximately took you about five minutes to walk the .4 miles. Was there a line at the security desk at that point?

A Not that I recall.

MS. MUNSON: Objection, Your Honor. He's

saying again that it was .4 miles, which is counsel's testimony. Ms. Applegate has never stated that it's .4 miles from Kilpatrick's office to the Court.

MR. LARSEN: Your Honor, this is cross-examination.

THE COURT: It is cross-examination.

MS. MUNSON: It is cross-examination, but (inaudible) she does not remember how far it is, and he's the one that's testifying.

THE COURT: Ms. Munson, I know that Ms. Applegate has said five minutes and not said how many miles it is, so the Court's not misled and the jury isn't either.

MS. MUNSON: Thank you, Your Honor.

BY MR. LARSEN:

Q Was there a line at the security desk your second trip to the Court of Federal Claims?

A Not that I recall.

Q And at that point you walked into the clerk's office. Do you recall if there was a line at that point in the clerk's office?

A No. No, I don't believe so.

Q No? And you presented again the Ak-Chin complaint, the cover sheet, the filing fee to the clerk?

A I did.
Q And you received a receipt and the file-stamped complaint for the Ak-Chin?
A Yes.
Q Okay. Then you walked back to the office with your file-stamped copy and receipt again for five minutes.
A Yes.
Q Took the elevator back up to your office, and at some point thereafter, you were alerted that the District Court complaint and the Ak-Chin District Court action was then ready to be filed, correct?
A It similarly was ready when I returned from the CFC.
Q What do you mean by that, it was ready?
A The copies had been made, and it was ready to go.
Q Okay. Do you recall your testimony in connection with the Ak-Chin hearing, Ms. Applegate, on October 24?
A Yeah, I remember doing it, yes.
Q And do you recall your testimony regarding preparing the Ak-Chin complaint for the District Court for filing that afternoon?

A . You’ll have to direct me specifically.

MR. LARSEN: May I approach the witness, Your Honor?

THE COURT: Yes.

MR. LARSEN: Actually, I don't need to approach the witness.

(The document referred to was marked for identification as Defendant's Exhibit No. 24.)

BY MR. LARSEN:

Q If I could have you turn to Exhibit 24 and then go to page 40 of that exhibit? I'm referring to line 2 and just read that testimony in line 2 through 10 to yourself. I'm talking about lines 6 through 10, and I apologize. I think I was talking to you about the District Court action.

A Right.

Q A minute ago you testified about the Court of Federal Claims action.

A Right.

MR. LARSEN: I'll withdraw the question, Your Honor.

MR. LARSEN: I apologize for that.

BY MR. LARSEN:

Q You did testify you prepared the copies in the Court of Federal Claims action?

A Yes, or I helped. Let me preface everything by saying we had multiple people working on this simultaneously.

Q Right. So then you took a cab back to the District Court, and I think your testimony was you dropped that complaint off?

A Yes.

Q Was the District Court busy at the security line and at the clerk's office for that Ak-Chin filing?

A I don't specifically remember the security line. It was busy at the intake clerk's desk, which is why she told me she didn't have time to to process it and that I would have to come back.

Q So you left the Ak-Chin District Court complaint?

A And all of its accompanying materials with the intake clerk and went back to the office.

Q All right. And this was after you had filed the Ak-Chin and walked to and from the Court of Federal Claims and filed the Ak-Chin complaint?

A That's correct.

Q And then you returned right back to your office, took the elevator back up to your desk, and at some point thereafter sent an email at 12:41 p.m. to Mr. Austin saying that you had filed all the documents?
A Right.
(The document referred to was marked for identification as Defendant's Exhibit No. 8.)
Q Okay. Now, Ms. Applegate, I'd like you to look at Exhibit 8 now, and I think you did testify that it was the last exhibit that you testified to on direct exam. You testified that you received this email from Ms. Munson on April 23, 2007, at 10:36 in the morning?
A I read it about the time I received it, it looks like at 10:20.
Q Okay. And you testified on direct regarding your recollection of the events surrounding this document, correct?
A I did.
Q Now, the subject line of this email says, "Complaints in Salt River and Passamaquoddy." Isn't that true?
A It does.
Q And in this email, Ms. Munson asks you whether

there was any way to find out what time Salt River and Passamaquoddy cases were filed in the CFC and the District Court on December 29?

A Yes.

Q She also, and when I say "she," I'm referring to Ms. Munson, in the email indicated that this information was "important." Did she not?

A She did.

Q And you told Ms. Munson, "There is no precise way" to tell what time these complaints were filed, correct?

A Yes.

Q And after your trip to the CFC talking about in the document, you said, "I know I went over and we were missing something, so I had to come back to the office and get it." Isn't that true?

A Yes, and on direct I testified that I had confused that with a trip I had taken in January.

(The document referred to was marked for identification as Defendant's Exhibit No. 10.)

BY MR. LARSEN:

Q Right. Right. We'll get to that in a minute. You testified on direct to that, but I'm actually

asking you to look at Exhibit No. 10 at this point. Do you recognize this document?

A It's one of the receipts from I'm not sure which one, one of the receipts.

Q It's a filing in the Court of Federal Claims, Ms. Applegate?

A Yeah, it's a receipt.

Q Dated November 29, 2007?

A It is.

Q And this is in the Ak-Chin Indian Community v. United States?

A I'm not certain.

Q In the caption on the first page?

A I'm not certain.

(The document referred to was marked for identification as Defendant's Exhibit No. 9.)

BY MR. LARSEN:

Q Are we looking at Exhibit 10? Exhibit 9. Excuse me, I'm sorry I'm at 10.

A Okay. 10.

Q I'm sorry. Did I say 10?

A Yes.

Q Okay.

A Exhibit 9 is Plaintiff's response to Defendant's post evidentiary hearing brief in support of defendant's motion to dismiss.

Q Correct. And that was filed in the Court of Federal Claims on November 29, 2007, according to the document?

A Yes.

Q Turn to page 12 of the document, please. I'd like to have you focus on the last paragraph of the document. Do you see the reference in there . . . just read the last paragraph to yourself and let me know when you're ready and continue on to page 13.

A Okay.

Q The filing that your law firm made references your testimony - not your testimony, but your April 23 statement in the email and attempts to explain something that you were missing. The explanation that is given in this document is referencing the Ak-Chin CFC complaint. Isn't that true?

A That is what it is referenced to here, yes.

Q Do you have any idea why this is different than your testimony on direct today?

A I don't. I can only assume that I wasn't clear on my explanation to those who drafted it.

Q Clearly you were not because there's absolutely no correlation between an admissions packet and you forgot something about the Ak-Chin complaint. Don't you agree?

A Umm . . .

Q Is there any way that this could be confused?

A Yes, there’s a way it could be confused.

Q Okay.

A It was a confusing day, Mr. Larsen.

Q Okay. But what's in this filing is inconsistent with what you just said a minute ago about the reason, the “forgot something,” you were missing something. Isn't that true?

A With regards to the missing something, it looks like they're referencing Ak-Chin, and that’s the two trips, not the missing something.

Q This was filed on November 29, 2007?

A Yes.

Q Okay. Now, I'd like you to turn back and look at Exhibit 8. We're back to that email we just discussed.

A Okay.

Q The subject line says nothing in there about complaints in the Ak-Chin proceedings. Does it?

A It does not.

Q Okay. Now I'd like to focus your attention on the testimony you gave in front of Judge Hewitt on October 24, 2007. You at least testified here this morning at both that hearing and today that you were aware when you went to file the Passamaquoddy, Salt River Pima-Maricopa and Tohono O'odham cases -- that morning you were aware that the Ak-Chin complaint was not prepared or ready to be filed?

A I believe I was, I would have taken if it was ready, so . . . .

Q Right. And you didn't go into that first trip because you knew that it was still being worked on?

A That was, I would assume so, yes.

Q So it would make no sense that the something that you would have been missing would have been related to the Ak-Chin complaint that we just discussed.

A I'm not following, Mr. Larsen.

Q We're back to this Exhibit 10, pages 12 and 13.

A Okay. That's not Exhibit 10, Exhibit 10 is a receipt.

Q I'm sorry. Exhibit 9. Excuse me. We're back to Exhibit 9.

A Okay.

Q Looking at pages 12 and 13 of that document.

A Let me read this again, so we're both talking about the same thing.

Q Okay.

A If I may? Reading this again, the missing something portion of this email seems to be consistent with what I was testifying to except for the fact that there's no mention of the January 2007 admissions packet. It says that, "Lastly, the government contends that the filings of the Salt River and Passamaquoddy CFC complaints did not go as smoothly as Ms. Applegate had testified based on her statement in the April 23 email that she was 'missing something at the Court of Federal Claims.'

"While Ms. Applegate initially recalled having to make a second trip to the Court of Federal Claims that day, because she was missing something her first trip there, the reason was she was required to make a second trip to the Court of Federal Claims was because the Ak-Chin CFC complaint was not ready," which is what I testified to earlier, minus the inclusion of the admissions packet.

Q Right. But do you see this explanation

offered by your law firm on behalf of the Ak-Chin Indian Community that the reason you were missing something was related their filing of their complaint, so (inaudible).

MS. MUNSON: Objection, Your Honor, that's absolutely not what the document states.

MR. LARSEN: Your Honor, I can move on. The document does speak for itself.

THE COURT: It does.

MR. LARSEN: Ms. Applegate has testified that she did not testify in consistency with this document.

THE WITNESS: Actually I recanted that and explained it, but that's neither here . . .

MR. LARSEN: Oh, you recanted? Okay. So we'll move on. We'll move on.

BY MR. LARSEN:

Q You just stated that you were aware on December 29 that you weren't going to be going to file the Ak-Chin complaint in the morning, correct?

A When I left to file the three complaints, the Ak-Chin was not ready, yes.

Q Okay. I'll ask you to look back now to Exhibit 7, which you've already seen this morning.

A Okay.

Q Do you recall this was the copy of the receipt

you received in connection with the filing of this case on December 29?

A It has Judge Baskir's name on it, so I assume yes it is.

(The document referred to was marked for identification as Defendant's Exhibit No. 19.)

BY MR. LARSEN:

Q Okay. Why don't you look at Exhibit 19. Do you recognize that document?

A It looks to be a ECF PACER printout of the docket for this case.

Q Okay. Looking at the bottom of the document under Box No. 1 for the complaint, can you read into the record the receipt number associated with this complaint?

A Receipt No. 065958.

Q Okay. Let's actually look at Exhibit 7 again and read the number that's in the bottom left-hand corner. It's a six-digit number.

A Okay.

Q And is that the same as the number referenced in the Court materials?

A It looks to be, yes.

Q Let's look at Exhibit 10 now. Do you recognize this document?

A I'm not sure for which complaint, but it is a receipt from one of the CFC complaints.

Q Okay. It's one of the receipts you received. If you look at the bottom right-hand corner of the document, you see a Bates No. SR0009?

A Yes.

Q So this is the document that is marked and produced to the government in connection with discovery in this case?

A Yes.

Q And would you read the number that's at the bottom left-hand corner of the document of the receipt of the Court of Federal Claims receipt?

A 065946.

(The document referred to was marked for identification as Defendant's Exhibit No. 20.)

Q And now look at Exhibit No. 20, and do you recognize this document, Ms. Applegate?

A I do.

Q What does it appear to be?

A It's again a PACER printout of the Court of

Federal Claim for the Ak-Chin case.

Q Okay. Do you see the receipt number listed at the bottom, 065946?

A I do.

Q Is that the same receipt number as referenced in Exhibit 10?

A It is.

(The document referred to was marked for identification as Defendant's Exhibit No. 11.)

BY MR. LARSEN:

Q Okay. Now, would you look at Exhibit 11?

A Yes.

Q Do you recognize this document?

A Again, it is another receipt from the Court of Federal Claims.

Q Okay. And it's dated 12-29-2006?

A It is.

Q And the receipt number in the bottom left-hand corner is 065957, correct?

A Yes.

(The document referred to was marked for identification as Defendant's Exhibit No. 21.)

BY MR. LARSEN:

Q Now, turn to Exhibit 21, please? Do you recognize this document, Ms. Applegate?

A I do.

Q And this is a civil docket sheet for the Passamaquoddy Tribe of Maine?

A Right.

Q And at the bottom of the docket under Box No. 1 you see the receipt number is 065957. Is that correct?

A Right.

Q And those numbers match up between Exhibits 11 and Exhibit 21?

A They seem to, yes.

(The document referred to was marked for identification as Defendant's Exhibit No. 12.)

BY MR. LARSEN:

Q Now, finally let's look at Exhibit No. 12. Again, this is a Court of Federal Claims receipt. The bottom right-hand corner it's Bates numbered SR00010 dated 12-29-2006. Could you please read the receipt number in the bottom left-hand corner of the document?

A 065959.

(The document referred to was marked for identification as Defendant's Exhibit No. 22.)

BY MR. LARSEN:

Q Okay. Now I'll ask you to turn to Exhibit 22.

A Yes.

Q Now, Ms. Applegate, this is a civil docket sheet for the Tohono O'odham Nation v. United States.

A I'm sorry?

Q For Tohono O'odham Nation v. United States, the Court of Federal Claims.

A Yes.

Q Filed 12-29-2006?

A Right.

Q And the receipt number for that case was 065959, correct?

A Right.

Q And those numbers are the same between the two documents?

A They seem to be, yes.

Q Okay. Now, you testified earlier that you received these receipts at the same time that you filed the complaints?

A That's my recollection.

Q Now I'd like to direct your attention to Exhibits 7, 10, 11 and 12. I know it might be a little bit bulky, but there are four receipts. Exhibit 7 is the receipt for the Salt River Pima-Maricopa Indian Community. Ten is the receipt that you received along with your complaint in the Ak-Chin case. Eleven is the receipt you received in connection with the filing of the Passamaquoddy case.

Lastly, Exhibit 12 is the receipt you received when you filed the complaint in the Tohono O'odham Nation case. Now, putting these cases in alphabetical order, Ak-Chin is the first in the alphabet, correct?

A Yep.

Q Right. And the lowest number of the day, 065946. The next alphabetically listed complaint would be the Passamaquoddy Tribe of Maine, and that is also coincidentally or not the next sequentially arranged number, 065957, correct?

A Which was it, I'm sorry.

Q Exhibit 10.

A Exhibit 10? Yes, 957.

Q And if you want to go --

A And 958 and 959.

Q Right. They're all in alphabetical order,

right?

A Yes.

Q Okay. So what really happened, Ms. Applegate, that despite the demonstration here to the procedure that you testified to on direct, what you did was you waited to file all of the Court of Federal Claims complaints in one action. You waited until 11:41 in the morning on December 29, or at least 11:41 on the 29th --

A I can interject and say no that's not how I recall it and I don't see how this relates.

Q Well, let me finish my question, and you can answer.

A Okay.

Q The question is what you did was you waited until all of the complaints were filed on the 29th, you walked all four of them over, you filed the Ak-Chin complaint, which is to repeat No. 065946. You forgot something. Left something at the office related to Passamaquoddy and Salt River, and if you look back to that email, Exhibit 8, and that confirms the complaint in Salt River and Passamaquoddy, that's the subject line of the heading. You said you forgot something and had to go back.

A I've also stated that I had to review several

documents in conjunction. At the point I send this 10:36 email, I had reviewed nothing, so it is very possible that I had gotten something incorrect in this e-mail.

Q Okay.

Q But what the e-mail says is, what the reference in the subject line is Salt River and Passamaquoddy, and in the email it says, and you didn't say I think, it says I know, I know I went over, and we were missing something, so I had to go back and get it, and the complaints were Salt River and Passamaquoddy.

A It does state that and I've given my explanation for that.

Q Okay. And you've already testified that the next complaint alphabetically would have been Passamaquoddy, followed by Salt River.

A Ak-Chin, Passamaquoddy, Salt River, Tohono O'odham right.

Q So you then went back to the Court of Federal Claims after you forgot something, and you filed Passamaquoddy, Salt River and Tohono O'odham, which are all sequentially numbered 065957, 065958 and 065959 altogether. You testified on direct that you received file-stamped copies of the complaint, and you brought them back the office with you, so I pose to you the

question again what really happened is you filed them altogether. Correct?

A It is not.

Q You still contend that it happened the way you say it did?

A I do.

Q Even given this evidence, and let's finish with this statement. You testified that you had filed all of the complaints by 12:41 p.m. on the 29th, correct? All of them.

A Given what evidence?

Q You testified earlier that you Well, there's an email from you to Mr. Austin that you filed all the complaints in the Court of Federal Claims and the District Court by 12:41.

A The Ak-Chin hadn't been filed yet, but it had been dropped off.

Q Well, you had dropped off all complaints by 12:41?

A Yes.

Q Finally, I'd like to ask you about Exhibit 13. Do you recognize this exhibit, Ms. Applegate?

A Yeah.

Q In fact, it's an email sent one minute later

apparently responding to Ms. Munson's important inquiry with regard to the tribal trust case filings.

A Yes.

Q And you answered her request saying this isn't very precise. You looked at your chained emails, and the quote says, "I think I went to CFC first, but I'm not certain about that." Isn't that true?

A Yes, 17 minutes after she initiated her initial inquiry, I sent her this. Since then I have testified that I had reviewed further material and gone through this so as to determine what actually happened.

Q But you knew this was important, right?

A Yes.

MR. LARSEN: I have nothing further at this time.

MS. MUNSON: Ms. Munson, do you have some redirect?

MS. MUNSON: A few questions.

//

REDIRECT EXAMINATION

BY MS. MUNSON:

Q With regard to the CFC filings that you did, when were the civil action numbers assigned to those complaints

A (inaudible) We have called the clerk's office here at the CFC. .

MR. LARSEN: Objection, speculation.

MS. MUNSON: No.

THE COURT: No. She may have --

MR. LARSEN: The civil case numbers?

MS. MUNSON: I'm asking her, when she filed the Court of Federal Claims Complaints, when did she receive a document showing that what the civil action number was for each of the Complaints.

MR. LARSEN: Okay.

THE WITNESS: We didn't receive one until later, until they had put into the ECF system, if my memory serves.

BY MS. MUNSON:

Q And to your knowledge, how does the Court of Federal Claims assign civil action numbers?

MR. LARSEN: Objection, speculation.

THE COURT: Do you know?

THE WITNESS: I called the clerk's office, and they told me.

BY MS. MUNSON:

Q And what did they tell you?

A They told me that the case, the case numbers

are not necessarily sequential.

MR. LARSEN: That's hearsay, Your Honor.

THE COURT: Well, the Court probably can take judicial notice of whatever this is.

MS. MUNSON: I have no further questions.

THE COURT: You're excused, ma'am. Thank you very much.

THE WITNESS: Thank you.

(Witness excused.)

MR. HARPER: Your Honor, Plaintiff's have one additional witness. We'll be brief. Her name is Jennifer Romero.

THE COURT: Sure.

MR. LARSEN: Your Honor, if we could discuss this additional witness that's been sitting in the courtroom the entire time of this testimony going on. May I approach, Your Honor?

THE COURT: One of you stay by the chair, and one of you can stay by the podium. Were you aware of this witness?

MR. HARPER: They were made aware that we would be bringing additional witnesses. I think we had a conversation about that, Your Honor, and this morning, I again reiterated that we would have an additional

witness in open Court. If Defendant's counsel thought that we needed a sequestration rule of some sort in this proceeding, then I think they could have moved for that earlier on in the proceeding.

THE COURT: Mr. Larsen, you were aware there were to be other witnesses?

MR. LARSEN: Your Honor, the question that we had beforehand was that Your Honor would take representations, and (inaudible) my clients sit here for the live witness testimony, but in fairness, I did sequester my witnesses. I proposed a proffer. (Inaudible).

THE COURT: Wait, wait, wait. Let's not spin out of control.

MR. HARPER: Your Honor?

THE COURT: Are you prepared to make a representation, or do you want this witness to testify?

MR. HARPER: Your Honor, there are two matters.

THE COURT: Okay.

MR. HARPER: There's the matter with respect to conversations that Defendant had with the clerk's office.

THE COURT: Right.

MR. HARPER: And conversations that

Plaintiff's counsel has had with the clerk's office.

THE COURT: Right.

MR. HARPER: With respect to that issue, we think it is appropriate provided that they give sufficient information to satisfy this Court of the trustworthiness of such information that that be accepted as a representation from counsel. We have an additional witness though as I mentioned this morning, direct observations with respect to the clerk's office that we think is relevant. I'd be prepared to make a proffer for Your Honor as to what she would testify. It's a very narrow issue.

THE COURT: Why don't you make a proffer.

MR. HARPER: Your Honor, Ms. Romero is a law clerk at our office. She was asked by Ms. Munson because Your Honor had expressed some concern about whether or not it made sense that the first filing of the day occurred around 10:30 at our last status conference. Well, we asked Ms. Romero to choose at random day to go and stay at the clerk's office and observe for herself when the first complaint was filed on a given day.

She's prepared to testify that indeed on the day that she randomly selected that the first complaint was filed around 11:40 a.m., and so it's not hearsay.

It's direct observation plainly relevant to an issue that this Court had raised with respect to a factual issue in this (inaudible).

THE COURT: I'll take that proffer. I have to say this evidence, whatever day this was, does not tell us what happened on December 29, 2006.

MR. HARPER: Indeed.

THE COURT: I think it has limited persuasiveness, so we'll take that proffer if Mr. Larsen doesn't mind as a proffer.

MR. LARSEN: Well, certainly Mr. Harper can make that proffer. It's the government's position that it's irrelevant. In fact, on our information that this was Friday, so one day. It's highly not scientific. It's not relevant to the issue before the Court.

MR. HARPER: Well, if you're --

THE COURT: Well, in particular it was not December 29, 2006.

MR. LARSEN: Right.

MR. HARPER: Could I just speak to that specific issue though, Your Honor?

THE COURT: Yes.

MR. HARPER: The question that you asked to both counsel is is it unusual to have the first filing at 10:30. Now, there's a lot of issues here about what

they think is usual and what we think is usual, but this is direct evidence based on specific observations made. Yes, a randomly selected day, but I think it is relevant to the notion of is it usual or is it not usual.

MR. LARSEN: Your Honor, if the Plaintiff's are going to put forth their proffer, the government respectfully requests permission to submit its proffer to the same type of issue, which is relevant information that we would like to proffer.

MR. HARPER: To the extent that it's not hearsay, Your Honor, we don't have an objection. Ours is not hearsay. If the government has nonhearsay or exception to the hearsay rule, then I think that it would be relevant evidence if it goes to the material that Your Honor has (inaudible).

THE COURT: What evidence do you have, Mr. Larsen, that you're prepared to proffer us?

MR. LARSEN: We also, the government that is, took Your Honor's question seriously and visited the District Court myself along with one of the members of our team, who is not in the courtroom, who we had excluded from these proceedings for this purpose, visited the District Court clerk's office on November 14, 2007, and attempted to ascertain this information.

We spoke to the District Court cashier, who was on duty on December 29, 2006, and asked her specifically whether it would be unusual for a complaint to come in during the day, several work hours into the morning close to the lunchtime hour, and she reacted and said yes, that would be unusual, so we can't say that it never happened, and I think we can stipulate to that.

The Plaintiff and the government can stipulate that it's possible that it happens occasionally, but the evidence that we are proffering is that the testimony would be hearsay. As Your Honor is aware, there are specific judicial conference regulations that the government would have to follow through, and one other thing I would like to remind Your Honor is that we were told any additional information we wanted to get from the District Court we had to put in writing.

Your Honor showed disfavor with anything that came close to looking like you were compelling the District Court or employee of the District Court to come before Your Honor and testify. We believe the witnesses that have relevant information as to this issue are now proffering it for your consideration in connection with these proceedings, but we would request that the government be allowed to pursue this avenue if Your Honor is not persuaded or is going to provide or

preclude the government using it on the basis of hearsay.

THE COURT: I'm prepared to accept the proffer of Ms. Romero's testimony as being accurate, and I'm prepared to accept your representation as counsel that yours is accurate, and what we do with it will turn partly on what you say in your papers and partly what the court decides to do, but I think we have all the evidence we're likely to have as a practical matter on this question.

MR. HARPER: Your Honor, if I can just state one additional proffer then because we did have specific conversations with the clerk's office, not necessarily inconsistent with Mr. Larsen because as I understand Mr. Larsen's proffer that he just made, they asked whether it was unusual to get a filing right before the lunch hour. Well, we asked the clerk of the Court, and I understand they asked the clerk of the Court.

We were both told, both the Defendant and the Plaintiff were told by the clerk of the Court that you can’t tell, different things happen on every day, and there's no rhyme, there's not reason, and sometimes things happen early in the morning, and sometimes things don't happen until very late, so I think on that issue, we are both consistent, that there is no specific

indication from the clerk's office there's a specific way things happen in the clerks office at least as far as morning filings are concerns.

THE COURT: One last comment, Mr. Larsen, and then we'll move on to something else.

MR. LARSEN: Thank you, Your Honor. Mr. Harper, with all due respect, was not there when I had this conversation, and he's mischaracterizing what information the government received. We spoke to two people. We spoke to the intake clerk, and we spoke to the cashier. While the intake clerk gave us information consistent with what Mr. Harper is saying, the cashier, who's also similarly involved in every filing of the day stated it would be unusual.

I certainly didn't propose a vague question to Ms. Latanya Webb in the District Court. We said several hours into the morning and to cut if off as a point of reference, we said close to the lunch time, and she said that would be unusual. I just want to make sure on the record because our proffer is clear.

THE COURT: The record will show what you said.

MR. LARSEN: Thank you.

THE COURT: Okay. Do we have anything else?

MR. HARPER: Your Honor? Sorry.

MR. LARSEN: One more housekeeping with regard to issues in the Court of Federal Claims, and I can address this at our --

THE COURT: Well, let's hold off a second. Do we have anything else from the Plaintiff on this?

MR. HARPER: (Inaudible) evidentiary of any further witnesses.

THE COURT: Okay. Do you have any witnesses?

MR. LARSEN: I do not, Your Honor.

THE COURT: All right.

MR. LARSEN: I do not.

THE COURT: The next matter?

MR. LARSEN: The next matter is, and as Your Honor is aware, the government did file its notice to the Court on the Friday.

As Your Honor just heard testimony with regards to the receipt in the Court of Federal Claims, the government believes that there may be additional relevant information that the Court of Federal Claims clerk's office could provide the government with regard to order received, et cetera, that the government would interested in following up with the clerk's office here at this Court in conformity with judicial conference regulations if this Court is inclined to see that it's necessary.

THE COURT: We've been dealing with this evidentiary problem for months upon months upon months, and it just seems to me at some time we have to stop, and today is the day that we stop getting evidence, and we just have to do what we can with what we have, so I think I'll pass up your suggestion.

MR. LARSEN: Thank you.

THE COURT: Okay. I think a couple of things are clear. I'm not sure that oral presentation now is going to be very useful unless the parties really want to do it right now because I think what we really want to have is written presentation, and the written presentation will be comprehensive, which is to say I don't want an addition or a correction to the papers you've done already on this matter.

I would like you to start from scratch and make one presentation, this presentation, based upon all the evidence that's been admitted, and have we admitted all the evidence by the way? We admitted the Plaintiff's exhibits.

MR. LARSEN: Your honor, Just as a procedural matter, the government at this point requests that all the exhibits are that we questioned Ms. Applegate be moved into evidence.

MS. MUNSON: We have no objection, Your Honor.

THE COURT: All right. They'll be admitted.

(The documents referred to, previously identified as Defendant's Exhibit Nos. 1, 3 through 12, 19 through 22 and 24, were received in evidence.)

THE COURT: Okay. So we'll do that.

MR. HARPER: Your Honor, on that one point just for clarification --

THE COURT: Can I suggest that you focus in one or another of the microphones.

MR. HARPER: Okay. How about this one.

THE COURT: That's fine.

MR. HARPER: Thank you, Your Honor. With respect to the briefing of these matters, is it right to presume that Your Honor would like simple briefing to the events, merely on the factual matters and not the legal question?

THE COURT: No. I think what you've had to say on the legal matters is said and needs no change unless there's something in the facts that changed that interpretation, but I don't think there is.

MR. HARPER: Yes, Your Honor. I just wanted to clarify that.

THE COURT: Right. It would just be the factual matter of which complaint was filed when, and we'll do this sequentially I think. It's the Plaintiff's burden, so it's your paper to file first.

MR. HARPER: Thank you, Your Honor.

THE COURT: Can you suggest a day that we're not --

MR. HARPER: Can we confer one moment, Your Honor?

THE COURT: Please do unless you want to confer with Mr. Larsen.

(Discussion held off the record.)

THE COURT: Let me say that I don't expect that you all will spend Christmas or New Years Eve doing this thing, so if you need to wait until January to do it.

MR. HARPER: Thank you, Your Honor. We were thinking about the 10th of January.

THE COURT: Mr. Larsen, do you have any problem with that?

MR. LARSEN: Your Honor, not a problem with that. We would propose two weeks, which is the 24th to respond.

THE COURT: I think you may be entitled. Don't you have a motion pending? You do have it. It is

your motion.

MR. LARSEN: Yes.

THE COURT: But it's the Plaintiff's burden. All right. I'm sorry, the date was January 24?

THE CLERK: 24.

MR. HARPER: And then if we can have until the 31st for the reply?

THE COURT: That would be fine. Okay.

MR. HARPER: Thank you, Your Honor.

THE COURT: Thank you. Are there any other matters for us this morning?

MR. HARPER: Not from the Plaintiff, Your Honor. Thank you.

MR. LARSEN: Nothing from the government.

THE COURT: Okay. Well, thank you all very, very much. Ms. Applegate, if she's still here, this may well be the last time you testify unless it gets reversed through further hearings by the Court of Appeals. We're adjourned.

(Whereupon, the hearing in the above-entitled matter was concluded.)

//

//

//

//

//
//
//
//
//
//
//
//
//
//
//
//
//