***SALT RIVER PIMA-MARICOPA INDIAN COMMUNITY***
***v.***
***THE UNITED STATES OF AMERICA***

**CASE NO. 06-943L**

**EXHIBIT 1 – PART 1**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PASSAMAQUODDY TRIBE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Docket No. 08-942C |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

Courtroom 7
National Courts Building
717 Madison Place NW
Washington, D.C.

Friday,
February 1, 2008

The parties met, pursuant to notice of the Court, at 10:02 a.m.

BEFORE: HONORABLE LYNN J. BUSH
Judge

APPEARANCES:

For the Plaintiffs:

CATHERINE MUNSON, Esquire
G. WILLIAM AUSTIN, III, Esquire
JENNIFER M. ROMERO, Esquire
Kilpatrick Stockton, LLP
607 14th Street, Suite 900
Washington, D.C. 20005-2018
(202) 824-1435; 508-5842; 639-4723

For the Defendant:

LAURA M.L. MAROLDY, Esquire
KEVIN I. LARSEN, Esquire
KEVIN REGAN, Esquire
U.S. Department of Justice
Environment and Natural Resources Division
601 D Street, N.W.
Washington, D.C. 20044
(202) 514-4565; 305-0258; 305-3022

APPEARANCES: (Cont'd.)

Also for the Defendant

ELISABETH C. BRANDON, Esquire
Department of the Interior
Office of the Solicitor
1849 C Street, N.W.
Washington, D.C. 20240
(202) 208-3100

ANTHONY HOANG
U.S. Department of Justice

## C O N T E N T S


| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| For the Plaintiffs: | | | | | |
| Alexis Applegate | 12 | 38 | 65 | 74 | -- |


## E X H I B I T S


| JOINT EXHIBITS: | IDENTIFIED | RECEIVED | DESCRIPTION |
|---|---|---|---|
| 1 | 9 | 38 | 12-28-06 9:44 p.m. email from Keith Harper |
| 2 | 9 | 38 | 12-29-06 2:24 p.m. email from Alexis Applegate |
| 3 | 9 | 38 | 12-29-06 9:26 a.m. email from Katherine Bosken |
| 4 | 9 | 38 | Receipt for Passamaquoddy filing of complaint |
| 5 | 9 | 38 | 1-3-07 5:21 p.m. email from Alexis Applegate |
| 6 | 9 | 38 | Receipt for Sale River filing of complaint |
| 7 | 9 | 38 | 12-29-06 11:41 email from Justin Guilder |
| 8 | 9 | 38 | 12-29-06 1:49 email from Bill Austin |

E X H I B I T S

JOINT (CONT'D)

| EXHIBITS: | IDENTIFIED | RECEIVED | DESCRIPTION |
|---|---|---|---|
| 9 | 9 | 38 | 12-29-06 2:23 email from Alexis Applegate |
| 10 | 9 | 38 | Petty cash slip and cab receipts from first trip |
| 11 | 9 | 38 | Petty cash slip and cab receipts from second trip |
| 12 | 9 | 38 | Petty cash slip and cab receipts for second trip |
| 13 | 9 | 38 | 4-23-07 10:36 email from Alexis Applegate |
| 14 | 9 | 38 | 4-23-07 10:37 email from Alexis Applegate |
| 15 | 9 | 38 | Plaintiff's responses and objections to first set of interrogatories |
| 16 | 9 | 38 | Pages 42 through 44 from District of Columbia live database |

## E X H I B I T S

JOINT (CONT'D)

| EXHIBITS: | IDENTIFIED | RECEIVED | DESCRIPTION |
|---|---|---|---|
| 17 | 9 | 38 | Pages 5 through 9 from District of Columbia live database -- doc 20-3 |
| 18 | 9 | 38 | Pages 11 through 13 from District of Columbia live database -- doc 20-3 |
| 19 | 9 | 38 | PA200383 Affidavit of Alexis Applegate |
| 20 | 9 | 38 | PAS00266 Affidavit of Alexis Applegate |
| 21 | 9 | 38 | Second affidavit of Alexis Applegate |
| 22 | 9 | 38 | PAS00217 Affidavit of Alexis Applegate |
| 23 | 9 | 38 | Plaintiff's responses and objections to Defendant's first set of interrogatories |

## EXHIBITS

| JOINT EXHIBITS: | IDENTIFIED | RECEIVED | DESCRIPTION |
|---|---|---|---|
| 24 | 9 | 38 | Plaintiff's response to Defendant's post-evidentiary hearing brief in support of Defendant's motion to dismiss. |
| 25 | 9 | 38 | 065946 12-29-06 receipt from U.S. Court of Federal Claims |
| 26 | 9 | 38 | 065959 12-29-06 receipt from U.S. Court of Federal Claims |
| 27 | 9 | 38 | 12-29-06 receipt from U.S. Court of Federal Claims |
| 28 | 9 | 38 | 065957 receipt from U.S. Court of Federal Claims |
| 29 | 9 | 38 | 065958 12-29-06 receipt from U.S. Court of Federal Claims |
| 30 | 9 | 38 | 12-29-06 receipt from D.C. Court |

E X H I B I T S

| JOINT EXHIBITS: | IDENTIFIED | RECEIVED | DESCRIPTION |
|---|---|---|---|
| 31 | 9 | 38 | 12-29-06 receipt from D.C. Court |
| 32 | 9 | 38 | 12-29-06 9:04 a.m. email from Katherine Bosken |
| 33 | 9 | 38 | Transcript Ak-Chin v. U.S. before U.S. Claims Court 10-24-07 |
| 34 | 9 | 38 | Transcript Salt River v. U.S. U.S. Claims Court 12-10-07 |
| 35 | 9 | 38 | Transcript Salt River v. U.S. U.S. Claims Court 12-12-07 |

P R O C E E D I N G S

(10:02 a.m.)

THE CLERK: All rise. The United States Court of Federal Claims is now in session, Judge Lynn Bush presiding.

THE COURT: Be seated, please. Good morning. We are here today to conduct an evidentiary hearing in this case to hear from Ms. Alexis Applegate in an effort to determine in what order the Passamaquoddy complaints were filed before this Court and the District Court. I will caution counsel, as I stated in my order, we're going to need to be out of here by 1:00, so I would appreciate that you conduct yourselves according.

In the last order that the Court issued, there was a request that counsel prepare a joint exhibit of documents to use during Ms. Applegate's testimony, so we'll need that before we start. I guess first let's have introduction of counsel first from Plaintiff.

MR. AUSTIN: Yes. Good morning, Your Honor.

THE COURT: Good morning.

MR. AUSTIN: My name is Bill Austin, and I'm here on behalf of the Plaintiffs, Passamaquoddy Tribe. Let me introduce my colleagues at counsel table, Ms.

Catherine Munson. Ms. Munson will be conducting the direct examination of Ms. Applegate this morning. Also present today with is Jennifer Romero from our firm, and seated in the audience is Ms. Applegate, who is, per the Court's order, here to offer testimony this morning.

We also have notebooks containing the exhibits that the Court had directed be prepared jointly for use during today's proceeding.

(The documents referred to were marked for identification as Joint Exhibit Nos. 1 through 35.)

THE COURT: Okay. So Ms. Romero is one of your attorneys?

MR. AUSTIN: Yes, yes.

THE COURT: Okay. For the government?

MS. MAROLDY: Yes. Good morning, Your Honor. Laura Maroldy for the United States in this matter, and with me at counsel table are Kevin Larsen and Kevin Regan, both with the Department of Justice, and Elisabeth Brandon of the Office of the Solicitor of the Department of Interior.

THE COURT: Okay. Great. Just so I will know who's in the audience beside Ms. Applegate, sir?

MR. HOANG: Good morning, Your Honor. Anthony Hoang, H-O-A-N-G, from the Department of Justice.

THE COURT: That's fine. Okay. I assume, Ms. Munson, you'll be doing direct, correct?

MS. MUNSON: Yes, Your Honor.

THE COURT: Okay. And you said you have the joint exhibit books that both parties have agreed to?

MS. MUNSON: Yes, Your Honor.

MS. MAROLDY: Just one matter, Your Honor. We and Plaintiffs are aware of this. The government objected to what's Exhibit 5 in the book on the basis that that document, which was covered by Defendant's discovery requests, was not produced until January. That just was sent over by Plaintiffs, and we don't feel that it should be admitted.

THE COURT: When you say January, this is February 1, so January is 31 days, so I'm not sure --

MS. MAROLDY: It was produced to us a matter of two weeks ago or so.

THE COURT: Okay. Well, do you have the --

MS. MAROLDY: In other words, we didn't have it when we did our briefing, and it was not revealed to us in the discovery process.

THE COURT: Okay. Well, let me assure that

you in fact after this the parties will have an opportunity for briefing, so you'll have a change.

MS. MAROLDY: I understand, Your Honor.

THE COURT: Thank you. Okay. With that, do you have copies?

MS. MUNSON: I do, Your Honor. May I approach?

THE COURT: Please.

MS. MUNSON: Okay.

THE COURT: Yes. Thank you. Thank you.

MS. MUNSON: I have one for the witness also.

THE COURT: Great. Ms. Maroldy, which document? You say Exhibit 5?

MS. MAROLDY: Yes, Your Honor. It was Exhibit 5. There's the Bates numbers at the bottom, PAS00485 and 486.

THE COURT: Okay. Well, you've had it for two weeks, and in light of the fact that you have Ms. Applegate here, and you will have the opportunity for briefing, do you maintain your objection?

MS. MAROLDY: Your Honor, as long as we have the opportunity for briefing after this, we will withdraw the objection.

THE COURT: That's fine. Okay. Then call

Ms. Applegate. By this time, you know your way to the witness stand. Raise your right hand.

Whereupon,

ALEXIS APPLEGATE

having been duly sworn, was called as a witness and was examined and testified as follows:

THE COURT: Thank you. You may be seated. Please state your name for the record.

THE WITNESS: Alexis Applegate.

THE COURT: Ms. Munson?

MS. MUNSON: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. MUNSON:

Q Good morning, Ms. Applegate. By whom are you employed?

A Kilpatrick Stockton, LLP in the Washington, D.C. office.

Q And where is that office located in relationship to this Court?

A It's at 607 14th Street, which is just a couple of blocks away.

Q And what is your position at Kilpatrick Stockton?

A I'm a litigation paralegal.

Q And describe for us your educational

background since high school.

A Post-high school, I went to a small Quaker school in Greensboro, North Carolina, called Gilford College where I obtained a B.S. in political science and a B.A. in German studies with a concentration in environmental studies from the honors program. I took that interest and did an internship at the Environment Law Institute at which point afterwards I moved to D.C. permanently, was hired with Kilpatrick Stockton, have been there ever since.

In addition, during my employment at Kilpatrick Stockton, I completed by masters of public policy at George Washington University.

Q Turning now to the December 29, 2006, filings, who was responsible for filing the complaints on behalf of the Passamaquoddy Tribe in the Court of Federal Claims and District Court?

A I was.

Q And what date did you file those complaints?

A December 29, 2006.

Q And do you remember what day of the week December 29, 2006, was?

A Yes. It was a Friday. It was the Friday before New Years.

Q And do you recall which of the Passamaquoddy

complaints you filed first on December 29?
A Yes. I filed the complaint for Passamaquoddy in this Court, in the CFC first.
Q How many tribal trust complaints altogether did you file on December 29?
A On December 29 I filed seven.
Q And please describe for the Court the steps you took to accomplish each of those filings?
A Once I got in in the morning, my first trip was here to the CFC. I took the finalized complaints for Passamaquoddy, Salt River and Tohono O'odham with the requisite materials, walked them over here, filed them, walked back to the office at which point the Salt River and Passamaquoddy complaints for the District Court, the copies had been made, had been prepared by my team.
I took a cab to the District Court, did the process there with the intake clerk and the filing, came back to the office via cab to find that they were still filling in some blanks on the CFC complaints for Ak-Chin. Once those were filled in, I prepared that for filing, again walked over here, filed, walked back at which point when I got back, the District Court complaints had been prepared, the complaint for Ak-Chin.

I took the complaint over via cab. The intake clerk told me that she was too busy to do it while I waited, so I returned back to the office via cab. She said she would call me when it was ready. During that time period, I prepared things for the process servers in the District Court, and then I returned back to the District Court via cab. The intake clerk had not called me, but I was ready for the process to be over, so I went back on my own, and it was ready.

I went through the process there, completed the filing of the Ak-Chin complaint, returned to the office, finalized things for the process server, and that was the end of it.

Q Okay. If you would please turn to Exhibit 1 in the notebook? Can you identify that document for us, please?

A Yes. It is a December 28, 2006, email at 9:44 p.m. from Keith Harper to myself and a number of other individuals. Specifically, it asks, "Alexis, can you make sure the two Courts are not closing early."

Q And why was there a concern about the Court's closing early?

A Like I had mentioned, it was the day before

the holiday. In addition, President Ford had just passed, so there was a another government closed day, so we wanted to make sure that the Courts were not going to close early for the holiday.

THE COURT: Excuse me. Ms. Munson, I noticed that this email is redacted. What's missing from that email?

MS. MUNSON: This is redacted because there was some information in here, which we claimed was work product and privileged communications, and we did produce a privilege log that explained why that information was redacted.

THE COURT: Thank you.

BY MS. MUNSON:

Q When did you first read this email, Exhibit No. 1?

A At the time, I didn't have a Blackberry, so I got it the next morning when I got in.

Q And what did you do in response to the email?

A As soon as the clerk's offices opened, I called and checked on the status.

Q And what did each of the Courts tell you?

A The D.DC. just told me that there was no plan to close early. When I called the CFC, the

clerk, who answered there, said well, there was no plan to close early. He was not in charge of what the Chief Judge decided to do.

Q And what did you do with that information?

A I told Mr. Harper.

Q And how did Mr. Harper respond?

A He decided that due to this information and the fact that we had yet to file a complaint in the Court of Federal Claims that he wanted me to file in the Court of Federal Claims first.

Q And did you follow Mr. Harper's instructions?

A I did.

Q And how do you know that?

A If I had strayed away from those instructions, I would have had a conversation with Mr. Harper, and we didn't have one.

Q If you would, please turn to Exhibit No. 2. Could you identify that document for us, please?

A Sure. It's a string of emails. Specifically, there's one at 8:59 a.m. on December 29. It says, "So we will have to run those copies again while you file the D.DC.."

Q And did you do that?

A I did not. I actually don't recall seeing

this email until the discovery process began, but as I mentioned before, at about this time is when I was making the phone calls to the clerk's office to determine whether there was going to be an early closure or not. In addition, while my office is on the 10th floor, I spent the majority of the day on the 11th floor with the attorneys getting all the complaints prepared, so as I mentioned, I didn't have a Blackberry, so I did not have access to email for a good chunk of the day.

Q What time did you start work on the morning of December 29?

A 7:30.

Q Why so early?

A I had seven complaints to prepare and get ready for filing and file that day. I wanted to ensure that everything was taken care of appropriately.

Q What time on December 29 did you file the complaint for Passamaquoddy in the Court of Federal Claims?

A I can't be certain. I can't be precise because the Court of Federal Claims does not have a time stamp. We do have some related emails that indicate that it was approximately after 9:30.

Q Okay. If you would, please turn to Exhibit No. 3. Can you identify that document for us, please?

A Sure. It's an email from Catherine Bosken to myself and a number of other individuals on our team forwarding the Tohono O'odham, Salt River and Ak-Chin final CFC complaints indicating that Justin, meaning Justin Guilder, is handling the Passamaquoddy complaint.

Q And who is Catherine Bosken?

A She's an associate in our Winston-Salem office, a member of our team.

Q And why did Catie's email not provide a link to the Passamaquoddy CFC complaints?

A Justin Guilder was preparing that one.

Q And when was the CFC complaint for Passamaquoddy final?

A Pretty much simultaneously. Justin and Catie were working together to get everything finalized.

Q And what does Ms. Bosken's email say about the Ak-Chin CFC complaint?

A It forwards the final version.

Q And was the Ak-Chin complaint final?

A It was not.

Q When was the Ak-Chin CFC complaint final?

A Again, I can't be precise, but due to emails it was after 11:41 a.m.

Q Now, why didn't you wait until the Ak-Chin CFC complaint was final and file all four CFC complains at the same time?

A Two reasons really. The first being that we represent several clients, and we didn't want to adversely impact three while we were waiting for one, so we wanted to go ahead and get the others on file. In addition, as I mentioned earlier, we had yet to file in the CFC. We did file the previous day in the District Court, so we knew those procedures really well, and we wanted to make sure that we didn't have to return to the CFC with any misreading of rules or anything like that.

Q And where were you when Ms. Bosken sent the 9:26 a.m. email, which is Exhibit No. 3?

A I was as I mentioned on the 11th floor at and around Mr. Guilder's office.

Q And what did Mr. Guilder do when he received the email?

A He printed out the emails. He printed out the final versions of the Salt River and Tohono O'odham complaints as well as the one he was preparing for Passamaquoddy, and I got the copies ready with my

team and walked them over here.

Q And how long did it take to get the copies done?

A We have multiple copiers, and I had people helping me, so my guess is that it would have been five to 10 minutes.

Q And aside from the copies of the complaints, what other documentation did you need in connection with filing the Court of Federal Claims complaints?

A In the Court of Federal Claims, if memory serves, it's just the civil cover sheet and a check for payment.

Q I'm sorry?

A Then the check for payment.

Q And when did you prepare those?

A I had prepared those along with the necessary documents for the D.DC. throughout the week, and they were ready to go on that Thursday. In the D.DC., I think there's the civil cover sheet, a notice of related cases, the summons and the check. It was my duty to prepare all those, so I had prepared those ahead of time.

Q And how did you get to the CFC that morning to file the Court of Federal Claims complaints?

A As I mentioned, I had walked. We're at 607

14th Street, which is between F and G, so I went up to G Street and took G Street over to 15th, crossed over to the closed portion of Pennsylvania Avenue, walked across the street and came here.

Q And how long did that take approximately?

A I've been here several times now, and each time it takes about five minutes.

Q Please describe the filing process for the Passamaquoddy, Salt River and Tohono O'odham Court of Federal Claims complaints.

A In the CFC?

Q Yes.

A Basically, like I said I walked over here. I went through security. I went to the first floor clerk's office, handed them the materials that I had. They gave me date-stamped copies, and that was it. I specifically remember walking out of the clerk's office wondering what Keith and I had been worried about. It was a very quick and simple procedure.

Q And aside from a stamped copy of the complaint, what else did you receive from the Court of Federal Claims at the time of filing?

A I actually didn't receive anything else. I testified previously in another hearing in Salt River that I had received a receipt. I have since gone back

and looked at the receipts that we received that day. I went to our files where we keep all of the original documentation. The three that I filed in the morning that day all have Judge assignments on them.

I know that I didn't get Judge assignments until January 3, 2007, for several of them, and January 4 actually for Salt River, so I know I couldn't have received those receipts. Again, in a previous hearing, I think she's the chief deputy clerk testified to the fact that the Court would have put those notations onto the receipts so that I couldn't have had those receipts on December 29.

I would have had to have gotten them at or after January 3 and 4.

Q Could you please turn to Exhibit No. 4 in the notebook? Can you identify that document for us, please?

A Yes. It is the receipt for the complaint in the Passamaquoddy.

Q And what does the receipt show regarding the civil action number that was assigned to the Passamaquoddy CFC complaint?

A It has a handwritten notation of 06-942 made by the Court.

Q And when did you receive the civil action

number for the Passamaquoddy CFC action?

A The same time, through the ECF notices from the Court on January 3, 2007.

Q And what does the receipt show regarding the judicial assignment?

A It was assigned to Judge Bush and Miller for the ADR proceedings.

Q And when did you learn that the Passamaquoddy CFC action had been assigned to Judge Bush?

A January 3, 2007.

Q If you would, please take a look at Exhibit No. 5 in the notebook? Can you identify that document for us, please?

A Sure. It's a string of emails on January 3, 2007. A few down Keith Harper is asking his assistant to check with me to see if the Judges were assigned in the Court of Claims cases. She asked me to do that. I did that, and as you'll see, I emailed back to Mr. Harper saying that Judge Hewitt had been assigned to Ak-Chin, Judge Bush for Passamaquoddy and Judge Allegra for Tohono O'odham.

Q And when did you receive the judicial assignment for the Salt River case?

A We didn't receive those ECF notices until

January 4, the next day.

Q If you would, please turn to Exhibit No. 6 in the notebook? Can you identify this document for us, please?

A It's the Salt River receipt for the filing of the complaint in this Court?

Q And what does this receipt show regarding the judicial assignment?

A It was assigned to Judge Baskir, and I assume that the Horn designation is for the ADR pilot proceedings as well.

Q What did you do after you had completed the filings of the Passamaquoddy, Salt River and Tohono O'odham CFC complains?

A I walked back to the office and realized that we were still working on the Ak-Chin complaints, and we prepared the CFC complaint and walked back over here for the filing of the Ak-Chin CFC complaint.

Q What about the status of the Passamaquoddy and Salt River District Court complaints?

A Right. Well, I did that first. We went to the Salt River and Passamaquoddy to the District Court and then came back. Then we had the CFC for the Ak-Chin and then D.DC. for the Ak-Chin.

Q Okay. How long did it take you to get to

the District Court to file the Salt River and Passamaquoddy complaint?

MS. MAROLDY: Objection. From what point, Your Honor?

MS. MUNSON: From the offices of Kilpatrick Stockton to the District Court.

BY MS. MUNSON:

Q Approximately, how long does that take by cab?

A I do it often. It's usually about five to 10 minutes.

Q Okay. And if you would, please describe the filing process for the Salt River and Passamaquoddy District Court complaints?

A The proceeding for the intake clerk at the D.DC. basically is you give her the packet of the documentation that you have. She went through it that day, and I had everything that we needed for both complaints. She then gave me a slip of paper with the check, which I took to the cashier. I paid the cashier and took the receipt from the cashier back to the intake clerk to show her that I had paid, and she gave me my date-stamped copies and my summons.

Q And what time in the morning of December 29 did you file the Passamaquoddy District Court

complaint?

A Again, I can't be precise, but in figuring out how long this would have all taken me, I would approximate about 10:30.

Q And after you finished the filings of the Passamaquoddy and Salt River District Court complaints, where did you go?

A That's when I went back, took a cab back to the office and helped prepare the Ak-Chin CFC complaint.

Q If you would, please take a look at Exhibit No. 7. Can you identify that document for us, please?

A Yes. It's an email from Justin Guilder, again who's an associate in our Washington office, to Edward Roybal, who is tribal counsel for Ak-Chin, asking for a piece of information.

Q For which complaint was the information for?

A For the CFC complaint.

Q And how long after Mr. Guilder sent this email was the Ak-Chin CFC complaint ready to be filed?

A Pretty soon after. It was actually a piece of public information that we were asking Mr. Roybal about, so Mr. Guilder searched for it and found it on his own.

Q And once the Ak-Chin complaint was

finalized, what did you do?

A Myself and another member of our team prepared the copies, and I walked them over here for filing.

Q And what was the process for the filing of the Ak-Chin CFC complaint?

A It was the same pretty much as the morning. I walked in and went through security and gave it to the intake clerk and got back date-stamped copies.

Q Okay. And what did you do after you filed the Ak-Chin CFC complaint?

A I walked back to the office, at which point my team had prepared the Ak-Chin District Court complaint. I took a cab back to the District Court, went through security and went to the intake clerk. She stated that she was too busy to process the claim while I waited, so that's when I took a cab back to the office.

As I explained earlier, I did all the process serving, went back to the District Court and went through the filing procedure, completed the filing, went back to the office and got the documents prepared for the process server.

Q Okay. And going back to the first trip to the District Court to file the Ak-Chin complaint, what

time did you return to the office after having dropped off but not yet having finished filing of the Ak-Chin complaint?

MS. MAROLDY: Objection, Your Honor, leading.

MS. MUNSON: I'm asking her what time. That's not a leading question.

THE COURT: I would ask you to rephrase it because it was a little confusing to me or if you could shorten it?

MS. MUNSON: Okay.

BY MS. MUNSON:

Q What time did you return to the office after having dropped off the Ak-Chin complaint, but not yet having finished the filing?

MS. MAROLDY: Objection.

MS. MUNSON: Still confusing?

THE COURT: It's still complex.

MS. MUNSON: Okay.

BY MS. MUNSON:

Q After having dropped off the Ak-Chin complaint, what did you do?

A I returned to the office. I sent an email to Mr. Austin at 12:41, so I know that I was back in the office by that time period.

Q Okay. If you would, please take a look at Exhibit No. 8? Can you identify that document for us, please?

A Sure. It's a string of emails. Specifically, there's the 12:41 email I just referenced answering Mr. Austin's question on the status of the filings. It says, "Sorry. We have filed them, but I am waiting for the summons. We filed most of them today."

Q And how do you know that this email is referring to the Ak-Chin District Court complaint?

A The Ak-Chin was the last that I filed in the day, and it was the one I had to go back and get the summons for.

Q Where does Ak-Chin fall as far as the civil action numbers in relation to the other District Court actions you filed that day?

A It's the last in conjunction to the three that we filed that day. We've had conversations with the District Court clerk's office, myself and colleagues, and they do consecutively number their cases, so I know that that was the last one that I filed that day.

Q What time did you return to the District Court for the last time that day to finish the filing

of the Ak-Chin complaint?

MS. MAROLDY: Objection, leading.

MS. MUNSON: I'm asking her what time she did something. That's not a leading question.

THE COURT: I'll overrule the objection. That was pretty clear to me.

THE WITNESS: Again, I can't be precise, but due to the emails that we've reviewed, it would be between 12:21 and I believe it's 2:23.

BY MS. MUNSON:

Q If you would, please take a look at Exhibit No. 9? Can you identify that document for us, please?

A It's an extension of the previous one with a response to Mr. Austin at 2:23 that says, "I just got back from the Court. Leaving soon. Have to get my time in before I leave."

Q And what did you do after you had completed the filing of the Ak-Chin District Court complaint?

A Once I returned to the office, as I stated before, I got everything ready for the process server and then sent this email to Mr. Austin.

Q Okay. Go ahead and please turn to Exhibit No. 10. Can you identify that document for us, please?

A Sure. It's actually three documents. It's

a petty cash slip that we use for reimbursement in our offices with two taxicab receipts. You'll notice the a.m. notations, which I put on there on December 29, 2006. I had to get everything in in order to get reimbursed before year end. There's a notation of a.m., which indicates to me that this is the first trip of the day to the District Court, which is when I filed the Salt River and Passamaquoddy District Court complaints.

Q Okay. If you would please turn to Exhibits No. 11 and 12 and identify those documents for us?

A Eleven, again petty cash slip with two taxicab receipts. You'll see that there's a notation. The taxicab receipt that says second trip, which indicates to me that this is the second trip of the day, first trip for Ak-Chin. Exhibit 12, again I have written Ak-Chin, it's the --

THE COURT: Wait. Wait just a moment.

THE WITNESS: I'm sorry.

THE COURT: You were talking about Exhibit 11?

THE WITNESS: Yes.

THE COURT: I'm sorry. I see second trip. I couldn't make that out first.

THE WITNESS: Yes, it's hard to read.

THE COURT: Okay. Thank you.

THE WITNESS: Exhibit 12 is my third and final trip to the District Court to complete the filing for the Ak-Chin, and I have made the Ak-Chin notations there are on the receipts.

BY MS. MUNSON:

Q If you would, please turn to Exhibit No. 13. Can you identify that document for us, please?

A Sure. It is an email exchange between you and myself on April 23, 2007, regarding the complaints in Salt River and Passamaquoddy. You asked me do you know of a way to find out what time the Salt River and Passamaquoddy cases were filed in the CFC and the District Court.

Q And how long did it take you to respond to this email?

A It looks like 16 minutes.

Q And what documents, if any, did you review prior to sending this email?

A This email I hadn't reviewed anything. I just responded to your question.

Q Okay. And what's the first sentence of your answer?

A "No. There is no precise way. There is no time stamp on documents filed during the clerk's

office business hours, just the date."

Q And is that true?

A It is.

Q Now, the second sentence of your April 23 response referred to your having to drop them off with the intake clerk so she could process them. What's that referring to?

A It's referring to the Ak-Chin procedure that I've gone through.

Q Okay. Let me direct your attention to the sentence in your April 23 response that begins with, "As for the CFC..." Do you see that?

A Yes.

Q It says, "As for the CFC, I know I went over there, and we were missing something, so I had to come back to the office and get it, but I just don't know what time all of this happened." Please explain what that is referring to?

A I actually was thinking of a trip that I took soon after December 29. It was in January. There's a couple of admissions packets I needed to do for this Court for Mr. Austin and another member of our team. I had brought the admissions packets over. I was missing something, one of the elements, so I had to bring it back, and that's what I was thinking of

that day.

Q If you would please turn to Exhibit No. 14? Can you identify that document for us, please?

A Sure. It's the 12:41 and 2:23 emails we were referencing earlier, but I had forwarded them to you a minute later we just had this other email exchange stating that this isn't very precise, but explaining the 12:41 and 2:23 timeframe that had happened, the emails that happened between Mr. Austin and myself.

Q What documents or other evidence did you review prior to sending Exhibit 14?

A I really had just taken a quick glance at my sent items to see if I thought anything was applicable.

THE COURT: Excuse me. What items?

THE WITNESS: Sent items in my email in-box.

BY MS. MUNSON:

Q And what documents or other evidence did you review prior to executing an affidavit in this case?

A By that time, we were going through the discovery process, or it might have been complete actually, and I reviewed my in-box, all the emails that I kept in my in-box, my sent items, cab receipts, District Court and CFC docket sheets. I reviewed all

the documents that we had gotten back from the Court that day, so I had done a little bit more.

Q I'm sorry?

A I'm sorry. Go ahead.

Q What did you review in preparation for your testimony today?

A I reviewed those same items.

Q And what have you concluded from your review of those materials?

A That the memory of what I had that day is supported by everything that I have found, so I filed the complaint in Passamaquoddy in the CFC before going to the D.DC..

MS. MUNSON: All right. Thank you, Alexis. I don't have any further questions at this time.

THE COURT: Ms. Maroldy, do you want a couple of minutes before you --

MS. MAROLDY: Yes, I would appreciate that, Your Honor.

THE COURT: We'll take a quick break. We'll be back in 10 minutes.

MS. MUNSON: Thank you.

(Whereupon, a short recess was taken.)

THE COURT: You may be seated, please. Ms. Munson?

MS. MUNSON: Your Honor, my apologies for not doing this earlier, but Plaintiff would like to move for the admission of Exhibits 1 through 14.

THE COURT: Well, since I had asked counsel to come to agreement, and so after any objections, I'll just accept the entire joint exhibit book. Is that agreeable to both parties?

MS. MAROLDY: It is to the government, Your Honor.

THE COURT: Okay. Then I think that's easier.

MS. MUNSON: Yes. Thank you, Your Honor.

THE COURT: Okay. Thank you. In fact, while we are on the subject, I would also assume that counsel would have no objection to the Court's ability to refer to the transcripts, recordings, briefs and exhibits that were used in the other hearings that were before the Court. For example, I don't want to have to bring Lisa Reyes back again and have her appear as a witness, so is there any objection from counsel for the use of those?

MS. MAROLDY: No, Your Honor. We don't object to the use of the those. Just we want to make sure that our ability to examine Ms. Applegate today is not limited by the fact that those transcripts from

other proceedings exhibit.

THE COURT: No, no.

MS. MUNSON: We don't object, Your Honor.

THE COURT: Okay. So they will be admitted as well as the joint exhibits. Thank you. You may proceed.

(The documents referred to, previously identified as Joint Exhibit Nos. 1 through 35, were received in evidence.)

THE COURT: You may proceed.

CROSS-EXAMINATION

BY MS. MAROLDY:

Q Good morning, Ms. Applegate.

A Good morning.

THE COURT: And I'll remind the witness, and I don't need to, but she's still under oath.

THE WITNESS: Yes, ma'am. Thank you.

BY MS. MAROLDY:

Q You testified this morning, Ms. Applegate that you filed the Passamaquoddy District Court complaint on December 29, 2006, at approximately 10:30. Do you recall that testimony?

A Yes.

Q You don't have an independent recollection of what time it was that you did that filing, do you?

A No, I don't. I just went through the process of figuring out how long it would have taken me to do all of this sort and estimate it.

Q In fact, if we turn to Exhibit 13 in the exhibit book, Ms. Applegate, you had relayed to Ms. Munson in April of 2007 that you did not remember what time you went over to the District Court on December 29?

A Yes. I said there was no precise way to figure out that time.

Q But your message to Ms. Munson three lines down, "So even if I could remember what time I went over there (I'll check my emails just in case I sent one that shows when I got back), we would have no idea what time the clerk actually filed them in the D.DC.." Did I read that correctly?

A Yes, and as I stated before, I've used a number of these documents that we've reviewed to corroborate what I remembered of the day.

Q So I read this sentence right?

A Yes.

Q This email, Exhibit 13, this contains the subject line "Complaints in Salt River and