***SALT RIVER PIMA-MARICOPA INDIAN COMMUNITY***
***v.***
***THE UNITED STATES OF AMERICA***

**CASE NO. 06-943L**

**EXHIBIT 1 – PART 2**

Passamaquoddy," correct?

A Yes.

Q And in Ms. Munson's email to you, she asks, "Do you know of a way to find out what time the SR and Passamaquoddy cases were filed in the CFC and DCT. on December 29? It is important," correct?

A Yes.

Q Did I read that correctly? Do you understand in that statement that Ms. Munson when she used the initials SR she meant Salt River?

A I do.

Q Okay. In your response, I believe you testified that the sentence that reads, "I had to drop them off with the intake clerk so she could process them and then come back for them," that you were referring to the Ak-Chin complaint in that statement?

A I was.

Q But Ak-Chin is not mentioned anywhere in the text of either Ms. Munson's question nor your response, correct?

A Right. I was responding on just what I had done that day.

Q So when you said, "I had to drop them off," you meant the Ak-Chin complaint?

A The Ak-Chin complaint and its copies, yes.

Q "So she could process them," that meant just the Ak-Chin complaint?
A Yes.
Q "And then come back for them," that meant just the Ak-Chin complaint?
A Yes.
Q In the next sentence, you state, "So even if I could remember what time I went over there..." et cetera, as I read to you, "we would have no idea what time the clerk actually filed them in the D.DC.." You were referring to only the Ak-Chin complaint?
A Yes, and it's copies. Yes.
Q But the clerk wouldn't file copies.
A Well, I was referring to the multiple things I had delivered to the District Court that day for Ak-Chin.
Q When you refer to filing, you were just referring to the Ak-Chin complaint?
A Yes.
Q So the phrase, "We would have no idea what time the clerk actually filed them..."
A Them meaning the complaint, its copies, the notice of related cases, the summons. I had multiples of complaints with the summons so that we could have a process server.

Q You never sent Ms. Applegate an email clarifying that those sentences referred to the Ak-Chin complaint and not to the Salt River complaint or the Passamaquoddy complaints that she asked about?

A Well, I am Ms. Applegate, but no I never sent one to Ms. Munson.

Q Excuse me.

A No, not that I know of.

Q But you reviewed your emails to see if you had other emails relating to this subject matter, correct?

A I have since. I did not when I did this email.

Q I understand, but your testimony a moment ago not that I know of, you did look for emails concerning this subject matter between the time in April 2007 when you sent this and today, correct?

A Yes.

Q And you didn't see anything where you told Ms. Munson that in those sentences in this email you were actually referring to the Ak-Chin complaint and only the Ak-Chin complaint?

A I don't believe I've seen anything in writing, no.

Q Now, in this same Exhibit 13, Ms. Applegate,

you testified this morning that the sentence, which reads, "As for the CFC, I know I went over, and we were missing something, so I had to come back to the office and get it, but I just don't know what time all of this happened." That actually had nothing to do with the Salt River or Passamaquoddy complaints. Is that right?

A No, not the complaints. I was remembering a trip I had made in January regarding admissions packets for attorneys that I work for.

Q And you're aware, aren't you, Ms. Applegate, that in a paper filed in the Ak-Chin proceeding in this Court your firm represented that actually that statement about missing statement referred instead to your going back to the Court to file the Ak-Chin complaint later in the day?

A If we're thinking about the same thing, I'm not quite sure that's what it says.

Q Okay. If you bear with me a moment, I'll find it. Let me make sure we're all on the same page, literally.

MS. MAROLDY: I apologize, Your Honor and Ms. Applegate. It will just take me a moment.

THE COURT: Take your time.

MS. MAROLDY: Someone is coming to my

rescue, Your Honor. I think it's Exhibit 24.

BY MS. MAROLDY:

Q I'm at page 12, Ms. Applegate.

A Yes.

Q Do you have it there in front of you? So this is what my question referred to. I had asked you you are aware, aren't you, that in the Ak-Chin proceeding in this Court, the Ak-Chin lawsuit in this court, it was represented in a paper filed by your colleagues that, and I'm going to read, and you can tell me if I'm reading it correctly. I'm at the bottom of page 12, the last paragraph on the page, and the second sentence of that paragraph.

"While Ms. Applegate initially recalled having to make a second trip to the Court of Federal Claims that day because she was 'missing something,' her first trip there, the reason Ms. Applegate was required to make a second trip to the Court of Federal Claims was because the Ak-Chin CFC complaint was not ready when the other three complaints were filed, and it had to be delivered for filing later that same morning." Did I read that correctly?

A You did.

Q So your testimony is that that statement actually is not correct?

A No, that statement is correct. That's how it happened. As I had stated before, I filed the first three and then went back to the office. I'm not going to go through the whole process again, but had to come back for Ak-Chin to file that in the CFC, so that's correct. What I have explained to my colleagues is that I wasn't missing anything there.

I think what I was thinking about then was the mid-January, and I'm not sure of the exact date, mid-January trip with the admissions packets for my colleagues.

Q So the representation here that the missing something statement in your email, Exhibit 13, had something to do with Ak-Chin is not correct?

MS. MUNSON: Objection, asked and answered.

THE COURT: I will sustain the objection.

BY MS. MAROLDY:

Q So when you said you were missing something in Exhibit 13, that had nothing to do in fact with the Salt River filings, the Passamaquoddy filings or the Ak-Chin filings. Is that correct?

A That's correct.

THE COURT: Let me ask a question here. When you say, Ms. Applegate, that this referred to admissions packets, was that admissions packets with

regard to Passamaquoddy and Salt River?

THE WITNESS: Well, they're admissions packets to the Bar for the CFC. Mr. Austin and another person that I worked with were not members. Our lead counsel of course, Keith Harper, is a member here in the CFC, but others were not, so I was doing admissions packets so that they could practice in this Court, and yes, it would have been for these proceedings.

THE COURT: Okay. I'm sorry, Ms. Maroldy. Please.

MS. MAROLDY: That's fine, Your Honor.

BY MS. MAROLDY:

Q The admissions packets, Ms. Applegate, would relate to Bar admission for any proceedings in this Court. Is that correct?

A Right. I mean, we were doing them for these cases, but yes. I assume the rules state they can now be in any case.

Q You assisted in the preparation of Passamaquoddy's responses to interrogatories in this case?

A Some, yes.

Q Did you review them before they were filed?

A Yes.

Q If you turn to Exhibit 15, Ms. Applegate? Are you there?

A Yes.

Q And if you'd look at Interrogatory No. 10, which I believe begins on page 10 of Exhibit 15? Are you there?

A Yes.

Q And that interrogatory says, "State the exact time and date the complaint in the D.DC. was filed. If you do not know the exact time of filing, please state your best approximation of the time, based upon all the information available to you." Did I read that correctly?

A Yes.

Q And the response reads in its entirety, "Ms. Applegate completed the filing of the Passamaquoddy District Court action on December 29, 2006, after she filed the instant action and before 12:41 p.m." Did I read that correctly?

A Yes.

Q And there's nothing in that specifically says approximately 10:30. Does it?

A No, there is not.

Q If you look at Interrogatory No. 11, which appears just below what we were just looking at on

page 10 also, and that says, "Set forth in detail all facts upon which your responses to Interrogatory No. 9 and 10, above, are based." Did I read that correctly?

A Yes.

Q Please take your time reading the response, which goes on for a few pages, and my question to you is there's nothing in this response that talks about how long it took you to do the various steps to file the complaint at D.DC.. Is there, such as the time estimates you testified to this morning?

A No. The time reference are the emails that we have produced.

Q But my question is there's nothing in the response to Interrogatory No. 11 that sets forth the time estimates you testified to this morning?

A No. I think I figured those out since.

Q Since these interrogatories were served?

A I think so. I'm not sure.

Q There's nothing in here estimating that it was at 10:30 that you filed the District Court complaint?

A Not in what you've had me read, no.

Q Do you recall testifying on December 10 regarding the same general events in the Salt River case, Ms. Applegate?

A I do.

Q Do you remember in that proceeding testifying in response to a question from Mr. Larsen, representing the United States, that it was a confusing day?

A No.

Q Okay. Well, if you would just turn to Exhibit 34? You're there?

A Yes.

Q If you would turn to page 69 of Exhibit 34, Ms. Applegate, and let me know when you're there?

A I'm here.

Q Okay. On page 69, this reproduces a portion of Mr. Larsen's cross-examination, correct? It has the words "Applegate - Cross" on the top, and what I was asking you about a moment ago is your testimony that appears on page 69. Mr. Larsen asks you a question at Line 6:

"Q Is there any way this could be confused."

And your response at Line 7:

"A Yes, there's a way it could be confused."

And your further response at 9:

"A It was a confusing day, Mr. Larsen."

That's what my question pertains to. December 29, 2006, was a confusing day. Wasn't it?

A Yes. I mean, it was a busy day, yes.

Q Not just busy, but confusing, correct?

A I don't know. It's what I've said here. I don't know that I would now correlate it to say it was a confusing day, but I've obviously said it was a confusing day.

Q If you would turn to Exhibit 14, Ms. Applegate and let me know when you're there?

A Yes.

Q Okay. Ms. Munson asked you some questions about this on direct. At the time you sent this email to Ms. Munson, you testified this morning that you had I think done a quick review of some items in your sent box?

A Right. Yes. If you look at the two emails in conjunction, I spent about a minute on it.

Q And when you say the two emails, you're referring to Exhibit 13 as well?

A Right. Yes.

Q So in other words you had not reviewed anything at the time you sent the 10:36 email? Is that your testimony?

A That's my testimony.

Q And then in the intervening minute, you reviewed some things?

A I keep my sent items for various things. I went directly to December 29 and found this.

Q But you knew when you responded to Ms. Munson's email that appeared in Exhibit 13 that Ms. Munson considered the information important, correct?

A Right. That's why I got back to her so quickly.

Q But without reviewing anything?

A We reviewed more as time went on, of course.

Q So your testimony is you had reviewed nothing when you sent your 10:36 email, and then you had reviewed some things a minute later when you sent the 10:37 email?

A I quickly looked at my December 29 sent items and forwarded her this due to the fact that I thought it was relevant.

Q Okay. And in Exhibit 14, your 10:37 a.m. email, you told Ms. Applegate, "I think I went to the CFC first, but I am not certain about that." Am I reading that correctly?

A Yes. I told Ms. Munson that I thought I went to the CFC first, and I wasn't certain about that. I hadn't reviewed any of the materials except

for this at that point.

Q You're saying the only materials you had reviewed were the ones that appear on this same page, PAS00483, Exhibit 14?

A I may have seen other emails. Again, it's like any other Outlook in-box. I just went to my sent items. I saw this one that was particularly relevant and just hit forward.

Q You gave an affidavit in this case. Didn't you, Ms. Applegate?

A Yes.

Q Okay. If you would turn to it? It is Exhibit 19. Well, why don't you just turn to Exhibit 19?

Q Are you there?

A Yes.

Q And if you will turn to the last -- my question is -- and you were making an effort to be accurate when you gave this affidavit, correct?

A Of course, yes.

Q And you had by August 13, 2007, reviewed more materials than you had at the time you sent the emails we looked at Exhibits 13 and 14?

A Yes.

Q If you look at numbered paragraph 8 of the

affidavit, Ms. Applegate, it bears the Page No. PAS00385 at the bottom?

A Yes.

Q And that states, "To the best of my recollection, I followed Mr. Harper's instructions, and I filed the complaint in the instant action prior to filing the complaint in the Passamaquoddy District Court action." Did I read that correctly?

A You did.

Q It does not say you were certain. Does it? It says to the best of your recollection, correct?

A It does.

Q It's your practice, Ms. Applegate, in your professional life to follow your supervisor's instructions? When I say supervisors, I mean lawyers at Kilpatrick Stockton with whom you're working on cases, correct?

A Right. And if for some reason I think there's a better way to do it, I would have a conversation with them about that.

Q Okay. But you've also testified and I believe stated in Exhibit 19, and in fact if we look at paragraph 9, you state there, "It is my practice to follow instructions from my supervisors regarding filings. If it necessary for me to depart from such

instructions, it is my practice to report back to my supervisor and explain the reasons for the departure." I read that correctly?

A You did.

Q There's no email, is there, Ms. Applegate, in which you respond to Mr. Harper's 8:59 a.m. email saying to file in the D.DC. first?

A No. I didn't see that email until later.

Q So your testimony is as to Exhibit 2, which Ms. Munson asked you about --

A Right.

Q Where the 8:59 email appears, your testimony is you did not see that on December 29 at or around 8:59 a.m.? You saw that only later?

A Yes.

Q My question to you is there's no email that you sent back to Mr. Harper responding to this saying well, no. As you discussed, we did it in a different order?

A No. As it says here, we discussed it orally.

Q Would you turn to Exhibit 22, Ms. Applegate?

A I'm there.

Q Thank you. This is, and please speak up if you have not had a chance to look at it, but this

Exhibit 22 is an affidavit you gave in the Ak-Chin case pending in this Court, correct?

A That is correct.

Q And if we look at the second and last page, PAS00218, that bears your signature, correct?

A It does.

Q And you signed that under oath, correct?

A I did.

Q The date on that is the 1st of May, 2007, correct?

A It is.

Q And in Exhibit 5 of that affidavit, you state, "I am certain that on December 29, 2006, I filed the complaints initiating the Court of Federal Claims actions prior to filing the complaint in they Ak-Chin District Court action."

A I did. It does say that, yes.

Q So as of May 1, you had reviewed sufficient materials to be certain about that matter?

A Yes.

Q Turning to the matter of receipts, Ms. Applegate, would you take a look at Exhibit 28 and again let me know when you're there?

A I'm here.

Q Okay. And this is a copy of a receipt

issued by this Court for the Passamaquoddy complaint, correct?

A It doesn't look like the one I have reviewed. It doesn't have a case number written on it or anything. You said 29?

Q Twenty-eight.

A Twenty-eight. I'm sorry. Yes. This is the Passamaquoddy. It's one of the ones we provided to you. We had taken that Judge assignment sticker off and made a copy to give that to you as well.

Q That's more than I asked, but let me follow up on that.

A Sure.

Q Are you saying, Ms. Applegate, that when you received this receipt that's Exhibit 28, it had a sticker on it?

A Well, yes. The one that we've used previously does have a sticker on it. When we produce things in discovery, and I was involved in this process, we made a copy with the sticker from the Court on it and one without so you can see the full receipt.

Q And you don't know who wrote the number in the upper right-hand corner of Exhibit 28. Do you? 06-942?

A I thought Ms. Reyes has testified --
Q My question is you don't know. Do you?
A No. I know what Ms. Reyes has said. I did not ask the question myself.
Q And that will be in the record. If you turn to Exhibit 29, Ms. Applegate, is it your testimony that this too had a sticker on it when you received it from the Court?
A Yes. This is the Salt River I believe. We can compare it which Exhibit 6. Yes. Yes, it's the same.
Q So your testimony is when you received that from the Court, that had a Post-It note on it?
A Yes. It still does, actually.
Q But Exhibit 29 does not.
A No. They're the same thing, but no.
Q But Exhibit 29 is something that your office produced to us in discovery looking the way it does today in the exhibit book, correct?
A In conjunction with Exhibit 6, yes.
Q You testified on December in the Salt River proceeding that you received these receipts at the time you filed the complaints. Is that correct?
A I did.
Q Did you testify earlier today on direct that

you did not in fact receive these receipts on December 29 when you filed these complaints?

A That's correct. I had gone back to the office to review the receipts that we had gotten. As I've stated before, these were the first complaints that I remember filing in the CFC, so I was used to the District Court proceedings where you get the receipt. After the Salt River hearing, I returned and looked at the receipts and saw the Judge assignments, which indicated to me that we didn't get those receipts until at or after January 3 and 4, depending on the case you're talking about.

Q Okay. Let me go through that to make sure I understand it. Your testimony today is that you did not receive these receipts at the time that you filed these complaints in the CFC on December 29, correct?

A Yes. With the information that's on them, it's not possible.

Q And that is different from your testimony on December 10 in the Salt River proceeding?

A It is.

Q Because in that proceeding you said you did get the receipts at the time you filed these complaints, correct?

A Yes, assuming that it was the District Court

procedure, and it wasn't.

Q In other words, when you testified in the Salt River proceeding, you weren't testifying from your recollection, you were testifying from an assumption?

A Yes.

Q Turn to Exhibit 5, Ms. Applegate, and again please let me know when you're on that document?

A Yes, I'm here.

Q If you look at the first page, which is PAS00485 on the bottom?

A Yes.

Q This says nothing about receipts. Does it?

A No. It discusses the Judge assignment, procedure and when we got the Judge assignments.

Q This is an email from you to Mr. Harper, correct?

A It's a string of emails. The top one is from me to Mr. Harper.

Q Right. I'm focusing on the top one, the one that bears a time stamp of 5:21 p.m. on January 3, 2007.

A Yes.

Q That one is an email from you to Mr. Harper, correct?

A That's correct.

Q And in that email you were telling Mr. Harper about what electronic notices say about various things, correct?

A Yes. It was the notification that we had gotten about Judge assignments. As you can see from his question down earlier, none of us had known about the Judge assignments before that time.

Q But my question is in this email, your discussion of notices and assignments, you are talking about electronic notices from the Court that were in Mr. Harper's email box?

A Right. he was the lead counsel, so he received the initial ECF notices, yes. He is lead counsel still.

MS. MAROLDY: The Court's indulgence for a moment?

(Pause.)

BY MS. MAROLDY:

Q Turn to Exhibit 15, Ms. Applegate.

A Yes, I'm here.

Q Right. You're quicker than I am. If you would look at Interrogatory No. 2, which appears I believe on page 5 of Exhibit 15? Are you there?

A I am.

Q And I'm looking at the first full paragraph at the top of the page, and if you just read that to yourself for a minute?

A This is the response to Interrogatory No. 2?

Q Yes, ma'am. Feel free to look at the interrogatory itself, which is on page 4. That reads, "Please describe, in detail, the steps taken by you to file the complaints in the D.DC. and the CFC respectively." Did I read that correctly?

A Yes.

Q Okay. So that's on page 4, and I just want to focus your attention on the first full paragraph that appears on page 5.

A The first on page 5? I'm sorry. I was reading 4. Yes.

Q Okay. That particular paragraph refers to your filing of the CFC complaint in the Passamaquoddy case on December 29, correct?

A Yes.

Q And the last sentence of that states, "Ms. Applegate walked back to the office with a file-stamped copy of the complaint."

A That's correct.

Q This morning, I believe you testified that you got date-stamped copies. Is that correct?

A Uh-huh.

Q There's no difference between a file-stamped copy and a date-stamped copy. Is there?

THE COURT: Ms. Applegate, your last response was uh-huh.

THE WITNESS: I'm sorry.

THE COURT: You need to go back and say what you means.

THE WITNESS: Yes.

THE COURT: Thank you.

BY MS. MAROLDY:

Q The pending question was there's no difference between a file-stamped copy and a date-stamped copy. Is there?

A Not in my mind.

Q Did you assist with the preparation of Exhibit 15? In other words, with the Passamaquoddy's responses to interrogatories?

A Again, yes.

Q I apologize if I asked you. Did you review them before they went out?

A I did.

Q Before they were served? Am I correct in understanding that any time that you've used the phrase "file-stamped copy" or "date-stamped copy,"

they're interchangeable. Is that correct in your testimony?

A Yes. The stamps we received here were the received stamps. That's what it says on the complaints that we have. I don't know that there was a date they were filed. I think I use them interchangeably, yes.

Q Turning back to the 10:30 a.m. approximation that you've today for the time that you filed the Passamaquoddy District Court complaint on December 29, it's correct, isn't it, that that's something you developed after the Ak-Chin hearing on October 10, correct?

MS. MUNSON: Objection, vague.

THE COURT: Actually, I'm not certain. You just said 10:30 for filing in the District Court for Passamaquoddy. Was that her testimony?

MS. MAROLDY: I believe it was, Your Honor, that she gave an approximation I believe was the word that Ms. Applegate used this morning, that it was an approximation that she filed the Passamaquoddy District Court complaint on December 29 at 10:30.

THE COURT: At the District Court?

MS. MAROLDY: District Court. Yes, ma'am.

THE COURT: Okay. Would you repeat your

question?

BY MS. MAROLDY:

Q That time estimate is something that you developed since your testimony in the Ak-Chin case on October 24, 2007, correct?

MS. MUNSON: Objection, vague.

THE COURT: Overruled.

THE WITNESS: I'm not quite certain when we went through the time procedures, the timeline for figuring out how much time it would have taken me to make copies. I know that we went through that in some detail at one point. I'm not quite certain when it was.

BY MS. MAROLDY:

Q When you say "we," you mean and the rest of the Kilpatrick Stockton legal team?

A I don't know if it was the rest, but yes, my colleagues and I.

Q And it was after the United States filed a paper in the Ak-Chin procedure questioning whether you could have completed all the steps to do the Ak-Chin filings in an hour? Is that correct?

A Again, I'm not certain. That may be the case. I'm not certain.

MS. MAROLDY: Your Honor, if I could have

just a moment to confer with my colleagues? I think I can wrap up pretty quickly.

THE COURT: All right.

(Discussion held off the record.)

MS. MAROLDY: That's all I have, Your Honor.

THE COURT: Ms. Munson?

MS. MUNSON: Your Honor, may we have a few minutes to confer? I don't think I'll have that many questions, but I'd like to confer with my colleagues?

THE COURT: Okay.

THE COURT: Would you like to stretch?

THE WITNESS: I'm okay. Thank you.

(Discussion held off the record.)

MS. MUNSON: Okay. Ready?

THE COURT: You may proceed.

MS. MUNSON: Okay. Thank you, Your Honor.

REDIRECT EXAMINATION

BY MS. MUNSON:

Q Ms. Maroldy cross-examined you about your certainty regarding the filings you completed on December 29. Explain for the Court why the filing in the Ak-Chin action was particularly memorable?

A It was particularly memorable for a couple of reasons, the first being that it was different than the rest. It was sort of odd. At least I felt that

it was odd that I had to make two trips to complete the filing. The rest of them had gone pretty smoothly.

In addition, I know that because of the way the case numbers are sequentially numbered in the District Court and consecutively numbered, I know that it was the last of the day, and I know for certain that the last Court that I went to that day was the District Court. It was a somewhat stressful day. I remember walking out of the District Court.

I actually embarrassingly enough high-fived a security guard that I had seen several times that day and left and went back to the office and knew that I was minus the summons and the service process, that I had done something that I had been somewhat anxious about for a while.

Q Explain for the Court your state of mind regarding the filings for Passamaquoddy?

MS. MAROLDY: Objection, Your Honor. I don't know what that means. It's a little vague, and her state of mind probably has relevance only in a particular context that's not clear to me from the question.

THE COURT: Do you want to rephrase your question?

BY MS. MUNSON:

Q In your affidavit given in this action, what did it state with regard to your memory of the events on that day?

MS. MAROLDY: Objection, Your Honor. The affidavit speaks for itself. It's in evidence.

MS. MUNSON: I'm simply giving her a chance to explain what that means. Ms. Maroldy opened the door. She cross-examined Ms. Applegate about the fact that her affidavit says it was to the best of her recollection, and we're simply giving Ms. Applegate an opportunity to explain what that means.

MS. MAROLDY: I don't think that was the question that was asked, Your Honor. Same objection. The document speaks for itself.

THE COURT: Okay. You'd have better luck going back. What was your initial question?

MS. MUNSON: My initial question was explain for the Court your state of mind regarding the filings for the Passamaquoddy Tribe.

THE COURT: That's awfully broad. Can you narrow it down without asking her to go back to the affidavit?

BY MS. MUNSON:

Q Well, I guess explain for the Court why your

testimony for the Passamaquoddy Tribe is to the best of your recollection?

A As I had stated previously, to the best of my recollection is my memory. It's the memory of what I had with the confirmations of the various documents that I ascertained, looking at the difference between the Ak-Chin and what I had said in Ak-Chin and Passamaquoddy. It's simply that Ak-Chin was more memorable because of all of the -- craziness is the wrong word, but the difference and some of the problems that I had with the filing.

Q I'm sorry. We're jumping around a little bit here. If you would turn to Exhibit No. 14, please? In that email it says, "This isn't very precise, but from the below chain of emails to Bill, it looks like I took them over to the D.DC. and picked them up again between 12:41 and 2:23." Do you see that?

A Yes.

Q Which complaint were you referring to there?

A The Ak-Chin.

Q If you would also turn to the next exhibit, which is Exhibit 15?

A Yes.

Q Response to Interrogatory No. 2 on page 5,

what does the response to Interrogatory 2 say with regard to what you received when you filed the Court of Federal Claims complaint?

MS. MAROLDY: Objection, Your Honor. The document speaks for itself.

THE COURT: Well, I don't know if it's leading up to something. The document does of course speak for itself, but is this like in preparation for a question?

MS. MUNSON: I'll withdraw the question, Your Honor.

BY MS. MUNSON:

Q Mr. Maroldy asked you about when you had testified about your approximation of how long it took you to perform certain tasks. Do you remember that?

A Yes.

Q When did you first testify in Court about how long it took you to perform certain tasks?

MS. MAROLDY: Objection, vague.

MS. MUNSON: It's the same question that Ms. Maroldy asked.

THE COURT: Overruled. You may answer.

THE WITNESS: In the timing of how long it took me to do certain things, I believe that was in <u>Salt River</u>.

BY MS. MUNSON:

Q When was the Salt River hearing?

A December 10.

Q And when was the Ak-Chin hearing?

A It was earlier. I don't remember the exact date.

Q Okay. If you would please turn to Exhibit No. 34? Ms. Maroldy had cross-examined you about your statement that it was a confusing day.

A Uh-huh.

Q If you would please turn to page 72?

THE COURT: I'm going to remind you not to respond with Uh-huh.

THE WITNESS: Sorry.

BY MS. MUNSON:

Q About halfway down page 72, Lines 11 and 12, you say, "Actually, I recanted and explained it." Explain for the Court what testimony you had recanted, and please take your time to read.

MS. MAROLDY: Objection. Beyond the scope of the cross. I didn't ask Ms. Applegate about that testimony?

MS. MUNSON: Well, this testimony is related to her earlier testimony about her saying it was a confusing day. That is the testimony that she was --

MS. MAROLDY: That's your interpretation, but I did not ask her about this testimony. I referred to one particular part to refresh her recollection about her testimony. I did not ask her about that portion of her testimony.

MS. MUNSON: Well, this is the same line of questioning. This is Mr. Larsen's questioning about her missing something, and that is where Ms. Applegate said it was a confusing day, and then after, she recanted that testimony, so it is related. It is within the scope of the cross.

MS. MAROLDY: Your Honor, my cross was about a statement on page 69 of the transcript. There are several pages of questions and answers between 69 and 72. I didn't ask her about anything on any of those intervening pages.

THE COURT: Let me take a moment and take a look at this portion of the transcript.

(Pause.)

Okay. What was your question, Ms. Munson?

MS. MUNSON: My question was what testimony were you recanting on page 72?

MS. MAROLDY: Again, Your Honor, that's beyond the scope of the cross. The government didn't ask any questions about that portion of the witness'

statements, and in fact looking at it here, there's testimony immediately preceding it about a document, not about anything that I asked in connection with page 69.

MS. MUNSON: The testimony that Ms. Applegate recanted was the testimony that she --

MS. MAROLDY: Objection. I think you're about to testify.

MS. MUNSON: I'm trying to explain why it's within the scope of cross.

THE COURT: Well, it says here Ms. Applegate has testified that she did not testify in consistency with this document. I'm going to sustain the objection simply because the testimony about it being a confusing day is more of a generalized statement. I don't see how going into recanting testimony about a document correlates with a generalized statement, so for that reason, I'm going to sustain the objection.

MS. MUNSON: Okay.

BY MS. MUNSON:

Q Ms. Applegate, are you confused about the order of the filings of the Passamaquoddy complaints?

MS. MAROLDY: Objection, Your Honor.

THE COURT: What is the basis for this objection?

MS. MAROLDY: It's leading, Your Honor. this is redirect I believe. She's asked are you certain.

MS. MUNSON: I didn't ask her.

MS. MAROLDY: It's a leading question.

MS. MUNSON: My question doesn't in any way suggest the answer. I'm asking her are you confused about the order of filing for the Passamaquoddy complaints in the Court of Federal Claims and District Court?

MS. MAROLDY: Objection.

THE COURT: I will overrule that objection. You may answer.

THE WITNESS: No, I'm not confused.

BY MS. MUNSON:

Q What is your recollection with regard to the order of filing?

A I filed in the CFC before I filed in the District Court that day, December 29, 2006.

MS. MUNSON: Thank you. I have no further questions. Thank you, Your Honor.

THE COURT: Thank you.

MS. MAROLDY: Briefly, Your Honor.

//

//

RE-CROSS-EXAMINATION

BY MS. MAROLDY:

Q A short time ago on redirect, Ms. Munson asked you questions about Exhibit 14. If you would just turn back there briefly?

A Yes.

Q And I believe you testified just a short time ago on redirect that this email, or at least the first sentence, which is what I think Ms. Munson asked you about, referred to the Ak-Chin complaint. Was that your testimony?

A Yes.

Q And the subject line of the email is the Tribal Trust Case Filings, correct?

A That's the leftover subject from the earlier emails, yes.

Q And you did not mention Ak-Chin by name in this email, correct?

A I did not.

Q And again you used the word "them," correct, in the first sentence?

A Yes. I've explained the use of that pronoun.

Q And this Exhibit 14 bears a time stamp of 10:37 a.m., correct?

A It does.

Q You sent that just a short time after the 10:36 a.m. email in that string bearing the title Complaints in Salt River and Passamaquoddy, correct?

A Right.

MS. MAROLDY: That's all I have, Your Honor.

THE WITNESS: Thank you.

(Witness excused.)

MR. AUSTIN: Your Honor, would it be possible to take a couple of moments for counsel to discuss what the schedule for the briefing is going to be?

THE COURT: I was going to ask you to do that. You're reading my mind here. Please.

MR. AUSTIN: If I could, and we have not had a chance to discuss this with Ms. Maroldy, so it will give counsel for the government an opportunity as well.

THE COURT: I'm planning on having I think at this point, unless counsel gives me a really good reason not to do it this way, but having simultaneous briefs, so what I thought would be that you could discuss a date that would be agreeable to both of you, and I'll be amenable to that.

MS. MAROLDY: In other words, Your Honor,

you would like counsel to coordinate offline as it were and get back to the Court? Is that what you have in mind?

THE COURT: Well, if you're prepared to discuss now and to tell me when would be a good date for briefing, that's fine, or if you would prefer to subsequently to get back to me and tell me when, that's fine as well. I'm amenable to accommodating counsel on this issue.

MS. MAROLDY: Well, we could certainly take a shot at it now between Mr. Austin and me and colleagues in coming up with a date.

MR. AUSTIN: Would you prefer to discuss this before we provide the Court those dates?

THE COURT: I think that might make sense.

MR. AUSTIN: That's fine, Your Honor. We're happy to talk with the government and then present the dates that are amenable.

THE COURT: Okay. So you don't want to do it now?

MR. AUSTIN: We can take a few moments, if the Court would like?

THE COURT: Okay.

MS. MAROLDY: That will be fine.

(Discussion held off the record.)

MR. AUSTIN: Your Honor?

THE COURT: Yes.

MR. AUSTIN: We've had a chance to confer if the Court is prepared to listen to what we propose?

THE COURT: Certainly.

MR. AUSTIN: I've had a chance to confer with Ms. Maroldy, and what we propose in regard to the Court's request that the parties make their initial submissions at the same date is that the parties opening briefs be due on Thursday, March 20. The reason for that date is that in the meantime, counsel will be briefing and completing the briefing schedule in the Salt River case.

The plaintiff's final brief in that CFC matter is due on March 6. We therefore propose making our opening submissions to Your Honor on March 20 with a right of reply then two weeks thereafter, which would be April 3.

THE COURT: Well, March 20 is fine. I had originally contemplated just one brief. I'll tell you what. Let's leave it open. We'll schedule the briefing to be due March 20, and I'll leave it up to my discretion. If I feel that I need reply briefs from you, then I will request them.

MR. AUSTIN: Thank you, Your Honor.

THE COURT: Thank you.

THE COURT: Thank you, Your Honor.

THE COURT: Absent anything else, we are adjourned, and I thank counsel for being so timely with the completion of this. Thank you.

(Whereupon, at 12:01 p.m., the hearing in the above-entitled matter was concluded.)

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

79

REPORTER'S CERTIFICATE

DOCKET NO.: 08- 942C
CASE TITLE: Passamaquoddy Tribe v. United States
HEARING DATE: 2/1/08.
LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the U.S. Court of Federal Claims.

Date: 2/1/08

Barbara Berney

Official Reporter
Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4018